1  ROBBINS GELLER RUDMAN
2     & DOWD LLP
   SHAWN A. WILLIAMS (213113)
3  DANIEL J. PFEFFERBAUM (248631)
4  Post Montgomery Center
   One Montgomery Street, Suite 1800
5  San Francisco, CA  94104
   Telephone:  415/288-4545
6  415/288-4534 (fax)
7  shawnw@rgrdlaw.com
   dpfefferbaum@rgrdlaw.com
8
9  Attorneys for Plaintiff

10                UNITED STATES DISTRICT COURT

11                CENTRAL DISTRICT OF CALIFORNIA

12                     SOUTHERN DIVISION

13  BUCKS COUNTY EMPLOYEES          )   Case No. 8:19-cv-02326
    RETIREMENT FUND, Individually   )
14  and on Behalf of All Others Similarly )   CLASS ACTION
    Situated,                       )
15                                  )   COMPLAINT FOR VIOLATION OF
                    Plaintiff,      )   THE FEDERAL SECURITIES LAWS
16                                  )
        vs.                         )
17                                  )
    MERIT MEDICAL SYSTEMS, INC.,    )
18  FRED P. LAMPROPOULOS and        )
    RAUL PARRA,                     )
19                                  )
                    Defendants.     )   DEMAND FOR JURY TRIAL
20  _____)

21

22

23

24

25

26

27

28

Plaintiff Bucks County Employees Retirement Fund ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by Merit Medical Systems, Inc. ("Merit" or the "Company"), as well as media and analyst reports about the Company and Company press releases and conference call transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

### SUMMARY OF THE ACTION

1. This is a securities class action on behalf of all persons who purchased the common stock of Merit between February 26, 2019 and October 30, 2019, inclusive (the "Class Period"), against Merit and certain of its officers and/or directors for violations of the Securities Exchange Act of 1934 ("1934 Act"), including the Company's Chairman and Chief Executive Officer ("CEO"), Fred P. Lampropoulos, and its Chief Financial Officer ("CFO"), Raul Parra.

### INTRODUCTION AND BACKGROUND

2. As reported in the Company's filings with the SEC, Merit purports to be a leading manufacturer and marketer of proprietary disposable medical devices used in interventional, diagnostic, and therapeutic procedures, particularly in cardiology, radiology, oncology, critical care, and endoscopy. Merit states that its products are used in the following clinical areas: diagnostic and interventional cardiology; interventional radiology; neurointerventional radiology; vascular, general, and thoracic surgery; electrophysiology; cardiac rhythm management; interventional pulmonology; interventional nephrology; orthopedic spine surgery; interventional

oncology; pain management; outpatient access centers; intensive care; computed tomography; ultrasound; and interventional gastroenterology.

3. Merit conducts business through two financial reporting segments: cardiovascular (which includes peripheral intervention, cardiac intervention, interventional oncology and spine, cardiovascular and critical care, and breast cancer localization and guidance product groups) and endoscopy.

4. During 2018, Merit acquired three companies. On February 21, 2018, Merit completed the acquisition of Becton, Dickinson and Company for up to $100 million. On November 13, 2018, Merit completed the acquisition of Aliso Viejo, California, based Cianna Medical, Inc., which makes products for the treatment of breast cancer, for up to $200 million, making it the Company's largest-ever acquisition. Following the acquisition, Cianna became a wholly owned subsidiary and Merit retained virtually all of its commercial sales and R&D teams. On December 14, 2018, the Company completed its acquisition of Vascular Insights, LLC, and acquired its ClariVein product, for up to $60 million.

5. Merit's products are offered for sale in six product groups:

- **Peripheral Intervention**:  Products that support minimally invasive diagnosis and treatment of diseases in peripheral vessels and organs throughout the body.

- **Cardiac Intervention Products**:  Products designed to treat various heart conditions.

- **Cardiovascular and Critical Care**:  Products that treat patients with life-threatening diseases and that protect healthcare providers from exposure to blood borne pathogens.

- **Interventional Oncology and Spine**:  Products that treat vertebral compression fractures, metastatic spinal tumors, liver cancer, uterine fibroids, benign prostatic hyperplasia, arteriovenous malformations, and hemostatic embolization for certain markets outside of the United States.

- **Breast Cancer**:  Products that treat early stage breast cancer with the SAVI Brachytherapy Breast Radiation and SAVI SCOUT Radar Localization System designed to produce audible and visual indicators for surgeons.

- **Endoscopy**:  Products for gastrointestinal and pulmonary conditions that create high-resolution cross-sectional images and mark tissue for targeted biopsies in the esophagus.

- **Specialty Procedure Products**:  Coating services for medical tubes and wires under original equipment manufacturer brands.

6.      At the outset of the Class Period, on February 26, 2019, the Company reported fourth quarter 2018 ("4Q18") and fiscal year 2018 ("FY18") results and established financial guidance for 2019, including core revenue growth of 8%-10%. The Company also forecast fiscal year 2019 ("FY19") net sales of $1,011 million to $1,030 million and adjusted earnings per share ("EPS") of $1.97 to $2.08.  Based on the purported strength of the Company's recent acquisitions – in particular the Cianna acquisition – defendants claimed to have good visibility into the Company's sales pipeline and performance and also forecast 8%-10% revenue growth for fiscal year 2020 ("FY20").  Defendants assured investors that they were successfully integrating the various acquired companies (including Cianna and Vascular Insights), the product pipeline was full, and expenses (in particular R&D) were being kept under tight control.

7.      On April 23, 2019, Merit announced its first quarter 2019 ("1Q19") results, including adjusted EPS of $0.11, and met its 8%-10% core revenue growth estimates.  Defendants told investors that the "first quarter met and exceeded our expectations" and it provided "a good foundation for growth for the balance of the year."  More importantly, defendant Lampropoulos also told investors that "'[t]he Cianna transition is complete and sales continue to grow according to our expectations'" and the Cianna acquisition was "slightly above where we had

expected." According to defendant Lampropoulos, the Company was poised to take advantage of recent product approvals and had strong momentum moving into the second half of the year. The Company also reaffirmed its FY19 and FY20 financial guidance initially announced on February 26, 2019.

8. Defendants' representations concerning the integration of the acquired companies, its product pipeline, and its prospects and financial guidance, were each materially false and misleading when made because defendants failed to disclose the following true facts, which were known to defendants or recklessly disregarded by them:

(a) the integrations of Cianna and Vascular Insights, including their products, sales people, and R&D facilities, had caused operational disruptions and reduced sales and were months behind schedule;

(b) sales of acquired company products had slowed substantially due to pre-acquisition pipeline fill, in particular for Vascular Insights products which, as late as July 2019, had zero orders during FY19; and

(c) in light of the foregoing, the Company's reported financial guidance for FY19 and FY20 was made without a reasonable basis.

9. As a result of defendants' material misrepresentations and omissions, Merit stock traded at artificially inflated prices of more than $62 per share.

10. On July 25, 2019, Merit announced its second quarter 2019 ("2Q19") financial results, including adjusted EPS of $0.42, which missed analyst consensus estimates of $0.50, and cut its FY19 sales outlook to $1,007-$1,029 million, from $1,011-$1,030 million, and adjusted EPS to $1.74-$1.97 from $1.97-$2.08. Defendants attributed the reductions to a variety of factors, including "'slower than anticipated conversion and uptake of acquired products,'" and they conceded that they had not made a single sale of the critical ClariVein product (acquired from Vascular Insights) since the close of the deal in December 2018 because of pre-acquisition pipeline fill, i.e., "We haven't had an order all year." Despite ClariVein's poor

1  performance, defendants assured investors that the negative drivers of the 2Q19
2  results were "short term," that "those storms are over," and that the Company was
3  well positioned to meet its revised FY19 and FY20 financial guidance.

4       11.     Following the 2Q19 financial results, the Company's stock price declined
5  more than 25% from a close of $54.84 per share on July 25, 2019, to a close of $41.00
6  per share on July 26, 2019, on trading volume of more than 6.2 million shares.
7  However, the stock continued to trade at artificially inflated prices because defendants
8  failed to disclose the following true facts, which were known to defendants or
9  recklessly disregarded by them:

10       (a)    the issues disclosed on the 2Q19 conference call were not short
11  term or resolved, but ongoing and systemic;

12       (b)    the purported product order pipeline and sales momentum
13  discussed in the conference call was insufficient to overcome the structural issues
14  plaguing the Company and did not support FY19 or FY20 guidance; and

15       (c)    in light of the foregoing, the Company's FY19 and FY20 guidance
16  was knowingly false and/or lacked a reasonable basis.

17       12.    Then, on October 30, 2019, the Company issued a press release
18  announcing the its third quarter 2019 ("3Q19") financial results, reporting adjusted
19  EPS of $0.28, well below consensus estimates of $0.45, and slashing FY19 revenue
20  and EPS guidance by 20%. Furthermore, defendants surprised investors by stating
21  that in addition to the FY19 guidance cut, "'*2020 guidance [was] off the table*'" until
22  they had reasonable confidence in their forecasting ability. The Company reported
23  significant operational issues in all aspects of its business, for example:

24       •    After previously claiming that their integration of Cianna and Vascular
25       Insights was on or ahead of schedule, defendants admitted the truth –
26       that they were "*9 or 10 months behind where we thought it would be*."

27       •    Sales for these two acquisitions fell millions of dollars short – *Cianna by*
28       *$4 million and ClariVein by $3 million, respectively*.

- The integration of acquired R&D facilities was too expensive and necessitated a 2%-5% reduction in headcount and the Company had shuttered its San Jose, California, facility.

- The Company had to make *a material revenue recognition adjustment of approximately $4.6 million* on product shipped during 3Q19.

13. Finally, defendants conceded that many of these failures were due to their "own overestimation and forecasting." Defendant Parra admitted that many of these issues could have been addressed months earlier.

14. As a result of these ongoing structural issues, defendants reduced the Company's FY19 guidance, once again, to net sales of $986-$995 million from $1,007-$1,029 million, and to non-GAAP EPS of $1.40-$1.46 from $1.74-$1.97.

15. Following these alarming disclosures and the significant reduction in the Company's outlook for free cash flow, Merit's stock price declined more than 29%, from a close of $29.11 per share on October 30, 2019, to a close of $20.66 per share on October 31, 2019, on a massive volume of more than 7.2 million shares traded.

## JURISDICTION AND VENUE

16. Jurisdiction is conferred by 28 U.S.C. §1331 and §27 of the 1934 Act. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

17. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because Merit conducts significant operations in this District, including maintaining a principal research and development facility in Aliso Viejo, California, which it acquired from Cianna in November 2018.

18. In connection with the acts and conduct alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate wire and telephone communications.

**PARTIES**

19. Plaintiff Bucks County Employees Retirement Fund purchased Merit common stock as described in the attached certification and was damaged thereby.

20. Defendant Merit Medical Systems, Inc., a Utah corporation, trades on the NASDAQ Global Select Market ("NASDAQ") under the symbol "MMSI."

21. Defendant Fred P. Lampropoulos ("Lampropoulos") is, and was at all relevant times during the Class Period, Chairman and CEO of the Company.

22. Defendant Raul Parra ("Parra") is, and was at all relevant times during the Class Period, CFO of the Company.

23. Defendants Lampropoulos and Parra are collectively referred to herein as the "Individual Defendants."

**CONTROL PERSONS**

24. As officers and controlling persons of a publicly held company whose common stock is traded on the NASDAQ and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

25. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports, and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their membership on Merit's Board of Directors and/or executive and managerial positions with Merit, each of the

1    Individual Defendants had access to the adverse undisclosed information about the

2    Company's financial condition and performance as particularized herein and knew (or

3    recklessly disregarded) that these adverse facts rendered the positive representations

4    made by or about Merit and its business or adopted by the Company materially false

5    and misleading.

6        26.    The Individual Defendants, because of their positions of control and

7    authority as officers and/or directors of the Company, were able to and did control the

8    content of the various SEC filings, press releases, and other public statements

9    pertaining to the Company during the Class Period.  Each Individual Defendant was

10   provided with copies of the documents alleged herein to be misleading prior to or

11   shortly after their issuance and/or had the ability and/or opportunity to prevent their

12   issuance or cause them to be corrected.   Accordingly, each of the Individual

13   Defendants is responsible for the accuracy of the public reports and releases detailed

14   herein and is therefore primarily liable for the representations contained therein.

15       27.    The Company and the Individual Defendants are liable as participants in

16   a fraudulent scheme and course of business that operated as a fraud or deceit on

17   purchasers of Merit common stock by disseminating materially false and misleading

18   statements and/or concealing material adverse facts.  The scheme: (i) deceived the

19   investing public regarding Merit's business, operations, management, and the intrinsic

20   value of Merit common stock; and (ii) caused plaintiff and other members of the Class

21   (defined herein) to purchase Merit common stock at artificially inflated prices.

22                              **SUBSTANTIVE ALLEGATIONS**

23       28.    On February 26, 2019, the Company issued a press release announcing its

24   financial results for 4Q18 and FY18 and its FY19 guidance.   The press release

25   emphasized that the integration of its newly acquired businesses was driving growth

26   and corporate confidence in the Company's FY19 and FY20 financial outlook:

27

28

**Merit Medical Reports Earnings For Fourth Quarter And Year Ended December 31, 2018, Gives 2019 And 2020 Guidance**

- Q4 2018 worldwide revenue of $233.2 million, up 22.2% as reported over Q4 2017

- Q4 2018 core revenue on a comparable, constant currency basis* up 13.1% over Q4 2017

- Q4 2018 GAAP EPS was $0.16, compared to $0.13 in Q4 2017

- Q4 2018 non-GAAP EPS* was $0.48, compared to $0.33 in Q4 2017

\*   \*   \*

"2018 was an important and very positive year for the company and included the closing of the Becton Dickinson deal, the acquisitions of Cianna Medical and Vascular Insights, and the execution of our global growth and profitability plan," said Fred P. Lampropoulos, Merit's Chairman and Chief Executive Officer. "*Integration of these new businesses and sales of our core products continue to drive growth to the point where we are confident forecasting an expansion of our 2019 core revenue growth to a range of 8 - 10%*."

\*   \*   \*

"*As we look forward, we are also comfortable adding a forecast for 2020, which we currently believe will be in the range of 8-10% core revenue growth, an addition of 100 - 150 basis points to gross margin, and net income improvement of approximately 14 - 19%*."

\*   \*   \*

"Additionally, *our new product pipeline is full*," Lampropoulos continued. "We expect to introduce 10 - 15 new products this year that will continue to support our overall business strategy. *Our business measurements of top-line improvement, discipline of the SG&A and*

*R&D expenses, and bottom-line improvement continue to support our business thesis*. . . ."

2019 GUIDANCE

\*   \*   \*

| Financial Measure | Range |
| --- | --- |
| Net Sales | $1,011 million - $1,030 million |
| | |
| GAAP | |
| Earnings per share | $1.02 - $1.13 |
| Gross Margin | 45.6% - 46.5% |
| | |
| Non-GAAP | |
| Earnings per share | $1.97 - $2.08 |
| Gross Margin | 50.6% - 51.3% |

29.     Following the February 26, 2019 report of the Company's 4Q18 and FY18 financial results, the Company held a conference call for analysts and investors hosted by defendants Lampropoulos and Parra.  During the call, defendants reiterated the Company's FY19 guidance and, based on their purportedly strong visibility, provided FY20 guidance of 8%-10% revenue growth and 14%-19% EPS growth. Defendants also stated that the Company's recent acquisitions – in particular Cianna – would drive business going forward:

[Lampropoulos:]   Let me go first to some recent acquisitions. We'll talk about Cianna and Vascular Insights.  *Of course, Cianna is the largest acquisition Merit has ever made and I would have to say that to this point, we are very pleased with the transition.  As you may recall, we kept the sales force in place for all intents and purposes, and we think that was not only the appropriate thing to do, but we think that it's part of what we expect will drive our business*.

\*   \*   \*

[Parra:]  We'll get into the 2019 guidance now.

So reported revenue will be in the range of $1.01 billion to $1.03 billion, a 15% to 17% increase over reported revenue of 2018, of which

- 10 -

1   $62 million to $62 million is non-core revenue related to Cianna,
2   Vascular Insights, BD, NinePoint, and a couple of other acquisitions.

3                                   *        *        *

4           [Lampropoulos:]  *So we're a couple of months into 2019 and I*
5   *think we have pretty good visibility, when you take into account all the*
6   *various issues that are out there.  And we've decided that we'd add this*
7   *additional year of 2020*.
8           . . . *[W]e're comfortable on our 2020 announcing that we believe*
9   *that our revenue line on the top line will grow 8% to 10%.  We will still*
10  *see 100 to 150 basis points of gross margin improvement*. . . .

11          *And then our bottom line will look at, I think . . . 14% to 19% on*
12  *the bottom line*.

13          30.    Following their prepared remarks, defendants Lampropoulos and Parra
14  answered questions from analysts and provided further positive commentary
15  concerning the integration of Merit's recently acquired businesses, including Cianna
16  and Vascular Insights:

17          [Analyst:]  Just for starters on Cianna, would love to hear a little
18          bit more about the integration there, sales force retention, and do we
19          think about that business adding after you get through this year
20          something on the order of magnitude of 100 basis points to 150 basis
21          points of organic growth going forward?
22  [Lampropoulos:]  *On the Cianna business, the integration I think is*
23  *going as well as could be expected* . . . .

24                                  *        *        *

25          *So I think everything is working quite nicely* . . . in terms of the
26  sales force, which ultimately in my view is the most important factor,
27  we've essentially had no turnover in that particular area.

28                                  *        *        *

Here we are 2 months into the year and as we go down another month or so, we're already being asked by analysts, what about 2020, what about this, and what about that. ***And we've thought to ourselves, look, we're confident. We've had 2 or 3 months now of Cianna. Our confidence is built there***. I would say the same thing about Vascular Insights.

31. On February 27, 2019, Wells Fargo issued an analyst report, titled "MMSI: Q4 Beat; 2019 Guidance and 2020 Outlook Encouraging," which stated in part:

**Cianna Medical 2019 Targets Unchanged; Integration Going Well**. On the Q4 call, MMSI reaffirmed its 2019 financial targets for the acquired, Cianna Medical business. These include: (1) incremental 2019 revenues of $50-56MM; (2) 55-130bps accretion to 2019 adj. gross margin; and (3) $0.08-$0.13 accretion to 2019 non-GAAP EPS. ***Management noted the integration process has gone very well to date*** (deal closed 11/13/18) . . . .

**2019 Guidance Ahead of our Expectations**. MMSI introduced its 2019 outlook, which included top-line guidance of $1,011-1,030MM (+14.7-16.7% reported; +8.0-10.0% organic ex-FX). . . .

**2020 Outlook Encouraging**. . . . MMSI provided financial targets for 2020 . . . ***ahead of consensus of $2.32 and our previous estimate of $2.28***.

32. On February 27, 2019, Barrington Research issued an analyst report, titled "Strong Q4 Results; FY/19 EPS Guidance Better Than Expected; Good Momentum into FY/20; Increasing Price Target to $69," which stated in part:

The company provided financial guidance for both FY/19 and FY/20 last night that communicates material confidence in the business. Guidance for FY/19 includes an expectation of 8-10% core growth ***that will be materially augmented by the Q4/18 M&A activity that brought Merit***

- 12 -

1      *the Cianna Medical and Vascular Insights assets*.  These businesses are

2      expected to generate over $60 million in (aggregate) revenue in FY/19.

3      33.      On April 23, 2019, the Company issued a press release announcing its

4    financial results for 1Q19.  Defendants stated that the Cianna acquisition was

5    completed and sales were growing consistent with expectations.  The press release

6    stated in relevant part:

7      **Merit Medical Reports Earnings For Quarter Ended March 31, 2019**

8      •      Q1 2019 worldwide revenue of $238.3 million, up 17.4% as

9              reported over Q1 2018

10     •      Q1 2019 core revenue on a comparable, constant currency basis*

11             up 10.0% over Q1 2018

12     •      Q1 2019 GAAP EPS was $0.11, compared to $0.10 in Q1 2018

13     •      Q1 2019 non-GAAP EPS* was $0.37, compared to $0.31 in Q1

14             2018

15                            *      *      *

16     "Our first quarter results fulfilled our goal of 8-10% core growth

17     by landing on the top side of our projection," said Fred P.

18     Lampropoulos . . . .

19                            *      *      *

20     "Our transition of the Becton, Dickinson deal continues on

21     schedule . . . ."

22     "***The Cianna transition is complete and sales continue to grow***

23     ***according to our expectations***," Lampropoulos continued.

24     34.      On April 23, 2019, following the Company's report of its 1Q19 results,

25   the Company held a conference call for analysts and investors.  The call was hosted by

26   defendants Lampropoulos and Parra.  During the call, defendants stated that Cianna

27   was in fact performing ahead of expectations:

28

                                  - 13 -

1         [Lampropoulos:] ***I think as you look at the business, you will see***

2    ***that we are on the topside***.  And the first thing I'd like to discuss is our

3    core growth.  I think it's a significant issue and opportunity.  You will

4    recall that as we looked forward to '19 and to 2020, we had moved up

5    our core growth, and I am pleased that we were on the top side of that,

6    particularly in the first quarter. . . .

7        . . . [T]he core growth, the fact that ***the business is strong and the***

8    ***pipeline is full***, and I would say, our business continues to be very

9    robust.

10                   *     *     *

11    ***And then finally, in Cianna, I want to talk about that.  Listen, we***

12    ***are performing slightly ahead of our expectations***.  And again, in the

13    first quarter, when you can do that I think it bodes well for the balance of

14    the year.  So we're excited about Cianna.  We continue to believe it's a

15    great opportunity.  ***And the fact that we are in fact through the***

16    ***transition period***. . . .

17    ***So all in all, I would say that the first quarter met and exceeded***

18    ***our expectations and we expect that it's a good foundation for growth***

19    ***for the balance of the year***.

20    35.    Following their prepared remarks, defendants Lampropoulos and Parra

21  answered questions from analysts and reaffirmed the Company's FY19 and FY20

22  financial guidance:

23    [Analyst:] ***You didn't make any comments regarding your guidance***

24    ***you gave for '19 and '20, so I assume based on the results today that***

25    ***everything you were thinking 3 months ago is pretty much intact***.

26    [Lampropoulos:]   ***Yes . . . I don't see that anything has***

27    ***changed***. . . .  There are always headwinds but I think there are more

28    tailwinds.  ***We're feeling the breeze to our back***.

*     *     *

[Analyst:]  First on Cianna.  Coming in stronger than expected.  Could you provide some color around kind of the rollout so far?

*     *     *

[Lampropoulos:]  I think with Cianna there's a couple of things I think that are important.  We . . . maintained their sales force.  And we think that was a critical thing to do.  We also didn't try to go out and one fell swoop and then throw it all into our Merit sales force.  We thought we'd get out there, have enough time to absorb it, to understand it, build the confidence of the former Cianna now Merit sales force.  And yet with all of that and through the transition and through all of those things that go on in those in these situations, *we were able to come slightly above where we had expected.  So I think there is a lot of momentum there.  There were no large single customers or anything like that.  It was just good old guts hardball selling and executing.  So I think that's probably the best*.

     *But I guess the bottom line is, it's as probably a good of a transaction and transition that we have done.  I think it may be the best one*. . . .  And just the way that our team has worked.  We kept all the R&D people, we kept the sales people, we've done, I think – they fit into the family actually quite easily. . . .  *I don't know how you could do it any better, to be honest with you*.

36.    On April 24, 2019, Barrington Research issued an analyst report, titled "Solid Q1 Result; 10% Core Sales Growth; FY/19 Financial Guidance Affirmed; Price Target Remains $69," which mirrored defendants' statements that the Cianna integration was ahead of schedule:

     *Merit disclosed that its recent Cianna acquisition is tracking a bit ahead of expectations in terms of both financial performance and*

1    *integration*.  As a reminder, Merit expects to generate around $50

2    million or so of revenue from this business in FY/19.

3    **Management said that the transition of the Cianna asset may be the**

4    **"best" that Merit has ever done.  This is an encouraging assessment**

5    **given the fact that Merit has done dozens of transactions over its 30-**

6    **plus year history**.

7    37.    Each of the above representations by defendants concerning the

8    Company's current business and financial condition, including its forecasted financial

9    results, were materially false and misleading when made because defendants failed to

10   disclose the following true facts, which were known to defendants or recklessly

11   disregarded by them:

12   (a)    the integrations of Cianna and Vascular Insights, including their

13   products, sales people, and R&D facilities, were causing operational disruptions and

14   reduced sales and were months behind schedule;

15   (b)    sales of acquired company products had slowed substantially due

16   to pre-acquisition pipeline fill, in particular for Vascular Insights products which, as

17   late as July 2019, had zero orders during FY19; and

18   (c)    in light of the foregoing, the Company's reported financial

19   guidance for FY19 and FY20 was made without a reasonable basis.

20   **THE TRUE FACTS BEGIN TO BE REVEALED**

21   38.    On July 25, 2019, the Company issue a press release announcing its

22   financial results for 2Q19, reporting non-GAAP EPS of $0.42 per share, which missed

23   consensus estimates of $0.50 per share, and reduced its FY19 EPS guidance by up to

24   $0.60 per share, but maintained FY20 guidance at 8%-10% revenue growth and 14%-

25   19% EPS growth.  In the press release, the Company stated that sales of its acquired

26   products from Cianna and Vascular Insights had been slower than anticipated but

27   attributed this to pipeline filling and stated that these problems were short-lived and

28   behind the Company:

**Merit Medical Reports Earnings For Second Quarter of 2019**

- Q2 2019 worldwide revenue of $255.5 million, up 13.7% as reported over Q2 2018

- Q2 2019 core revenue on a comparable, constant currency basis* up 9.6% over Q2 2018

- Q2 2019 GAAP EPS was $0.12, compared to $0.21 in Q2 2018

- Q2 2019 non-GAAP EPS* was $0.42, compared to $0.43 in Q2 2018

\*   \*   \*

"There were a number of factors affecting revenues and gross margins during the second quarter," said Fred P. Lampropoulos, Merit's Chairman and Chief Executive Officer.  "The shortfall in revenue involved foreign exchange, ***slower than anticipated conversion and uptake of acquired products such as the Vascular Insights (ClariVein®) product line and some products from the BD acquisition*** . . . .

"There are several other factors that lead us to believe there are opportunities for continued growth," Lampropoulos continued.  "***As previously announced, Merit has secured a number of GPO contracts which will layer in over the balance of the year as will the growth of our embolic products which grew at 10% for the quarter with an acceleration in June***.  We believe this is due to a recently proposed divestiture from a strategic competitor.  We believe this will continue to be an opportunity in what has otherwise been a flat business for the last few years.  We believe it will also be enhanced by the continued growth of our recently introduced EmboCube™ and the Torpedo™ embolic products that were recently cleared by the FDA."

"As we proceed through July, we are seeing increased orders for our ClariVein products," Lampropoulos said. "***Some of the orders are first-time orders which we attribute to pipeline filling prior to closing the transaction***."

\*       \*       \*

"Finally, to insure progress and attention to financial matters, we have increased our focus on efficiency of COGs, our habits and priorities of all our operating expenses," Lampropoulos said. "We believe we will maneuver the ship rather quickly to continued growth and profitability improvement. ***Because of this confidence, as well as the tailwinds of GPOs, the introduction of new products and our momentum, we are not changing our 2020 forecast***."

***REVISED 2019 GUIDANCE***

\*       \*       \*

| Financial Measure | Prior Guidance | Revised Guidance |
|---|---|---|
| Net Sales | $1,011 - $1,030 million | $1,007 - $1,029 million |
| **GAAP** | | |
| Earnings per share | **$1.02 - $1.13** | **$0.62 - $0.84** |
| Gross Margin | 45.6% - 46.5% | 44.1% - 44.8% |
| **Non-GAAP** | | |
| Earnings per share | $1.97 - $2.08 | $1.74 - $1.97 |
| Gross Margin | 50.6% - 51.3% | 49.2% - 49.9% |

39.     On July 25, 2019, following the report of the Company's 2Q19 financial results, the Company held a conference call for analysts and investors to discuss the results. The call was hosted by defendants Lampropoulos and Parra. Defendants admitted that the miss and guidance reduction were in part due to the fact that ClariVein had ***zero orders for the first half of the year*** due to pipeline filling prior to the acquisition, but assured investors that the issues plaguing the Company during 2Q19 were temporary and behind them and reiterated their confidence in their FY19 and FY20 guidance:

[Parra:] *The unexpected sales shortfall for ClariVein was the result of excess inventory of some of the distributors prior to our acquisition*. We believe we have made it past that, and sales are ramping to our expectations.

\*       \*       \*

*Our guidance will be updated to reflect a couple of things that we are experiencing during the first half of the year*. We're adjusting for the FX headwinds that we continue to see in the euro, CNY and emerging markets, the change in our product mix and for our most recent acquisition, Brightwater. We are adjusting our previous reported revenue guidance of $1.01 billion to $1.03 billion for the potential incremental impact of FX headwinds of $3 million to $4 million, assuming the prevailing FX rates persist in the second half of the year.

\*       \*       \*

[Lampropoulos:] In some of the ClariVein, which is we're short a little bit more than $2 million, there were some products that we have just started to deliver in the last 30 days. *We haven't had an order all year because of pipeline filling from the former customer or fear by the distributor that somehow they wouldn't be able to keep it*. And so consequently, and those things are surprises to us, we didn't expect that and those are high-margin products. *But they are now ordering. And we think that, that storm or that delay is over*.

*So if you look at all the events that took place, I think we have explained them. They are short term or those storms are over*.

\*       \*       \*

*We're confident as we move through the second half, and we feel confident enough that we don't want to go change numbers that we'd*

- 19 -

1  *have to change again because we're so positive on the pipeline, the*
2  *contracts, the new products, the new approvals and so on and so forth*.

3  *   *   *

4  *So today, may seem like a dark day, it's not.  There was just a*
5  *thunderstorm that came through town, and the thunderstorm has left*.

6  40.  Following their prepared remarks, defendants Lampropoulos and Parra
7  answered questions from analysts:

8  [Analyst:]  Just to be clear on the 2020 outlook, Fred, I think you
9  said in the past 8% to 10% top line, 100 to 150 basis points of margin
10  expansion and then 14% to 19% EPS growth next year.  That 14% to
11  19% is now off the lower base that you just guided us all to.  You're not
12  saying stick with where the Street came out, which was like 2 35 for next
13  year.  Is that correct?

14  [Parra:]  That's correct.

15  [Lampropoulos:]  That's correct.

16  41.  On July 26, 2019, Wells Fargo issued an analyst report, titled "MMSI:
17  Downgrading To Market Perform; Due to the lack of visibility in the business,"
18  stating that Merit had "materially lowered" it FY19 guidance.  According to the
19  report:

20  We are downgrading to Market Perform for the following reasons: *(1)*
21  *what we perceive to be MMSI's lack of visibility into the business; (2)*
22  *our inability to grasp the magnitude of the EPS guidance*
23  *reduction* . . . .  The difference between the midpoint of the previous
24  EPS guidance (~$2.02) and low-end of the new guidance ($1.74) is a
25  ~$0.28 reduction or about a 14% decrease.  In our view, *it is rare to see*
26  *an EPS reduction of this magnitude without a substantial change to*
27  *the top-line guidance*.

28

- 20 -

42.     On July 26, 2019, Morningstar issued an analyst report, titled "Merit's 2Q Miss Poised to Reset Investor Expectations; Reiterate Our Overvalued Call," which noted that while the FY20 growth forecast was maintained, it was based on a smaller base and thus was actually a reduction:

> Management maintained its 8%-10% organic revenue growth guidance and 14%-19% adjusted EPS growth outlook for 2020. ***However, while growth rates are expected to be similar, they are now calculated off a much lower base, meaning investors' multiyear EPS forecasts are going substantially lower***.
>
> It's not particularly straightforward to determine what exactly changed in the quarter to so dramatically recalibrate the financial outlook for the business.

43.     Following these disclosures and the reduction in the Company's FY19 financial guidance, the Company's stock price declined more than 25%, from a close of $54.84 per share on July 25, 2019, to a close of $41.00 per share on July 26, 2019, on volume of more than 6.2 million shares traded.

44.     While defendants partially disclosed the Company's operational and performance disruptions to date, the stock price continued to be inflated due to defendants' continuing misrepresentations regarding the Company's current business and financial condition and its ability to meet its reduced outlook for FY19 and FY20 and defendants' failure to disclose the true facts, which were known to defendants or recklessly disregarded by them, as set forth in ¶37, above, as well as the following:

(a)     the issues disclosed on the 2Q19 call were not short term or resolved, but ongoing and systemic; and

(b)     the purported product order pipeline and sales momentum was insufficient to overcome the structural issues plaguing the Company and did not support its FY19 or FY20 guidance.

45.     On September 4, 2019, Merit presented at Wells Fargo's healthcare conference.  The following day, Wells Fargo issued an analyst report, titled "MMSI: Key Takeaways From Wells Fargo Healthcare Conference," stating that defendants had reiterated their FY19 and FY20 financial guidance:

> ***MMSI remains confident in the top line outlook for 2019*. . . .**
> MMSI reaffirmed its full year 2019 guidance of +8-10% organic ex-FX growth. . . .   Management said it is confident in the implied back half acceleration on a stacked two year basis, which it expects to be driven by a mix of new products continuing to ramp as well as large contracts signed recently (benefitting Q4). . . . ***Management was confident in the ~6% organic growth number the Street is at for Q3 (we are at 7.2%)*.**

46.     On October 30, 2019, after the market closed, the Company issued a press release announcing the Company's 3Q19 financial results, reporting non-GAAP EPS of $0.28, well below consensus estimates of $0.45, reducing FY19 guidance, and completely withdrawing FY20 guidance.  Defendants disclosed significant operational issues in all aspects of Merit's business.  Defendants admitted that they were months behind in their integration of Cianna and Vascular Insights, their integration of R&D facilities was too expensive and had necessitated a 2%-5% reduction in headcount, and that they had to take a material revenue recognition adjustment in the quarter. Defendants conceded that many of these issues were known or foreseeable in prior quarters, but not sufficiently accounted for:

**Merit Medical Reports Earnings For Third Quarter Of 2019**

- Q3 2019 worldwide revenue of $243.0 million, up 9.6% as reported over Q3 2018
- Q3 2019 core revenue on a comparable, constant currency basis* up 4.3% over Q3 2018
- Q3 2019 GAAP loss per share was $(0.06), compared to GAAP EPS of $0.30 in Q3 2018

- Q3 2019 non-GAAP EPS* was $0.28, compared to $0.47 in Q3 2018

*     *     *

Merit Medical Systems, Inc. . . . today announced revenue of $243.0 million for the quarter ended September 30, 2019, an increase of 9.6% over revenue of $221.7 million for the quarter ended September 30, 2018.  Core revenue on a comparable, constant currency basis* for the third quarter of 2019 increased 4.3% compared to the third quarter of 2018. ***Additional products, which generated revenue of approximately $4.6 million, were shipped during the third quarter of 2019, however, due to revenue recognition requirements, revenue attributable to those products will not be recognized until the fourth quarter of 2019***.

*     *     *

"***Consequently, we have adjusted our 2019 full year guidance to $986-$995 million in revenue, 43.2%-43.6% in GAAP gross margins, 48.4%-48.7% in non-GAAP gross margins and $0.27-$0.33 in GAAP earnings per share, and $1.40-$1.46 in non-GAAP earnings per share***," ***Lampropoulos continued***.  "***We are also pulling 2020 guidance off the table at this time so that we can provide more accurate forecasting***. . . ."

"During the third quarter of 2019 we initiated a number of initiatives to increase efficiency and lower costs," Lampropoulos said. "***We have already completed a headcount reduction of 2% of our total workforce***, with a substantial portion coming from our SG&A category."

"***We believe we have been through the trough and are now emerging as a leaner, more efficient growth company***," Lampropoulos said.

*     *     *

REVISED 2019 GUIDANCE

\*        \*        \*

| Financial Measure | Prior Guidance | Revised Guidance |
|---|---|---|
| Net Sales | $1,007 - $1,029 million | $986-$995 million |
| | | |
| GAAP | | |
| Earnings per share | **$0.62 - $0.84** | **$0.27 - $0.33** |
| Gross Margin | 44.1% - 44.8% | 43.2% - 43.6% |
| | | |
| Non-GAAP | | |
| Earnings per share | $1.74 - $1.97 | $1.40 - $1.46 |
| Gross Margin | 49.2% - 49.9% | 48.4% - 48.7% |

47.     On October 30, 2019, following the report of the Company's 3Q19 miss, FY19 guidance reduction, and FY20 guidance cancellation, the Company held a conference call for analysts and investors to discuss the results.  The call was hosted by defendants Lampropoulos and Parra.  Defendants admitted that Cianna and ClariVein had not rebounded, but had fallen further behind by millions of dollars and the Company had to take a material revenue recognition adjustment:

> [Parra:]   Additionally, the following products continue to be behind our forecast for the year: Aspira by $3 million; DFINE by $5 million.  Acquired products contributed revenue of $14 million with Cianna and ClariVein contributing $11.6 million and $2 million, respectively. ***Both Cianna and ClariVein fell behind by $4 million and $3 million, respectively***. . . .
>
> . . . ***In addition, during Q3 we also had an abnormally high revenue recognition adjustment amount as compared to prior quarters***. In relation to our most recent quarter, Q2, this amount was higher by approximately $4.6 million. . . .  Normally we don't comment on our revenue recognition because it's not a material adjustment from quarter to quarter, but in this case, ***the adjustment was significantly higher by a factor of approximately 3x*** than in other periods and felt it was necessary to call out.

1          *     *     *

2     [Lampropoulos:]   The essence of what I'm saying is we have hit the

3     bottom of that trough.   We have taken actions.   And let me tell you what

4     some of those are because I think they're significant.

5          First of all, we have reduced our global headcount by 2% in the

6     quarter.   That's about 150 employees. . . .

7          *     *     *

8          We've shut down our San Jose facility in California . . . .

9          *     *     *

10         ***First of all, we're going to take 2020 guidance off the table*** . . . .

11    48.    Defendants also admitted that their acquisition integrations were at least

12    three quarters behind schedule, that the miss and guidance reduction were attributable

13    to their own overestimation and forecasting, and that these issues should have been

14    caught in 2Q19 – *i.e.*, six months prior:

15    [Analyst:]   But one high level question, Fred.   I guess the question is

16    how did we get here?   It seemed like last year things were going so well.

17    And it seems like, frankly, a lot has gone wrong this year.   So I don't

18    know, Fred.   Operationally, anything you think you need to change?

19    How do you think you got to this place?

20         [Lampropoulos:]   Yes, I think there were a couple of things . . . .

21    ***If we go to the acquisitions, we thought we did the right thing in terms***

22    ***of keeping the Cianna sales force in effect.   We still believe that way.***

23    ***But just the integration of both the Becton Dickinson, the Cianna, the***

24    ***Vascular Insights, all of these things just caught up with us.   And we***

25    ***thought we were Superman and we found out that we're human***.   So I

26    think looking at where we are today, on Vascular Insights, we beat the

27    previous quarter.   So the third quarter, even in the summer which is the

28    slowest quarter for that year, beat the previous quarter by over $400,000

1  in revenue.  **So I think that will be on track, but it's 9 or 10 months**
2  **behind where we thought it would be**.  So there are those factors that
3  came into play that had to do with the, I think the instability of the
4  marketplace, and as it pertains to our products, **our own overestimation**
5  **and forecasting**.

*     *     *

6

7  [Analyst:]  I guess just for starters, when I look at Q3, we're a
8  little bit short in the top line.  But the Q4 number's about a $15 million
9  cut to what you had been expecting, so that's pretty meaningful.  And I
10 know Cianna's part of it, but I think it's just a sliver.  What else is
11 coming out of Q4?  Seemed like standalone in catheter is pretty weak
12 this quarter.

*     *     *

13

14 [Parra:]  Yes.  **To be honest with you . . . it's a little bit of**
15 **everything.  I think we've cut our outlook for acquisitions**.  So you've
16 got Cianna that's going to impact that.  You're going to have ClariVein
17 that's going to impact that. NinePoint's a little slow, too, so that's
18 impacting it. . . . Drainage is struggling.  So we've got those factors built
19 into the guidance.  And I think it's really just making sure that we
20 thought through all the inputs.  And also there's some FX, too, that we
21 were hoping that FX was going to get a little bit better.  It didn't. . . . **I**
22 **just think we tried to think through all those things that quite frankly**
23 **we should have caught in Q2**.

*     *     *

24

25 [Lampropoulos:]  Let's start with Vascular Insights. . . .  What was
26 painful was that that pipeline got filled up . . . that didn't play out the
27 way that our others have played out in terms of revenue. . . .  So let me
28 go to Cianna.  I think on Cianna, we're okay with the folks that we have

1   there.  But listen; you're right.  There is complexity in all of these things

2   . . . *but listen, it's a fair statement to say that we didn't execute as*

3   *well*. . . .  *Maybe we just got a little big for our boots and we did not*

4   *understand some things.  Clearly they didn't perform the way we*

5   *wanted to*.

6   49.   On October 30, 2019, Piper Jaffray issued an analyst report on Merit,

7   titled "Another Shoe Drops Here in Q3; Sticking with OW," which discussed the

8   "Disappointing Q3 Results," which were primarily attributable to the Company's

9   acquisitions, and reduced its price target to $30.00 from $40.00.  The analyst report

10  stated, in part:

11      •   **Disappointing Q3 Results**. . . .  The primary source of the

12          shortfall was in acquired products where both Cianna and

13          ClariVein came in light of expectations. . . .  Adjusted EPS of

14          $0.28 was $0.15 below our target.

15      •   **'19 Guidance Reduced and '20 Outlook Pulled Off the Table**.

16          Given the weakness in the acquired business and a bit of softness

17          in the core segments, management lowered its revenue outlook by

18          about $27M at the mid-point (down to $986-$995M).  *A big part*

19          *of the reduced outlook is weak performance from two of the*

20          *recent acquisitions (Cianna and ClariVein)*. . . .

21      •   *Key Points from the Call.  The weakness in the acquired*

22          *products is the biggest disappointment from our perspective*.

23  50.   Following these alarming disclosures and the significant reduction in the

24  Company's outlook for free cash flow, Merit's stock price declined more than 29%,

25  from a close of $29.11 per share on October 30, 2019 to a close of $20.66 per share on

26  October 31, 2019, on a massive trading volume of more than 7.2 million shares traded.

27  51.   The market for Merit common stock was open, well developed, and

28  efficient at all relevant times.  As a result of these materially false and misleading

1  statements and omissions as set forth above, Merit common stock traded at artificially
2  inflated prices during the Class Period.  Plaintiff and other members of the Class
3  purchased Merit common stock relying upon the integrity of the market price of Merit
4  common stock and market information relating to Merit, and have been damaged
5  thereby.

6      52.    During the Class Period, defendants materially misled the investing
7  public, thereby inflating the price of Merit common stock, by publicly issuing false
8  and misleading statements and omitting to disclose material facts necessary to make
9  defendants' statements, as set forth herein, not false and misleading.  Said statements
10  and omissions were materially false and misleading in that they failed to disclose
11  material adverse information and misrepresented the truth about the Company, its
12  business, and operations, as alleged herein.

13      53.    At all relevant times, the material misrepresentations and omissions
14  particularized in this complaint directly or proximately caused or were a substantial
15  contributing cause of the damages sustained by plaintiff and other members of the
16  Class.  As described herein, during the Class Period, defendants made or caused to be
17  made a series of materially false or misleading statements about Merit's business,
18  prospects, and operations.  These material misstatements and omissions had the cause
19  and effect of creating, in the market, an unrealistically positive assessment of Merit
20  and its business, prospects, and operations, thus causing the Company's common
21  stock to be overvalued and artificially inflated at all relevant times.  Defendants'
22  materially false and misleading statements during the Class Period resulted in plaintiff
23  and other members of the Class purchasing the Company's common stock at
24  artificially inflated prices, thus causing the damages complained of herein.  When the
25  true facts about the Company were revealed to the market, the inflation in the price of
26  Merit common stock was removed and the price of Merit common stock declined
27  dramatically, causing losses to plaintiff and the other members of the Class.

28

## ADDITIONAL SCIENTER ALLEGATIONS

54.     As alleged herein, defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, these defendants, by virtue of their receipt of information reflecting the true facts regarding Merit, their control over, and/or receipt and/or modification of Merit's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning Merit, participated in the fraudulent scheme alleged herein.

## LOSS CAUSATION/ECONOMIC LOSS

55.     During the Class Period, as detailed herein, defendants made false and misleading statements about Merit's business and prospects and engaged in a scheme to deceive the market.  This artificially inflated Merit's stock price and operated as a fraud or deceit on the Class.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Merit's stock price fell precipitously, as the prior artificial inflation came out of the stock price over time.  As a result of their purchases of Merit common stock during the Class period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

56.     Merit's "Safe Harbor" warnings accompanying its reportedly forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.  To the extent that projected revenues and earnings were included in the Company's financial reports prepared in accordance with Generally Accepted Accounting Principles ("GAAP"), including those filed with the

1  SEC on Form 8-K, they are excluded from the protection of the statutory Safe Harbor.

2  15 U.S.C. §78u-5(b)(2)(A).

3       57.    The defendants are also liable for any false or misleading FLS pleaded

4  because, at the time each FLS was made, the speaker knew the FLS was false or

5  misleading and the FLS was authorized and/or approved by an executive officer of

6  Merit who knew that the FLS was false.   None of the historic or present tense

7  statements made by defendants were assumptions underlying or relating to any plan,

8  projection, or statement of future economic performance, as they were not stated to be

9  such assumptions underlying or relating to any projection or statement of future

10 economic performance when made, nor were any of the projections or forecasts made

11 by defendants expressly related to or stated to be dependent on those historic or

12 present tense statements when made.

13
         **APPLICABILITY OF PRESUMPTION OF RELIANCE:**
         **FRAUD ON THE MARKET**
14
15       58.    Plaintiff will rely upon the presumption of reliance established by the

16 fraud-on-the-market doctrine in that, among other things:

17       (a)    defendants made public misrepresentations or failed to disclose

18 material facts during the Class Period;

19       (b)    the omissions and misrepresentations were material;

20       (c)    the Company's common stock traded in an efficient market;

21       (d)    the misrepresentations alleged would tend to induce a reasonable

22 investor to misjudge the value of the Company's common stock; and

23       (e)    plaintiff and other members of the Class purchased Merit common

24 stock between the time defendants misrepresented or failed to disclose material facts

25 and the time the true facts were disclosed, without knowledge of the misrepresented or

26 omitted facts.

27       59.    At all relevant times, the market for Merit common stock was efficient

28 for the following reasons, among others:

1          (a)     As a regulated issuer, Merit filed periodic public reports with the

2 SEC; and

3          (b)     Merit regularly communicated with public investors via

4 established market communication mechanisms, including through the regular

5 dissemination of press releases on major news wire services and through other wide-

6 ranging public disclosures, such as communications with the financial press, securities

7 analysts, and other similar reporting services.

8 **CLASS ACTION ALLEGATIONS**

9      60.    Plaintiff brings this action as a class action pursuant to Rule 23 of the

10 Federal Rules of Civil Procedure on behalf of all persons who purchased Merit

11 common stock during the Class Period (the "Class"). Excluded from the Class are

12 defendants and their immediate families, the officers and directors of the Company, at

13 all relevant times, members of their immediate families, and defendants' legal

14 representatives, heirs, successors, or assigns, and any entity in which defendants have

15 or had a controlling interest.

16      61.    The members of the Class are so numerous that joinder of all members is

17 impracticable. The disposition of their claims in a class action will provide substantial

18 benefits to the parties and the Court. Merit has more than 55 million shares of stock

19 outstanding, owned by hundreds or thousands of persons.

20      62.    There is a well-defined community of interest in the questions of law and

21 fact involved in this case. Questions of law and fact common to the members of the

22 Class that predominate over questions that may affect individual Class members

23 include:

24          (a)     whether the 1934 Act was violated by defendants;

25          (b)     whether defendants omitted and/or misrepresented material facts;

26          (c)     whether defendants' statements omitted material facts necessary in

27 order to make the statements made, in light of the circumstances under which they

28 were made, not misleading;

(d)    whether defendants knew or recklessly disregarded that their statements were false and misleading;

(e)    whether the price of Merit common stock was artificially inflated; and

(f)    the extent of damage sustained by Class members and the appropriate measure of damages.

63.    Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

64.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

65.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

66.    Plaintiff incorporates ¶¶1-65 by reference.

67.    During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68.    Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Merit common stock during the Class Period.

69.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Merit common stock. Plaintiff and the Class would not have purchased Merit common stock at the prices they paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

70.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Merit common stock during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

71.     Plaintiff incorporates ¶¶1-70 by reference.

72.     The Individual Defendants acted as controlling persons of Merit within the meaning of §20 of the 1934 Act.  By virtue of their positions and their power to control public statements about Merit, the Individual Defendants had the power and ability to control the actions of Merit and its employees.  Merit controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff, and certifying plaintiff as Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

1        D.      Awarding such equitable/injunctive or other relief as the Court may deem

2   just and proper.

3                                    **JURY DEMAND**

4        Plaintiff demands a trial by jury.

5   DATED:  December 3, 2019                ROBBINS GELLER RUDMAN
                                              & DOWD LLP
6                                          SHAWN A. WILLIAMS
                                           DANIEL J. PFEFFERBAUM
7

8                                               */s/ Shawn A. Williams*
9                                           SHAWN A. WILLIAMS

10                                         Post Montgomery Center
                                           One Montgomery Street, Suite 1800
11                                         San Francisco, CA  94104
                                           Telephone:  415/288-4545
12                                         415/288-4534 (fax)

13                                         Attorneys for Plaintiff

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

BUCKS COUNTY EMPLOYEES RETIREMENT FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      (a)     Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*In re Under Armour Sec. Litig.*, No. 1:17-cv-00388 (D. Md.)

(b)     Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

None.

(c)     Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:

*In re Newell Brands, Inc. Sec. Litig.*, No. 2:18-cv-10878 (D.N.J.)
*Melucci v. Corcept Therapeutics Incorporated, et al.*, No. 5:19-cv-01372 (N.D. Cal.)
*Nikolov v. Livent Corporation, et al.*, No. 2:19-cv-02218 (E.D. Pa.)

MERIT MEDICAL

6.     Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 26th day of November, 2019.

BUCKS COUNTY EMPLOYEES
RETIREMENT FUND

By:     _____
        Robert G. Loughery, Chairman

- 2 -

MERIT MEDICAL

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/05/2019 | 300 | $56.15 |
| 06/13/2019 | 523 | $56.45 |
| 09/06/2019 | 900 | $30.80 |
| 09/18/2019 | 340 | $29.87 |
| 09/19/2019 | 100 | $30.31 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 09/10/2019 | 3,385 | $27.67 |

Prices listed are rounded up to two decimal places.

*Opening position of 4,422 shares.