**SAXENA WHITE P.A.**
David R. Kaplan (Bar No. 230144)
dkaplan@saxenawhite.com
Brandon Marsh (Bar No. 268316)
bmarsh@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone:   (858) 997-0860
Facsimile:    (858) 369-0096

**BERNSTEIN LITOWITZ BERGER
   & GROSSMANN LLP**
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Tel: (310) 819-3470

*Counsel for Lead Plaintiffs and
Co-Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE MERIT MEDICAL SYSTEMS, INC. SECURITIES LITIGATION | No. 8:19-cv-02326-DOC-ADS<br><br>DEMAND FOR JURY TRIAL<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS** |

# **Table of Contents**

I.      INTRODUCTION ............................................................................. 2

II.     JURISDICTION AND VENUE .......................................................... 7

III.    PARTIES ......................................................................................... 7

    A.      Lead Plaintiffs ....................................................................... 7

    B.      Defendants ............................................................................. 8

IV.     SUMMARY OF THE FRAUD .......................................................... 9

    A.      Leading up to the Class Period, Defendants Were Under Pressure to Maintain the Company's "Growth-By-Acquisition" Strategy .......... 9

    B.      Merit Purchases Cianna in Its Largest Acquisition Ever, Committing to Retain Cianna's Specialized Sales Force .................... 13

    C.      Merit Acquires ClariVein from Vascular Insights, Promising Substantial Immediate Revenues ........................................... 19

    D.      Defendants Falsely Claim That Cianna's Sales Force Remains Intact as Part of a "Successful" and "Complete" Integration .............. 20

    E.      Defendants Falsely Promote ClariVein's Performance and Sales ........ 24

    F.      Unbeknownst To Investors at the Time, and in Direct Contrast to Defendants' Public Statements, Cianna's Top Salespeople Quit Shortly After the Acquisition, Merit Failed to Complete the Cianna Integration, and Merit Had *Zero* Orders of ClariVein For Over Six Months After the Vascular Insights Acquisition .................................. 26

        1.      The Most Important Members of Cianna's Sales Force Left Merit Shortly After the Acquisition ............................................. 27

        2.      Merit Struggled to Integrate Cianna, Which Remained Unintegrated Beyond the First Quarter of 2019 ......................... 36

        3.      As Defendants Were Ultimately Forced to Admit, Merit Had *Zero* ClariVein Orders During the Entire First Half of 2019 due to Pre-Existing Reimbursement and Regulatory Roadblocks ............................................................................ 42

    G.      When the Truth Emerges, Merit's Stock Drops Precipitously, Analysts Disparage "Management Credibility," and Lampropoulos Dumps His Stock Just Before the End of the Class Period ................ 55

        1.      July 25, 2019: Merit Partially Reveals the Truth About Cianna Attrition and ClariVein Sales, Causing Merit Shares to Plunge by More Than 25% ...................................................... 55

| | 2. | August-September 2019: After Falsely Reassuring Investors on July 25, Lampropoulos Dumps Nearly $6.5 Million of Merit Stock .................................................................58 |
| | 3. | October 30, 2019: Defendants Finally Disclose that Cianna and Vascular Insights Were Failed Acquisitions, Sending Merit Shares Plummeting 29% as Analysts Disparage Defendants' Credibility and Call for Their Removal ................59 |

V.   DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS ...............................................62

    A.   February 2019 Investor Conference ......................................62

    B.   February 2019 Press Release ...............................................65

    C.   March 2019 Form 10-K ......................................................66

    D.   March 2019 Letter to Investors ...........................................67

    E.   April 2019 Press Release ....................................................68

    F.   April 2019 Investor Conference ...........................................70

    G.   July 2019 Investor Conference ............................................72

VI.   ADDITIONAL SCIENTER ALLEGATIONS ...............................76

VII.   LOSS CAUSATION ...................................................................86

VIII.   THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR ..........91

IX.   THE PRESUMPTION OF RELIANCE ........................................92

X.   CLASS ACTION ALLEGATIONS .............................................93

XI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT .........................94

    COUNT I For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against All Defendants) ...................................94

    COUNT II For Violations of Section 20(a) of the Exchange Act  (Against Defendants Lampropoulos and Parra)....................................96

XII.   PRAYER FOR RELIEF .................................................................98

XIII.   JURY DEMAND................................................................................................98

Court-appointed Lead Plaintiff Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund (collectively, the "Atlanta Funds") and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge" and, together with the Atlanta Funds, the "Lead Plaintiffs"), by and through their undersigned attorneys, bring this action individually and on behalf of all persons who purchased the common stock of Merit Medical Systems, Inc. ("Merit" or the "Company") between February 26, 2019 and October 30, 2019, inclusive (the "Class Period"), and were damaged thereby (collectively, the "Class").

Lead Plaintiffs allege the following based upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Lead Plaintiffs' information and belief are based on, among other things, the independent investigation of their undersigned counsel.  This investigation included, but was not limited to, a review and analysis of: (i) Merit's public filings with the Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of investor conference calls; (iv) publicly available presentations by Merit; (v) press releases and media reports; (vi) securities pricing data; (vii) consultations with relevant experts; (viii) interviews with former employees of Merit, Cianna Medical, Inc. ("Cianna"), Vascular Insights LLC ("Vascular Insights"); and (ix) the other material and data identified herein.  Lead Counsel's investigation into the factual allegations is continuing, and many of the relevant facts are known only by the Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations after a reasonable opportunity for discovery.

# I.    __INTRODUCTION__

1.    Merit Medical Systems, Inc. is a medical device company whose entire business model was predicated on a "growth-by-acquisitions" strategy. While the Company completed numerous acquisitions leading up to the Class Period, by late 2018, that strategy had put Merit on such a steep growth trajectory that securities analysts questioned whether Merit could maintain its momentum. To quell these concerns, Merit set its sights on two acquisitions that Defendants told investors would significantly bolster its upward trajectory: (i) Cianna, a manufacturer of devices for the treatment of breast cancer that was by far the largest acquisition in the Company's history; and (ii) ClariVein, a device for varicose vein treatment that was Vascular Insights' crown jewel. Given the critical importance of these transactions to Merit's business strategy and growth prospects, analysts and investors were keenly focused on the progress of these acquisitions, and Defendants were under intense pressure to deliver a seamless and successful integration of these two businesses.

2.    Accordingly, throughout the Class Period, Defendants repeatedly assured investors that Merit was timely and successfully integrating Cianna and Vascular Insights. With respect to Cianna, Defendants made clear that the most important aspect of the integration was Merit's ability to retain Cianna's team of highly trained and specialized sales representatives, who had established deep and valuable relationships with hospitals and physicians. Given that Merit's financial projections for the Cianna business and much of the Company's overall growth were built on this unique sales force retention, Defendants specifically and repeatedly represented that Merit would retain the entirety of Cianna's sales force, and that Merit's CEO, Defendant Lampropoulos, would be personally overseeing that retention and "lead[ing Cianna's] efficient integration" of its critical systems into Merit's business.

3.    As the Class Period progressed, Defendants' assurances concerning these transformative acquisitions grew even more pronounced. On February 26, 2019— months after the acquisitions were completed—Defendants specifically touted to

1   investors that the Cianna integration was going "as well as could be expected," and
2   claimed that ClariVein was well on its way to generating 2019 revenues of "$10
3   million to $11 million."  On April 23, 2019, Defendants told investors in no uncertain
4   terms that (i) the Cianna integration was now "complete"; (ii) it was "<u>as good of a</u>
5   <u>transaction and transition that we have done</u>"; and (iii) it "<u>may be the best</u>" integration
6   in the Company's history in large part because Merit had successfully "<u>maintained the</u>
7   <u>[Cianna] sales force</u>."  Defendants also assured investors that Merit saw "<u>strong sales</u>
8   <u>in standalone products</u>," including the ClariVein product line, and that they did not
9   "see anything that has changed" post-acquisition regarding ClariVein's purportedly
10  outstanding performance.

11          4.      These statements were utterly false.  The detailed accounts of sixteen
12  former Merit, Cianna, and Vascular Insights employees confirm that the Cianna and
13  ClariVein integrations were a disaster throughout the Class Period.  For example,
14  contrary to Defendants' representations, Merit did not successfully retain Cianna's
15  sales force after the acquisition.   To the contrary, within just months of the
16  acquisition—and long before Merit's CEO assured investors that Merit had retained
17  the entirety of Cianna's sales force—<u>over 20% of Cianna's total sales representatives</u>
18  <u>resigned</u>, including Cianna's highest-performing sales team members who were alone
19  responsible for <u>22% of Cianna's overall revenues</u>.  Not surprisingly, these departures
20  crippled Cianna's sales, causing a sharp decline in revenue of 25% to 30% during 2019
21  alone—a massive drop that the Executive Defendants (defined below) personally
22  reviewed in real time.  Defendants' statements touting the successful integration of
23  Cianna's systems were patently false.  Numerous former employees confirmed that,
24  while Defendant Lampropoulos told investors in April 2019 that the integration was
25  "complete," in reality, Merit had not yet completed even half of the integration,
26  including the integration of Cianna's critical operating, marketing and customer
27  management systems that were central to Merit's operations and business prospects.
28

1        5.     These same former employees also confirmed that Defendants kept well

2   hidden from investors the true facts about Merit's acquisition of Vascular Insights'

3   ClariVein product line.   Indeed, at the same time that Defendants were touting

4   ClariVein's immediate success in singlehandedly generating $10 million to $11

5   million in sales for 2019, they knew (but failed to disclose) a devastating fact: <u>Merit</u>

6   <u>had not had a single order for ClariVein during the entire first half of 2019</u>.  Multiple

7   former Merit and Vascular Insights employees have confirmed that Merit could not

8   sell the product because of two fundamental roadblocks to sales.  First, the country's

9   largest commercial insurance companies uniformly declined to cover ClariVein and,

10  without reimbursement coverage, doctors refused to place new orders for ClariVein.

11  Second, Merit internally determined that FDA restrictions precluded it from marketing

12  ClariVein to treat varicose veins (as Vascular Insights had previously marketed it)

13  which posed a significant impediment because ClariVein's primary market was vein

14  treatment centers.

15       6.     Significantly, numerous witnesses also confirmed that Merit's CEO and

16  CFO, Defendants Lampropoulos and Parra, respectively, were fully aware of the

17  dearth of ClariVein orders.  These Defendants (i) had <u>60" monitors outside each of</u>

18  <u>their offices that displayed in real-time the daily, monthly, and quarterly orders for</u>

19  <u>ClariVein</u>; (ii)  had access to this same sales information on their mobile phones; (iii)

20  had access to this same sales information (and more) on their computers through the

21  Company's centralized "Domo" software system, which tracked and stored all of the

22  sales and order data for each of Merit's products in real time; and (iv) received highly

23  detailed ClariVein sales information through regular written reports and presentations.

24       7.     The truth regarding Defendants' fraud began to emerge during a July 25,

25  2019 investor conference, when Defendants shocked investors by belatedly disclosing

26  that—contrary to their Class Period statements touting ClariVein's success—in

27  reality, ClariVein "<u>hasn't had an order all year</u>."  Investors were further blindsided by

28  Defendants' announcement that instead of retaining the entirety of Cianna's sales

force—as Defendants had expressly represented during the Class Period—there had been "attrition" among Cianna's sales representatives and, as a result, post-integration sales for Cianna were well below expectations. On this news, Merit's stock price plummeted by over 25%, from $54.85 to $41.00 per share, wiping out over $740 million in shareholder value.

8.     Significantly, however, even after this partial disclosure, Defendants continued to lie to investors. For example, rather than disclose the established industry and regulatory roadblocks to ClariVein sales, Defendant Lampropoulos falsely attributed the absence of orders to a "short-term" problem caused by "pipeline filing," i.e., doctors ordering <u>too much</u> product prior to the acquisition, and falsely represented that ClariVein sales were actually already "ramping to our expectations." And rather than tell investors the truth about the Cianna sales force departures, Lampropoulos falsely reassured investors that there had been just "<u>a little bit</u>" of attrition, "but <u>not much</u>."

9.     Almost immediately after reiterating these misrepresentations, Defendant Lampropoulos began to dump his stock. Within weeks of minimizing and misrepresenting the disastrous integration and performance of two of the most important acquisitions in Merit's history, Lampropoulos unloaded over <u>$6 million</u> worth of his personal shares of the Company. These sudden and unexpected sales were deeply suspicious and dramatically out-of-line with his prior trading. Indeed, Lampropoulos had not sold a <u>single share</u> of stock in the open market over the past <u>three-and-a-half years</u>, had realized only about $27,000 in proceeds from all stock sales over the preceding six years, and sold more shares during this short three-week period in the summer of 2019 than in the past <u>thirteen years combined</u>. Piper Jaffray analysts specifically noted the suspicious nature of Lampropoulos' stock sales, remarking that his trading had understandably "drawn the ire of investors."

10.     By the following quarter, Defendants could no longer conceal the truth. On October 30, 2019, Merit disclosed that sales for ClariVein and Cianna had lagged

- 5 -

so far behind that Merit was forced to slash year-end revenue guidance by $27 million and withdraw entirely its guidance for 2020.  With investors and analysts demanding answers, Defendant Lampropoulos finally admitted that Merit was "<u>nine or ten months behind</u>" in integrating ClariVein, which it had acquired ten months earlier—in other words, Merit had made no progress since the 2018 acquisition.  With regard to Cianna, Lampropoulos admitted that the integration—which he had previously told investors months earlier had already been "completed"—was <u>not</u> complete.  To the contrary, the integration had in reality "taken a lot more time," taught management "some painful lessons," and "caught up with" them.  Moreover, the two debacles completely halted Merit's "growth-by-acquisitions" strategy, leading Defendants to concede that "<u>we fell on our face</u>" and it was "<u>back to basics</u>" for the Company.  In response to the Company's disclosures, Merit's stock price tumbled 29% in a single trading day, falling from a closing price of $29.11 on October 30, 2019 to close at $20.66 per share on October 31, 2019, eliminating another $452 million in shareholder value.

11.    Given Defendants' repeated misrepresentations to investors, outraged securities analysts excoriated Defendants Lampropoulos and Parra, explicitly stating that Merit suffered from a significant "<u>management credibility issue</u>."  The revelations at the end of the Class Period were so shocking that analysts took the remarkable step of calling for the outright removal of these executives, with other analysts advising that investors "probably don't want to try catching this falling knife until there have been some changes in the executive suite," and that "<u>[i]t will take a few years . . . for established investors to trust this management team again</u>."

12.    As a result of Defendants' violations of the federal securities laws, investors who purchased Merit's common stock at artificially inflated prices during the Class Period have suffered substantial losses, with nearly $1.2 billion in shareholder value erased as a result of the disclosure of Defendants' fraud.  This action seeks redress on behalf of these aggrieved investors.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

## II.     JURISDICTION AND VENUE

13.     This action arises under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b 5, promulgated under the Exchange Act.

14.     This Court has jurisdiction over the Exchange Act claims pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

15.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  At all relevant times, Merit has conducted business in this District.  In addition, many of the acts alleged herein, occurred in this District.

16.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mails, interstate telephone communications, and the facilities of the national securities exchanges and markets.

## III.    PARTIES

### A.     Lead Plaintiffs

17.     Lead Plaintiff City of Atlanta Police Officers' Pension Fund ("Atlanta Police Officers") is a defined benefit pension plan providing benefits to police officers of the City of Atlanta and their family members.  As set forth in the certification accompanying its Lead Plaintiff motion (ECF No. 35-1), Atlanta Police Officers purchased shares of Merit common stock during the Class Period and suffered damages as a result of Defendants' misrepresentations and omissions.

18.     Lead Plaintiff City of Atlanta Firefighters' Pension Fund ("Atlanta Firefighters") is a defined benefit plan providing benefits to firefighters of the City of Atlanta and their family members.  As set forth in the certification accompanying its Lead Plaintiff motion (ECF. No. 35-1), Atlanta Firefighters purchased shares of Merit common stock during the Class Period and suffered damages as a result of Defendant's misrepresentations and omissions.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

19.     Lead Plaintiff Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge") is a defined benefit pension plan established in 1953 that provides retirement allowances and other benefits to regular employees of the City of Baton Rouge.  As set forth in the certification accompanying its Lead Plaintiff motion (ECF. No. 35-1), Baton Rouge System purchased Merit securities during the Class Period and suffered damages as a result of Defendants' misrepresentations and omissions.

20.     By order dated February 24, 2020, the Court appointed Atlanta Police Officers, Atlanta Firefighters, and Baton Rouge as Co-Lead Plaintiffs in this action.

**B.     Defendants**

21.     Defendant Merit Medical Systems, Inc. manufactures and sells single-use disposable medical products for medical procedures to hospitals and physicians. Historically, the Company sold "accessory" products, such as syringes, inflation devices, and wires for use during non-surgical procedures.  Shortly before the Class Period, the Company also began selling "therapeutic devices," which are higher-margin products used to treat or cure diseases and used during surgical procedures. Merit trades on the NASDAQ stock exchange under the symbol "MMSI."

22.     Defendant Fred P. Lampropoulos ("Lampropoulos") is the founder, Chairman and Chief Executive Officer of Merit.  Lampropoulos signed and certified the Company's quarterly and annual SEC filings throughout the Class Period.  During the Class Period, Lampropoulos regularly spoke to investors and securities analysts regarding the Company and its acquired businesses and products, professing to know what he was speaking about.  When speaking to investors, Lampropoulos identified himself and his team as "experts" at being able to integrate acquired businesses into Merit's operations, explaining that they integrated newly-acquired companies "very, very well" and that Lampropoulos and his team "are seasoned" at executing integrations.

23.     Defendant Raul Parra ("Parra") is, and at all relevant times during the Class Period was, the Chief Financial Officer of Merit.  Parra signed and certified the Company's quarterly and annual SEC filings throughout the Class Period.  During the Class Period, Parra regularly spoke to investors and securities analysts regarding the Company and its acquired businesses and products, professing to know about what he was speaking.  Merit held Parra out as an expert in the Company's business and the primary author of the Company's statements to investors, with Lampropoulos stating that Parra "knows the business, he knows it well," and stating that "[t]he statements you [investors] have been seeing for many years have been prepared by Raul [Parra]."

24.     Defendants Lampropoulos and Parra are collectively referred to herein as the "Executive Defendants" and, together with Merit, as the "Defendants."   The Executive Defendants directly participated in the management of Merit's operations and had the ability to control and did control Merit's financial reporting.  They were both involved in drafting, reviewing, publishing, and making the materially false and misleading statements and omissions alleged herein, and approved or ratified these misstatements or omissions.

## IV.   <u>SUMMARY OF THE FRAUD</u>

### A.   Leading up to the Class Period, Defendants Were Under Pressure to Maintain the Company's "Growth-By-Acquisition" Strategy

25.     Merit was founded in the 1980s as a small company with about $8 million in annual sales.  Its founder, Defendant Lampropoulos, was an investment banker who worked for stock brokerage firms, including Dean Witter, helping corporations raise capital.   Since its founding Merit has experienced exponential growth, which it achieved by employing a "growth-by-acquisition" strategy.   Indeed, Defendant Lampropoulos emphasized to investors that "[t]his is a growth business" and his mission was to "grow that top line."[1]  Rather than invest in research and development

---

[1] Merit Medical July 23, 2018 Second Quarter 2018 Earnings Call.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1  to "grow that top line," Lampropoulos and Merit instead used shareholder dollars to

2  acquire other companies with established products and businesses.

3      26.    Leading up to the Class Period, Merit applied this "growth-by-

4  acquisition" strategy even more aggressively, with analysts noting in mid-2018 that

5  Merit has been "leaning more heavily on acquisitions to accentuate its growth

6  profile."[2]  As one analyst aptly put it, mergers and acquisitions are a "fixture in

7  MMSI's business model."[3]

8      27.    Merit's acquisition-driven growth strategy has long been of interest to the

9  market, but also a source of concern.  On the one hand, investors have been attracted

10  by the fruits of Merit's acquisitions and the prospect of continued high growth.  As the

11  pace and scale of its acquisitions increased, Merit reported increasing revenue growth:

12  6.3% in 2015, 11.4% in 2016, over 20% in 2017, and over 21% in 2018.  When Merit's

13  revenues increased, its stock price also soared, from approximately $12 in late 2010

14  to approximately $56 in late 2018.  By the second half of 2018, given the years of high

15  growth through acquisitions, Defendants understood that analysts and investors

16  expected such high growth to continue.

17      28.    On the other hand, while the Company's acquisition strategy fueled

18  growth and revenue, it also presented serious risks.  As Merit's portfolio expanded

19  over the years to include more complex and specialized products, the makeup of its

20  sales force became an increasingly critical part of its operations.  The ability to market

21  more sophisticated medical products required a sophisticated, well-trained, and

22  experienced sales team that could effectively sell and offer ongoing support to highly

23  skilled medical professionals, such as surgeons and oncologists.  If Merit proved

24  unable to retain an acquired company's sales force, its success in selling its newly

25

26  _____

27  [2] Morningstar, "Merit's growth characteristics impress, but margin improvements are difficult to come by" (June 8, 2018).

28  [3] Canaccord Genuity, "Mixed Q2 (in part due to storms) - OM leverage shined; Biz set to accelerate in Q4; PT to $47.50 from $45" (October 25, 2017).

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

acquired products would suffer. Similarly, the success of Merit's acquisitions depended upon the careful integration of the acquired company. If the acquired company's systems were not fully and successfully integrated, expected synergies would be hindered and lost.

29. Integration issues with Merit's acquisition of DFINE in late 2016 exemplified such acquisition risks. Following that acquisition, members of DFINE's sales force terminated their employment with Merit. Their terminations, Lampropoulos would later admit to investors, directly impacted Merit's sales of DFINE's products. As securities analysts noted, the benefits of the DFINE acquisition were delayed "stemming from integration challenges with respect to its specialized sales force." For sophisticated devices—such as the one developed by DFINE—maintaining the acquired entity's sales force was particularly critical to Merit's post-acquisition sales success. For example, analysts at Canaccord Genuity noted in an April 27, 2017 report that it took members of Merit's general sales force "in our estimation, around a year or so to become fully productive" at selling an acquired entity's specialized product.

30. Given such issues, the Executive Defendants were particularly attuned to acquisition integration risks leading up to the Class Period. Indeed, given Merit's recent experience, analysts explicitly recognized and raised concerns about Defendants' ability to successfully continue similar acquisitions. Canaccord Genuity, for example, noted in 2018 that, "[w]hile we favor Merit's recent acquisitions, the company has endured some snafus with previous deals," stating further that "additional M&A [mergers and acquisitions] . . . could pose further integration risk."[4] Bank of America and SunTrust Robinson Humphrey similarly identified "M&A integration issues" as a risk of Merit's business strategy.[5]

---

[4] Canaccord Genuity, "Updating model to incorporate assets acquired post-BDX/BCR merger; reiterate BUY, target to $50" (January 2, 2018).
[5] Bank of America, "Raising PO on BDX asset deal" (February 15, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

31.    Eager to remain attractive to investors amongst its larger and better capitalized competitors, Merit and its CEO, Defendant Lampropoulos, successfully squelched investor concerns about Merit's growth-by-acquisition strategy.  Over and over, Lampropoulos told investors that Merit conducted particularly careful due diligence before every acquisition and only selected companies that fit neatly within Merit's growing portfolio.  Lampropoulos also specifically assured investors that he was at the forefront of these due diligence efforts.  Lampropoulos stated, for example, that Merit was never "in any hurry"[6] to acquire other companies and that "we don't take flyers."[7]  He stressed that, instead, "[i]f the right thing comes along," Merit would "take a hard look" and always be "very patient."[8]

32.    Lampropoulos also comforted investors with assurances that Merit had a specialized and effective process for integrating acquired companies into the fabric of the Company following each acquisition.  When speaking to investors, Lampropoulos identified himself and his team as "experts" at being able to integrate acquired businesses into Merit's operations, explaining that they integrated newly-acquired companies "very, very well" and that Merit's senior executives "are seasoned" at executing integrations.[9]  Lampropoulos even coined a term for Merit's integration process—"Meritizing"—and told investors that Merit began the process of Meritizing companies "immediately upon acquisition."[10]    Lampropoulos likened Merit's

---

[6] Merit Medical July 21, 2011 Second Quarter 2011 Earnings Call; Merit Medical February 26, 2019 Fourth Quarter 2018 Earnings Call.
[7] MedTech Talk Episode 125, "Merit Medical CEO Fred Lampropoulos Lays Out Aggressive Growth Strategy, Including Opportunistic M&A" (February 14, 2019).
[8] Merit Medical July 21, 2011 Second Quarter 2011 Earnings Call.
[9] Merit Medical July 6, 2016 Conference Call, "Merit Medical Systems Inc Conference Call to Discuss a Definitive Agreement to Acquire DFINE Inc"; Merit Medical February 26, 2019 Fourth Quarter 2018 Earnings Call.
[10] *See, e.g.*, Merit Medical October 26, 2016 Third Quarter 2016 Earnings Call; Medtech Talk, Episode 125 Podcast, "Merit Medical CEO Fred Lampropoulos Lays Out Aggressive Growth Strategy, Including Opportunistic M&A" (February 14, 2019).

- 12 -

seamless integration process to a "symphony," which he carefully orchestrated and personally carried out to perfection.[11]

33.     Analysts accepted Lampropoulos' representations.    For example, Barrington Research highlighted how "Merit has repeatedly said that deals under consideration need to be scalable, make sense strategically, and contribute to the company's financial goals reasonably quickly."[12]    Canaccord Genuity likewise embraced Merit management's commitment to have "diligently assessed, strategically consummated, and successfully launched newly acquired/licensed, higher margin therapeutic products."[13]    It is within this landscape that Merit made its two most significant acquisitions of all time.

**B.      Merit Purchases Cianna in Its Largest Acquisition Ever, Committing to Retain Cianna's Specialized Sales Force**

34.     Merit historically focused its acquisition efforts on companies that created "medical accessory" products, such as syringes, inflation devices, and wires. Over the past few years, however, Merit attempted to break into the larger, more lucrative "therapeutic device" market.  Lampropoulos explained this transformation to investors in April 2018, telling them that Merit had adopted a "strategy to move from accessories to a more therapeutic model."[14]

35.     Therapeutic devices are far more sophisticated and complex than medical accessory products.  They are intended to be used in, on, or for human beings in connection with preventing, diagnosing, monitoring, treating, or curing a disease. Examples of therapeutic devices include pacemakers, implantable loop recorders, glucose monitoring systems, and hemodialysis machines.  Unlike the market for medical accessories, the global therapeutic device market is vast, and was valued at

---

[11] Merit Medical February 26, 2019 Fourth Quarter 2018 Earnings Call.
[12] Barrington Research, "Solid Q3; Top-Line Momentum Continues; Expense Control Also Solid; Price Target is $69" (October 26, 2018).
[13] Canaccord Genuity, "'New Merit' firing on all cylinders; raise PT to $45" (July 27, 2017).
[14] Merit Medical April 25, 2018 First Quarter 2018 Earnings Call.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1    $425 billion as of 2018.   Entering this market presented Merit with diverse
2    opportunities for expansion, but also pitted Merit against significantly larger and better
3    capitalized competitors, including Fortune 500 companies like Medtronic, Boston
4    Scientific, and Abbott Laboratories.

5          36.    Accordingly, Merit sought to jump-start its efforts to enter the therapeutic
6    device market and compete with its larger rivals by acquiring Cianna, a California-
7    based company that had already gone to market with a successful therapeutic product.
8    In 2015, Cianna developed and began selling a revolutionary therapeutic device, the
9    SCOUT, for the treatment of breast cancer.   Cianna's SCOUT product was a wire-free
10   breast tumor radar localization system that aided surgeons in locating target tissue
11   during lumpectomies.   Specifically, the SCOUT was designed to produce audible and
12   visual indicators that surgeons could use to identify cancerous tissue during
13   lumpectomies and biopsies.   Cianna sold its sophisticated SCOUT product through a
14   small, specialized sales force of 19 highly trained and educated Cianna professionals,
15   each of whom possessed an in-depth understanding of how the SCOUT works and
16   how to properly market it to physicians and surgeons.

17         37.    On October 1, 2018, Merit announced that it was acquiring Cianna for
18   $200 million.   Significantly, the Cianna acquisition was the Company's largest
19   acquisition ever.   With a $200 million price tag, the purchase price was almost one
20   quarter of Merit's entire revenue for all of 2018 and nearly five times greater than the
21   Company's net income for 2018.   Given that Merit spent a <u>total</u> of $300 million on its
22   <u>ten</u> acquisitions between mid-2016 and mid-2018 prior to the Cianna acquisition,
23   Cianna's $200 million price tag immediately signaled to the market that Cianna was
24   by far the most significant transaction in Merit's history.

25         38.    To announce this landmark deal, Defendants issued a press release and
26   conducted a special conference call with investors and analysts on October 1, 2018
27   devoted entirely to discussing the Cianna acquisition.   During the call, Defendants
28   Lampropoulos and Parra touted the Cianna acquisition as "the largest transaction

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

[Merit] has ever done," and as a vehicle for accelerated Company growth that they had deeply researched, brushing aside concerns that the Company's entry into a new market (therapeutic devices) posed significant risks.  In particular, Lampropoulos and Parra assured investors that they would not repeat prior failures of having significant attrition in the acquired company's sales force.  During the conference call, Lampropoulos emphasized how Defendants had "known this company for a long time," "followed it," and waited until the "opportunity became available." Defendants' press release and statements during the conference call further assured investors that Lampropoulos and his colleagues had closely "looked at [Cianna]," that the acquisition was being completed with "discipline," and that Lampropoulos himself was personally "lead[ing Cianna's] efficient integration."[15]  Lampropoulos told investors that Cianna was a "perfect fit" for Merit and would drive an estimated $50 million to $56 million in revenues in 2019 alone.  He added that Cianna "has a track record of growth and has some of the largest accounts in the country."

39.    Given the complexity of Cianna's products, the large pre-existing Cianna sales accounts, and Merit's prior failure to retain sales personnel, Lampropoulos emphasized several times during the October 1 call that Merit would keep "in place" Cianna's "entire sales force."  Cianna's sales force consisted of a small, qualified and knowledgeable group of salespeople who were highly skilled and experienced in selling Cianna's SCOUT product to sophisticated medical professionals.   As Lampropoulos recognized during the Class Period, given the complexity of the SCOUT product as compared with Merit's medical "accessory" products, it was vital that Merit retain the Cianna sales force after the acquisition.  Lampropoulos thus reiterated to investors that the Cianna employees who "are sales and marketing and in the field" would be "staying in place."  He explained, "I want them to become part of

---

[15] Merit Medical Press Release, "Signs Agreement To Acquire Cianna Medical, Inc. (MERIT MEDICAL SYSTEMS INC)" (October 1, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

the Merit family, and that's exactly [what] we're going to do."  Lampropoulos stressed the importance of doing so, explaining that the expected "returns" from the acquisition were dependent upon the "maintenance of their sales force," so they would be "keeping that sales force and adding to it."  He assured investors that the Company had "learned lessons from our situations in the past"—where Merit failed to keep all members of the acquired entity's specialized sales force after the acquisition.  He further explained that maintaining Cianna's sales force was so important that the Company's financial models depended on that fact, stating that for "this particular situation [i.e., the acquisition of Cianna], the [financial] models that we're talking about and the [financial] returns <u>reflect the maintenance of the sales force</u>."

40.    Underscoring the importance of Merit's retention of the members of Cianna's small and specialized sales force, analysts immediately asked how the Cianna sales force would be integrated and utilized.  During Merit's October 1, 2018 conference call, Canaccord Genuity analyst Jason Mills asked whether Lampropoulos' intent was to bring the "Cianna sales effort into your existing sales force without a significant effort in terms of training."  Lampropoulos confirmed that Merit was keeping, and needed to keep, Cianna's sales force, as they had "momentum" and "we don't want to take away from the momentum that these guys have."  He reiterated, "in terms of the sales team, we want to keep them in place and keep that momentum going."  An analyst from Barrington Research similarly sought confirmation that Merit would keep the Cianna sales force "intact."  Lampropoulos again assured that they would, responding that, "I've said it over and I'll say it again: I do not want to disrupt the momentum of this company.  I want them to become part of the Merit family, and that's exactly what we're going to do.  Our model reflects that."  Lampropoulos further assured investors that the Company had learned from its prior mistakes, stating that Cianna was "night and day from the DFINE acquisition in terms of sales force integration."  Maintaining Cianna's sales force was so important to Merit that Lampropoulos made clear that he was personally involved with retaining the Cianna

1    sales force, citing a call he was having with the Cianna sales force later in the day, and

2    his trip to meet them personally in Orange County later in the week.

3         41.    Analysts embraced Defendants' promises that Merit would keep Cianna's

4    sales force intact after the acquisition, noting that this was critical for the success of

5    the deal.  For example, an October 2, 2018 Morningstar analyst report stated:

6         [W]e're encouraged that [Merit] intends to keep the Cianna sales team and
          research and development organization largely intact following
7         integration.  One of our key criticisms of management's acquisition
          strategy has been poor post-integration sales performance, largely due to
8         cost-cutting and sales force attrition associated with a handful of
          transactions completed over the years.
9

10

11   Analysts at Canaccord Genuity echoed in a report on October 1, 2018 that they

12   expected "the full, combined, scaled sales force hitting the ground running from day

13   one."

14        42.    Analysts also viewed Merit's retention of the Cianna sales force as a

15   mitigating factor to Cianna's significant $200 million price tag.  On October 2, 2018,

16   for example, Raymond James reported that while Cianna is Merit's "largest acquisition

17   to date," the fact that Merit planned "to keep the entire Cianna team . . . lessens the

18   risk profile."  Thereafter, on October 26, 2018, Canaccord Genuity issued a "Buy"

19   rating and increased its price target for Merit, applauding the Cianna acquisition as

20   "the most accretive deal yet" and specifically highlighting Merit's "plans to leverage

21   Cianna's existing sales force."

22        43.    Analysts also accepted Defendants' representations about the benefits of

23   the Cianna acquisition, its unique importance to Merit's effort to enter and become

24   competitive in the market for therapeutic devices, and its ability to immediately

25   generate blockbuster revenues for the Company in 2019.  In an October 1, 2018 analyst

26   report, Canaccord Genuity reported that the Cianna acquisition "could take over the

27   number one position in MMSI's history" as the Company's "most accretive deal,

28   dethroning" other recent additions to the Company's "broadening and increasingly

therapeutically focused product portfolio."  In an October 2, 2018 analyst report, Piper Jaffray applauded the Cianna acquisition as "more accretive than any deal in recent history for Merit," stating that "MMSI is moving closer to a company focused on therapeutic areas."  In another report on the same day, Raymond James maintained its "Outperform" rating for Merit "following the proposed Cianna deal."

44.   Over the ensuing weeks leading up to the start of the Class Period, Defendants continued to reassure analysts that the members of the Cianna sales force remained in place.  For example, during an October 25, 2018 investor call, a Needham & Co. analyst asked, "which of [Merit's] sales forces would be selling [Cianna] products once you close the deal?"  Lampropoulos responded that "some of the things we've learned just from history is we didn't want to destroy what we think is a very, very important team with a lot of momentum.  So we've kept it in place."  Similarly, in discussing Merit's plans to retain the entire Cianna sales force, Lampropoulos highlighted the enthusiasm of the Cianna sales force to join the Merit team, stating that "almost everybody on [the Cianna] sales team [had] sen[t] me a note and share[d] with me their excitement and they're looking forward to being a part of Merit."

45.   In addition to their assurances about maintaining the Cianna sales force, Defendants also explained the importance of a successful integration of the companies' systems to unlocking the value of the Cianna acquisition.  In Merit's annual filings with the SEC, Defendants stated that the integration process involved combining "operations, culture, information management systems and other characteristics of the acquired entity with our own, including sales models related to capital equipment."[16]  Defendants further recognized in Merit's annual filings that a failure to successfully integrate Cianna's operational systems would harm the Company.  Specifically, if Merit could not successfully integrate Cianna's operational

---

[16] See, e.g., Merit Medical November 9, 2018 Third Quarter 2018 Form 10-Q.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

systems, it could not achieve the "financial results, product development and other anticipated benefits" that Defendants had touted leading up to the Class Period.[17]

46. On November 13, 2018—three and a half months before the start of the Class Period—Merit issued a press release announcing that it had successfully closed the Cianna acquisition. In the press release, Lampropoulos stated that "[w]e are delighted to have Cianna Medical join the Merit family," "continu[e] Cianna's momentum," and "associat[e] with Cianna Medical's domestic sales and marketing team."

## C. Merit Acquires ClariVein from Vascular Insights, Promising Substantial Immediate Revenues

47. On the heels of the Company's announcement that it had completed the Cianna acquisition, Merit announced on December 17, 2018 that it had completed another transformative acquisition targeting a therapeutic device company. This time, Merit announced that it had acquired the assets of Vascular Insights for $60 million— specifically, its one and only product line, ClariVein, which was marketed to treat varicose veins. This acquisition, Defendants claimed, positioned Merit to exploit a $700 million global market opportunity.

48. In a December 17, 2018 press release announcing the acquisition, Defendants told investors that, like with Cianna, Merit had thoroughly vetted ClariVein, as "[w]e have had our eye on these products for some time." Defendants explained that ClariVein would significantly expand Merit into the "$700 million global market" for therapeutic relief for varicose veins. They further specifically assured investors that ClariVein would immediately contribute meaningful sales once combined with Merit's "global sales footprint," injecting additional revenues "in the range of $10-$11 million" for ClariVein in 2019.

---

[17] Merit Medical Press Release, "Merit Medical Closes Cianna Medical, Inc. Deal" (November 13, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

49.     Analysts credited Defendants' representations that Merit's acquisition of ClariVein would generate important and immediate revenues for 2019.  In a December 17, 2018 analyst report following the Company's announcement, Piper Jaffray stated that ClariVein's "assets (used for the treatment of varicose veins) complement an already substantial vascular portfolio and it should drop in the bag quickly, allowing MMSI's large global sales force to address this $700M global market."  The analysts specifically highlighted how Merit "expects $10-$11M in revenue from the [ClariVein] purchase in 2019, which should be accretive to the 2019 bottom line," and that Merit "will integrate the asset quickly, make any necessary refinement, and enjoy success in this large overall market opportunity."  Piper Jaffray analysts similarly noted in a February 11, 2019 report that ClariVein, "a disposable hand-held device that is used to treat varicose veins . . . [is] a very good product" and "will prove successful in growing [Merit's] franchise in the coming years."  Analysts concluded that, in light of the Cianna and ClariVein acquisitions, "2019 is shaping up to be another strong year for MMSI."[18]  Raymond James observed that "[w]ith a slew of new products in 2019" and "a strong track record of execution, we have confidence in . . . the potential for upside going forward."  With these two acquisitions underfoot, the consensus price target for Merit's stock shot up to $68 per share.[19]

**D.     Defendants Falsely Claim That Cianna's Sales Force Remains Intact as Part of a "Successful" and "Complete" Integration**

50.     After the announcement of Merit's acquisition of Cianna on October 1, 2018, investors and analysts were laser focused on the status of Cianna's integration into the Company.  This heightened attention was not surprising.  The Cianna acquisition was the largest in Merit's history, with a $200 million price tag, and

---

[18] Wells Fargo Securities Equity, "MMSI: Key Takeaways from Management Call" (December 25, 2018).

[19] Seeking Alpha, "Merit Medical Acquires Vascular Insights For PVD Treatments" (December 20, 2018).

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

Lampropoulos assured investors that Cianna would provide Merit with an immediate boost of meaningful revenue in 2019.

51.     On February 26, 2019, the first day of the Class Period—five months after Merit announced the Cianna acquisition, and nearly four months after it closed—Defendants held an earnings call with investors.  Given that Cianna's integration had been well underway for several months by the time of the conference call, analysts were particularly anxious to learn about the status and promised success of the integration.  Lampropoulos kicked off the earnings call by stating that "Cianna is the largest acquisition Merit has ever made, and I would have to say that to this point, we are very pleased with the transition."  When a Piper Jaffray analyst asked to hear "more about the [Cianna] integration," Lampropoulos responded that "the integration . . . is going as well as could be expected," and underscored that "everything is working quite nicely."

52.     As he had done when the acquisition was first announced in October 2018, Lampropoulos continued to impress upon investors during the February 26, 2019 investor conference the critical importance of maintaining Cianna's uniquely qualified sales force.  He underscored that the Cianna sales force consisted of "highly trained, clinical personnel" with "a higher level of clinical understanding and support" than the existing Merit sales force.  He further emphasized the "critical" need for this sophisticated sales force to continue to remain with Merit given the Company's recent transition from an accessory device company to a therapeutic device company, stating that "as our products get more complicated, we need to have these folks [i.e., the members of the Cianna sales force] who know how to sell, interface with surgeons, and have a strong knowledge of physiology and anatomy."  He added that, given the complexity of these products and the reasons for their use, the Cianna sales force's special skillset was vital to Merit's ability to sell Cianna's unique products, highlighting that Cianna's existing sales force was key "to drive the business to the upside."

53.   Given its critical import, Lampropoulos assured investors that Merit continued to maintain the members of Cianna's sales force.  He specifically told investors during the February 26, 2019 conference call that "<u>we kept the [Cianna] sales force in place</u> . . . that was not only the appropriate thing to do, but we think that it's part of what we expect will drive our business."  He went on to confirm that "[w]e're seeing the stability, as I mentioned earlier, in the sales force and in the operating staff. And by that, what I mean by stability, <u>we haven't lost anybody</u>."  By contrast, he stated, Merit had lost some Cianna employees "on the operational side."  Underscoring how critical and purportedly successful the Cianna integration had been, Defendants attributed up to <u>40%</u> of the entire Company's expected 2019 revenue growth to Cianna revenues alone.

54.   Lampropoulos further assured investors during the February 2019 conference call that he personally kept a close watch over the Cianna sales force.  He trumpeted his firsthand knowledge of the group's composition and direct involvement in transitioning the team to Merit.  He noted that he "did a lot of work [in reviewing] the operations, the manufacturing, sales force" and further explained that he visited Cianna multiple times in Southern California, and even recently "invited [Cianna's] best producers" to join him and his fellow executives "in all of our national meetings and international meetings."

55.   Analysts reacted favorably to Defendants' assurances about the Cianna integration and Merit's retention of the Cianna sales force.  In a February 26, 2019 analyst report, for example, Piper Jaffray reiterated that "[t]he integration of Cianna is going well," and further that "management commentary and tone surrounding Cianna was positive, in our view, with the CEO stating he is more bullish on the asset than before they acquired the company."  The next day, on February 27, 2019, Barrington Research similarly credited management's representation that the Cianna "integration efforts seem to be going well," and Wells Fargo reported that, according to Merit, "the integration process has gone very well to date."  Likewise, on February 27, 2019,

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

Canaccord Genuity published a "buy" rating and raised its price target for Merit's stock, projecting a "positive 2019 and beyond" as "the Cianna Medical acquisition—which we think holds the potentially to become MMSI's most accretive deal ever—is integrated within the Merit portfolio."

56.     Then, on April 23, 2019, seven months after the Cianna acquisition was announced and six months after it closed, the Company issued a press release announcing that the Cianna transition was fully accomplished and just as successful as Defendants had always believed it would be.  Lampropoulos stated in the press release that "[t]he Cianna transition is complete, and sales continue to grow according to our expectations."  Lampropoulos likewise confirmed the Company's supposed completion of the Cianna integration process during an earnings call with investors the same day.  When securities analyst David Kenneth Rescott of Canaccord Genuity asked during the call for details about the completed integration, Lampropoulos made clear that the integration of Cianna had gone superbly—even perfectly—and was the "best" integration the Company had ever completed in its history.  He boasted that "the bottom line is, it's as probably as good of a transaction and transition that we have done" and "I don't know how you could do it any better, to be honest with you."

57.     During the same April 23, 2019 investor call, Lampropoulos also continued to assure investors that the Cianna sales force remained at Merit.  In fact, he unequivocally told investors that Merit had "maintained the sales force," and that the Company's "goal to maintain the sales force" was "moving along" without issue.  Then, in response to an analyst's question about the Cianna "rollout," Lampropoulos pointed to the Company's continued employment of Cianna's sales force, explaining that, "as you recall, . . . we maintained their sales force.  And we think that was a critical thing to do."

58.     Analysts again credited these representations, focusing on Defendants' assurances that the integration was complete and had proceeded consistent with Merit's integration plan.  On April 23, 2019, Piper Jaffray reported that "MMSI has

1   completed the integration of Cianna, with minimal disruptions and strong results out

2   of the gate."   The next day, Barrington Research issued a report maintaining its

3   "Outperform" investment rating for Merit's stock and cited Defendants' positive

4   statements about the integration: "Management said that the transition of the Cianna

5   asset may be the 'best' that Merit has ever done.  This is an encouraging assessment

6   given the fact that Merit has done dozens of transactions over its 30-plus year history."

7        **E.    Defendants Falsely Promote ClariVein's Performance and Sales**

8        59.    Analysts and investors were also eager during the Class Period to learn

9   about the status of Merit's recently acquired ClariVein product from Vascular Insights,

10  and whether the acquisition had been as lucrative for Merit as Defendants promised it

11  would be.  Defendants told investors it had been nothing less than a complete success

12  and that it was driving Company growth.

13       60.    On the first day of the Class Period, February 26, 2019, Defendants

14  provided an update to the market on the purported success of ClariVein, which Merit

15  had now owned for nearly three months.  In a press release issued by Merit that day,

16  Lampropoulos specifically identified the acquisition of Vascular Insights' ClariVein

17  and stated that "integration of these new businesses and sales of our core products . . .

18  continue to drive growth."

19       61.    Lampropoulos continued to tout the supposed immediate success of

20  Vascular Insights' ClariVein during the Company's investor call held that same day.

21  At the beginning of the investor call, Lampropoulos spoke specifically about Vascular

22  Insights.   He reported how Merit was "satisfied" with the Vascular Insights'

23  acquisition and how now—with over three months of experience selling ClariVein—

24  "our confidence is built."  Parra echoed Lampropoulos' enthusiasm for ClariVein,

25  reassuring investors later in the conference call that "we haven't changed the guidance

26  that we disclosed when the acquisition happened" three months earlier, with ClariVein

27  still generating $10 million to $11 million in revenues in 2019.

28

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

62. Defendants made further efforts during the February 26, 2019 conference call to assure investors that Merit was successfully selling ClariVein in line with prior expectations. Lampropoulos specifically singled out the Company's supposed early success with ClariVein as a key reason not only for maintaining the Company's previously stated $10 million to $11 million in Vascular Insights revenues for 2019, but also for the Company's extraordinary issuance of full-Company revenue guidance for the following year, 2020. While Defendants never provided any financial guidance for 2019 throughout all of 2018, on February 26, 2019, Defendants estimated revenue growth of 8-10% for 2020 due in part to supposed ClariVein sales strength. SunTrust analyst Bruce Nudell noted during the February 26, 2019 conference call that "it's kind of unusual . . . for a company of your size to put out 2020 guidance" and asked Lampropoulos "what gave [him] the confidence to really take that forward-looking step." In response, Lampropoulos pointed to Merit's purportedly successful "2 or 3 months" with Vascular Insights' ClariVein, and with Cianna, as an important basis for providing financial guidance all the way through the end of 2020.

63. As the year progressed, Merit continued to tout the acquisition of Vascular Insights' ClariVein and its immediate and meaningful contribution to the Company's 2019 revenues. On March 1, 2019, four months after the acquisition, Merit published a letter to its shareholders, which Lampropoulos signed, highlighting "the acquisitions of Cianna Medical and Vascular Insights" as a key part of Merit's "global growth and profitability plan," and claiming that the "[i]ntegration of these new businesses and sales of our core products . . . continue to drive growth."

64. On April 23, 2019, over five months after the Vascular Insights acquisition, Merit again led investors to believe that it had encountered no impediments selling Vascular Insights' ClariVein, with the acquisition proving to be just as lucrative as Defendants expected it would be. During that call, in which the Company announced its first quarter 2019 results, Lampropoulos stated that "the first quarter met and exceeded our expectations." Parra further told the market that, as part

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

of the Company's exceptional revenue acceleration, "we had strong sales in stand-alone products," which included ClariVein.   When asked whether anything had changed with respect to Merit's 2019 and 2020 guidance, Lampropoulos responded that "I don't see that anything has changed," and that "there are always headwinds, but I think there are more tailwinds.  We're feeling the breeze to our back."

65.    Analysts and investors trusted Defendants' representations about the Company's success with the ClariVein product.  For example, on February 27, 2019, Canaccord Genuity published a report reiterating its "buy" rating, raising Merit's target price, and highlighting that the positive "top-line performance in Q4" was "driven by ramping contributions from recent acquisitions [Cianna and Vascular Insights' ClariVein]."  Likewise, on February 27, 2019 and again on April 24, 2019, Barrington Research issued reports maintaining its "Outperform" investment rating and increasing its price target for Merit.  To support its thesis, Barrington pointed to "the Q4/18 M&A activity" that brought ClariVein to Merit.  On April 23, 2019, Canaccord Genuity analysts also issued a "buy" rating for the Company's stock and reported that Merit had a "[s]olid start to 2019," highlighting that, according to Defendants' representations, Merit "continues to see momentum in recently acquired assets."

**F.    Unbeknownst To Investors at the Time, and in Direct Contrast to Defendants' Public Statements, Cianna's Top Salespeople Quit Shortly After the Acquisition, Merit Failed to Complete the Cianna Integration, and Merit Had *Zero* Orders of ClariVein For Over Six Months After the Vascular Insights Acquisition**

66.    At the same time that Defendants were publicly touting the immediate success of their acquisitions of Cianna and Vascular Insights' ClariVein, they internally faced a harsh reality.  As detailed below, Defendants' efforts to integrate Cianna and keep its critical sales force had failed, which was adversely impacting the Company's ability to sell Cianna's products.  In addition, Merit actually had a remarkable zero orders of ClariVein for the entire first half of 2019, and fundamental issues precluded Merit from successfully marketing and selling ClariVein in the

- 26 -

second half of 2019 and beyond—namely, a widespread refusal by insurance companies to reimburse physicians for the costs of ClariVein, and Merit's determination not to market ClariVein for its intended use. Rather than disclose these critical facts to investors, Defendants instead kept them hidden.

### 1. The Most Important Members of Cianna's Sales Force Left Merit Shortly After the Acquisition

67. As set forth above, maintaining Cianna's sales force was critical to Defendants' ability to market that company's products, and Defendants had repeatedly assured investors, both before and during the Class Period, that Merit was keeping the Cianna sales force intact. *See* ¶¶34-46, 50-58. However, these statements were false, misleading, and omitted material facts. In reality, three of Cianna's top four salespeople—including the top performers in its most critical sales region—all quit within a matter of months after the acquisition, leaving Merit without sales coverage in broad swaths of the country. All told, by April 15, 2019, a full 8 days before Defendant Lampropoulos assured investors that Merit had successfully "maintained the [Cianna] sales force" and "I don't know how you could do it better, to be honest with you," more than 20% of the Cianna sales force had quit. These departures included 60% of Cianna's sales force in the Western region, including the region's top performers, who were single-handedly responsible for 75% of the region's entire sales and 22% of Cianna's total company-wide sales. They were also the only sales representatives selling Cianna product in 15 states in the United States—i.e., nearly one-third of the entire country.

68. By way of background, the Cianna sales force was divided into discrete regions: the Western, Eastern, and Central regions. Cianna Sales Rep 3, a sales representative from Cianna's Western region sales force, explained that the Western region generated the most sales of any region and, for this achievement, was awarded

"Region of the Year" in 2018.[20]  Cianna's Vice President of Sales likewise identified the Western region as its strongest performing region prior to the acquisition, describing it as "a very important region" for the company that generated a "very significant" percentage of Cianna's sales.[21]

69.    Cianna Sales Rep 3 explained that the Western region's sales force consisted of five sales representatives.  Each of these five sales representatives covered distinct parts of the Western United States.   Multiple former Merit employees, including Cianna Sales Rep 3, explained that three of those five salespeople quit within a matter of weeks of each other shortly after the Cianna acquisition, and all before Lampropoulos' representations to investors on April 23, 2019 that "we maintained [Cianna's] sales force" and accomplished the "goal to maintain the sales force."

70.    The members of Cianna's sales force in the Western region who quit Merit shortly after the acquisition—referred to herein as Cianna Sales Reps 1 and 2 in addition to Cianna Sales Rep 3—had been with Cianna for, collectively, over 10 years, and were the only salespeople covering the vast majority of the Western United States. Cianna Sales Rep 3 explained that Cianna Sales Reps 1, 2, and 3 were the only sales representatives selling Cianna product in Northern California and twelve states,

---

[20] Cianna Sales Representative 3, as referred to herein, was an Account Executive at Cianna from February 2014 until Cianna was acquired by Merit in November 2018, then worked for Merit until April 2019.  Cianna Sales Representative 3 was responsible for sales and clinical support, including speaking with doctors about Cianna's SCOUT product, helping them trial the product, and selling it as needed.

[21] Cianna's Vice President of Sales, as referred to herein, worked for Cianna from October 2015 as a Regional Director of Sales until Merit acquired Cianna, and then worked for Merit until March of 2020 in the same role with a different title, Regional Vice President of Sales at Merit Oncology.  He oversaw a large region of Cianna, including 16 employees, and was also responsible for certain customer service functions.  Prior to joining Cianna, he had significant prior experience as a sales manager in the medical field.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

including Arizona, Colorado, Idaho, Utah, Oregon, Washington, Montana, New Mexico, North Dakota, South Dakota, Wyoming, and Alaska.[22]

71.     Cianna Sales Reps 1, 2, and 3 were the company's most important salespeople in its most important sales region.  Cianna Sales Rep 3 explained that these three former sales representatives were responsible for <u>nearly 75% of the Western region's sales</u>, and <u>over 20% of the total sales for the entire company in 2018</u>.  Consulting a January 3, 2019 Cianna internal sales report listing the names of the 19 members of the Cianna sales force and covering total sales in 2018, he explained that these representatives were responsible for sales of $7.141 million of the company's approximate $9 million in total sales in the Western region for the Company's primary product, Savi SCOUT—i.e., 74.5% of total sales in the Western region in 2018.  Cianna Sales Reps 1, 2, and 3 were also responsible for more than 22% of the total, overall company-wide sales of Savi SCOUT—$7.141 million of the company's total $32.184 million in sales—rendering them three of the four top sales people in the entire company for Savi SCOUT.  These representatives also sold 73% of the total number of SCOUT consoles sold by the Western region's sales representatives (i.e., 61 of the 84 total Consoles sold) and 27% of the total number of the SCOUT consoles sold company-wide (i.e., 61 of the 226 consoles sold) during 2018.[23]  Cianna Sales Rep 3 further explained that, in addition to their sales of Savi SCOUT, these top salespeople also sold $1.3 million of the company's overall $10 million in total sales of Cianna's only other product, Savi Brachy, representing 13% of the entire company's Savi Brachy sales in 2018.

---

[22] For ease of comprehension and readability, the Complaint uses the pronoun 'he' and possessive 'his' in connection with the Former Employees.  However, this convention is not meant to identify the actual gender of any of the Former Employees.
[23] Cianna Sales Representatives 1, 2, and 3 all reported to reported to Cianna's Regional Vice President of Sales, Mark Vinger.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

72.     Cianna Sales Rep 1 was one of Cianna's top salespeople.   For his accomplishments, he received Cianna's Account Executive of the Year award in 2016 and the coveted President's Club Award for 2015 and 2018.[24]   Cianna Sales Rep 3 explained that the President's Club award was given to the sales representatives who had the most company-wide sales for Cianna's products.   Cianna Sales Rep 1 was Cianna's lone sales representative covering Arizona, Utah, Colorado, Wyoming, New Mexico, North Dakota, and South Dakota, and had been with Cianna beginning in April 2014—i.e., over four years before the acquisition.   A January 2019 Cianna sales report, which was corroborated by Cianna Sales Rep 3's account, reflected that Cianna Sales Rep 1 sold $2.266 million in annual sales of the company's primary product, Savi SCOUT, underlining that he was single-handedly responsible for 7% of Cianna's total Savi SCOUT sales for 2018.   Cianna Sales Rep 3 stated that Cianna Sales Rep 1 quit Merit in March 2019—approximately three months after the acquisition closed in November 2018 and long before Lampropoulos' false and misleading representation to investors on April 24, 2019 that Merit "maintained the [Cianna] sales force."

73.     Cianna Sales Rep 2 was also one of the company's top salespeople.[25] Cianna Sales Rep 2 was Cianna's lone sales representative covering Idaho, Washington, Oregon, Alaska, and Montana.   The January 2019 Cianna sales report, described above and corroborated by Cianna Sales Rep 3, reflected that Cianna Sales Rep 2 sold $2.265 million in Savi SCOUT product during 2018, placing him just

---

[24] Cianna Sales Representative 1, as referred to herein, was an Account Executive at Cianna beginning in April 2014, and then worked for Merit after the acquisition until February 2019 where he was responsible for selling the Cianna SCOUT.   He specialized in Breast, Cardiac Intervention, and Cardiac Surgery areas.   Prior to Cianna, he had 17 years of experience in sales of complex medical devices across several medical device companies.   He rose to the top of each sales force.   Former Cianna Sales Representative 1 received a Bachelor of Science in Management for Business Management and an associate degree in Nursing.

[25] Cianna Sales Representative 2, as referred to herein, was an Account Executive at Cianna from August 2017 until Cianna was acquired by Merit in November 2018, then worked for Merit until March 2019.   Former Cianna Sales Representative 2 was responsible for selling the SCOUT product in the Pacific Northwest.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

behind Cianna Sales Rep 1, and <u>meaning that he was single-handedly responsible for</u> <u>approximately 7% of Cianna's total Savi SCOUT sales</u>.  Moreover, Cianna Sales Rep 2 was one of Cianna's up-and-coming stars.  In 2018, Cianna Sales Rep 2 exceeded the company's year-end target for his performance by approximately $1.2 million, which was the <u>highest actual-to-target performance of all Cianna salespeople</u>.  He also sold the second-highest number of consoles of any of the company's salespeople in 2018.  Cianna Sales Rep 2, who joined Cianna well over a year before the acquisition, quit Merit in March 2019—approximately three months after the acquisition closed in November 2018 and long before Lampropoulos' false and misleading representations to investors on April 24, 2019 that Merit "maintained the [Cianna] sales force."

74.    Cianna Sales Rep 3 was also one of the company's top salespeople. Cianna Sales Rep 3 explained that he ranked highest in the country in total sales of Savi SCOUT consoles and second highest in total sales of Savi SCOUT product, selling $2.61 million worth of product in 2018 (i.e., approximately 8% of the Company's overall sales)—facts that were corroborated by the January 3, 2019 Cianna sales report recapping each salesperson's total sales in 2018.  In 2018 alone, Cianna Sales Rep 3 exceeded his sales target by $1.18 million, which was the second-best performance, relative to sales target, of all Cianna sales representatives.  Cianna Sales Rep 3 was the company's lone sales representative covering Northern California, including Bakersfield, Redding, San Jose, and San Francisco, and had been with the company for five years before the acquisition.  Cianna Sales Rep 3 personally had over 50 accounts, including some of the Company's most important, such as Stanford, Sutters, and Kaiser.  Cianna Sales Rep 3 stated that he quit, effective immediately, on April 15, 2019—approximately four months after the acquisition and before Lampropoulos' false and misleading representations to investors on April 24, 2019 that Merit "maintained the [Cianna] sales force."

75.    In addition to these critical departures, another Cianna account executive from the Central region—referred to herein as Cianna Sales Rep 4—also quit Merit

1    shortly after the Cianna acquisition.  Cianna Sales Rep 4 joined Cianna in March of

2    2018 and was the company's sales representative covering all of Missouri, Kansas,

3    Iowa, and Nebraska, as well as Southern Illinois.  Cianna Sales Rep 4 had over 10

4    years of sales experience in women's oncology products before joining Merit.  While

5    at Merit, Cianna Sales Rep 4 handled several important accounts, including St.

6    Anthony's and St. Luke's hospitals.  He explained that he left Merit in January 2019,

7    after the Cianna acquisition—approximately one month after the acquisition and long

8    before Lampropoulos' false and misleading representations to investors on April 24,

9    2019 that Merit "maintained the [Cianna] sales force."

10           76.    The rapid departure of over 20% of Cianna's sales force within just

11   months of the acquisition, who collectively covered nearly a third of the country and

12   were responsible for nearly one-fourth of Cianna's total revenues, dealt a significant

13   blow to the purportedly transformative Cianna acquisition.   The impact of these

14   departures was particularly acute for at least three reasons: (1) the sales force

15   departures included Cianna's top performers; (2) the sales force was extremely small

16   to begin with, making the loss of even one key salesperson extraordinarily impactful;

17   and (3) the bulk of the sales force losses occurred in Cianna's most important region,

18   the Western region.  Cianna's VP of Sales explained that, when these top performers

19   left in quick succession, it "felt like a mass exodus" in the critical Western region.

20   Cianna Sales Rep 3 put it succinctly: "the West coast sales team was decimated"—a

21   fact that Cianna Sales Rep 3 explained was widely discussed at Merit.  Cianna's

22   Clinical Account Manager corroborated these accounts, explaining that in early 2019,

23   just months after the acquisition and right after the sales quotas went out for the sales

24   representatives, Cianna sales representatives who were among its top performers and

25

26

27

28

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1  who worked in a large area in the Western region quit Merit, leaving Merit with hardly

2  any sales representation on the West Coast.[26]

3      77.    Not surprisingly, the departure of 60% of Cianna's total West Coast sales

4  force and over 20% of its total overall sales force, including its top performers,

5  negatively impacted Cianna's ability to generate and grow revenues after the

6  acquisition.  Merit could not easily replace these highly-valued sales professionals

7  with individuals with equivalent experience, training, and, most importantly,

8  relationships with existing customers—relationships that required years to develop.

9  Plus, as Lampropoulos himself publicly acknowledged, Cianna's technology was a

10  different and more complex technology than the accessory products that Merit was

11  accustomed to selling and, accordingly, Merit could not substitute its own sales

12  representatives.  Cianna Sales Rep 3 concurred that the sales force at Merit—which he

13  described as a "widget" company that sold tubes and syringes—was not equipped to

14  sell Cianna's sophisticated products.

15      78.    Cianna Sales Rep 3 stated that new business dropped off precipitously

16  once his colleagues quit.  He further explained that, in his current position at his new

17  employer, he continues to work in the same territory for a different medical device

18  company.  When he returned four months after starting his new job to some of his

19  biggest former accounts, including Stanford Hospital, his former accounts told him

20  that they had never even seen his replacement sales representative at Cianna.

21      79.    Merit's Regional Vice President of Sales in the Southeast region stated

22  that it was a "really big deal" when the Cianna West Coast sales representatives quit

23

24

25  _____

26  [26] Cianna's Clinical Account Manager worked for Cianna from October 2017 and then for Merit after
it acquired Cianna until October 2019.  His responsibilities included interfacing regularly with

27  customers, including travelling to hospitals and training the physicians on how to use Cianna's
products, as well as acting as a clinical liaison for Cianna accounts.

28

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

Merit shortly after the acquisition.[27]  He explained that these individuals were tenured sales representatives and had great relationships with Cianna accounts, who they introduced to the SCOUT technology.  He explained that their departures were expected to have—and did have—a significant impact on sales of Cianna products going forward.  He stated that "everyone knew, we lost a significant percentage of our sales force in the West, so there was going to be drop off in revenue."  He added that, "[w]hen these sales reps left, they created a significant ripple effect in terms of a drop off in revenue."

80.    The Southeast Regional VP of Sales explained that the drop off in revenue caused by the West Coast sales representatives' departures was clearly visible, including in the Company's regional sales figures.  Merit's Southeast Regional VP of Sales explained that Merit's sales leadership received weekly, monthly, and quarterly sales figures, which were sent by email to the sales leadership and were also available on the Company's Domo software system as described in more detail below.  These sales figures were broken out by sales region.  He indicated that, after the Cianna sales representatives in the West coast region quit, there was a significant decline in the sales numbers for the Western region, as reflected in these weekly, monthly, and quarterly sales reports.  Merit's Southeast Regional VP of Sales confirmed that Lampropoulos had access to these sales numbers via Domo reflecting the decrease in sales in the West Coast region.

81.    Merit's Southeast Regional VP of Sales explained that the sales numbers in the West Coast Region—which was one of the higher performing regions in 2018— were down by at least 25% to 30% the entire time he was with the Company in 2019 because of the sales force departures in the Western region.  He added, "this was a

---

[27] Merit's Southeast Regional VP of Sales, as referred to herein, was a Regional Vice President of Sales at Merit from February 2019 until February 2020 in the Southeast region.  He managed sales representatives that sold Cianna's products in 14 states within the Southeast region.  He reported to Will Irby, Merit Oncology Franchise Vice President.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

significant decline which they never recovered from." He further explained that, in stark contrast to its sales performance pre-acquisition (*see* ¶68), the West Coast region was recording the <u>least sales of all of Merit's sales regions</u> after the acquisition in 2019.

82.    The West Coast's Regional VP of Sales, Mark Vinger, openly recognized and discussed with his colleagues the crippling impact of these top performers' departures on the Company's sales. Merit's Southeast Regional VP of Sales recounted how he discussed the impact of these critical departures with Mr. Vinger shortly after they occurred. Mr. Vinger told Merit's Southeast Regional VP of Sales that Merit was "going to get killed" by the departures of these core salespeople in the West Coast. In addition, during subsequent meetings and tradeshows that they attended together, Vinger further told Merit's Southeast Regional VP of Sales that these departures adversely affected his West Coast region's sales numbers.

83.    Merit's Southeast Regional VP of Sales further recounted how each regional sales leader provided a regional sales report during quarterly "close-out" meetings in advance of Merit's quarterly investor calls. He explained that, during these close-out meetings, the West Coast's regional sales leader reported the Company's very soft sales numbers in the Western region. He noted that Justin Lampropoulos, Merit's Executive Vice President of Sales, Marketing & Strategy and the son of Defendant Lampropoulos, attended the close-out meeting for the first quarter of 2019, and both Fred and Justin Lampropoulos attended the close-out meeting for the second quarter of 2019 in advance of the Company's quarterly investor call. As a result, both Fred and Justin Lampropoulos were informed of the poor sales in the Western region shortly before the Company's earnings calls for both the first and second quarters of 2019.

84.    Former Cianna and Merit employees have explained that Lampropoulos' representations to investors about the Cianna sales force were false and misleading. When told of Lampropoulos' statements to investors in February and April 2019 that

Merit maintained the Cianna sales force, Cianna Sales Rep 3 explained that "It's false to say [that]."

## 2. Merit Struggled to Integrate Cianna, Which Remained Unintegrated Beyond the First Quarter of 2019

85.     During the Class Period, Lampropoulos not only misled investors into believing that Cianna's sales force remained intact, but he also falsely assured investors that Cianna's integration was proceeding successfully and was complete by the end of the first quarter of 2019.  In truth, as multiple former Merit employees have recounted, Defendants' integration efforts were an unmitigated disaster and far from complete by the first quarter of 2019.  Indeed, they were not even complete by the end of the Class Period, as Merit later conceded.  *See* ¶¶140-146.

86.     Cianna's Vice President of Marketing, who was identified by Cianna on its website as a member of its leadership team, explained that he was one of three Cianna executives responsible for the integration process following the acquisition.[28] Cianna's VP of Marketing stated that he attended meetings with Lampropoulos and other Merit executives during the due diligence phase prior to the acquisition in December 2018 and that, during these meetings, all of Cianna's separate systems were discussed.

87.     Contrary to Lampropoulos' April 23, 2019 statement to investors that the transition was "complete" by the end of the first quarter of 2019, Cianna's VP of Marketing stated that Merit had not completed 50% of the items planned for integration by that time.  Indeed, in addition to failing to integrate the Company's sales force, as discussed above (*see* ¶¶67-84), Cianna's Clinical Account Manager confirmed that Merit wanted, but failed, to integrate a number of key aspects of

---

[28] While at Merit, Cianna's Vice President of Marketing reported to Senior Marketing Product Manager Jesse Hansen.  He worked for Cianna from July 2013 until November 2018, and then for Merit until August 2019.  He was responsible for developing and executing the launch of the SCOUT Radar Localization System.  He has over 25 years of medical device marketing experience.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1    Cianna.  Among other things, by April 2019, Merit had still failed to integrate Cianna's

2    most important systems and platforms, including its customer relationship

3    management platform, marketing platform, and meeting planner.

4          88.    ***Merit failed to integrate Cianna's CRM platform.***  Companies that sell

5    medical products, such as Merit and Cianna, maintain customer relationship

6    management platforms (also known as "CRMs").  These platforms are central to

7    medical product companies' operations, as they contain the core customer information

8    and sales data necessary to analyze performance and trends.  Merit recognized the

9    importance of these critical systems, stating in its SEC filings that the integration

10   process entailed integrating the acquired companies' "information management

11   systems."  In its SEC filings and elsewhere Merit assured investors that the Company

12   was, in fact, integrating the acquired companies' "processes" and "technology."

13         89.    Cianna's Vice President of Marketing explained that Cianna's CRM was

14   highly sophisticated and was designed to track everything that occurred within

15   Cianna's accounts, including who the customers were, who the decisionmakers were

16   at the accounts, what the sales process was for the accounts, and where Cianna was

17   within the sales process on the accounts.  He further explained that Cianna's CRM

18   included information about current and anticipated future sales and tracked sales

19   opportunities for six to twelve months in the future.  He noted that Cianna's CRM

20   generated analyses of downturns in sales by region, providing comparisons of previous

21   quarters to the current quarter by region.  Cianna's Clinical Account Manager further

22   explained that the Cianna CRM additionally contained sales forecasting information

23   and contracts with customers.

24         90.    Merit and Lampropoulos understood early in the due diligence process

25   for the Cianna acquisition that Cianna and Merit had two separate CRMs that would

26   need to be integrated.  Cianna's VP of Marketing presented directly to Lampropoulos

27   and his fellow Merit executives during up-front meetings in the third quarter of 2018,

28   in advance of the acquisition.  He explained that all of Cianna's systems were

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

discussed during these meetings, and that it was specifically discussed during these meetings that Merit operated using a different CRM system than Cianna. Cianna's VP of Marketing further explained that Lampropoulos "was an active participant in these [up-front] meetings," all of which he attended, and was deeply involved in the operational details. During these meetings, Cianna's sales, marketing, and R&D groups all presented their organizations to Lampropoulos, including in PowerPoint presentations. Cianna's VP of Marketing specifically recalled personally presenting at one such meeting in November 2018, during which they discussed how Cianna operated from a sales and marketing perspective.

91.   Merit understood—and told investors—that integrating Cianna's information systems, such as its CRM, was a necessary part of the integration, and that a failure to fully complete the integration would adversely impact Merit. For example, in its SEC filings signed by Lampropoulos, Merit stated that "[a]s we grow through acquisitions, we face the additional challenges of integrating the . . . information management systems . . . of the acquired entity with our own."[29]  Merit's failure to integrate the two companies' platforms would result in needless expenses and inefficiencies, and prevent the Company from realizing anticipated synergies from the acquisition. As Cianna's VP of Marketing explained, "Merit Medical was paying for two separate CRM platforms, and that is not very efficient."

92.   As former senior employees of Merit made clear, Merit failed to integrate the two companies' platforms by April 23, 2019, notwithstanding Lampropoulos' representations to investors on that date that the Cianna integration was "complete," and, in fact, the integration was not complete even by the end of the Class Period. Cianna's VP of Marketing explained that the plan was to integrate the two companies' CRMs after the acquisition. But, the two platforms were not integrated as planned,

---

[29] Merit Medical Form 10-K for the year ended December 31, 2018 filed with the SEC on March 1, 2019.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

and former Cianna employees were still operating from (and Merit was still paying for) a separate CRM platform as of at least June 2019, with Cianna using a Salesforce platform and Merit using a Microsoft Dynamics platform to operate their respective CRMs.

93.    Merit's attempt in early 2019 to integrate the two CRMs failed miserably. Cianna's Clinical Account Manager provided an account of the Company's failed efforts in early 2019 to integrate the companies' CRMs.  He explained that, after Merit's January sales meeting, the two companies tried to merge the data from their respective CRMs.  But when the integration was attempted, it became a jumbled mess, resulting in incorrect account numbers and addresses listed for Cianna accounts.  As a result, previously ordered products for long-time Cianna customers were sent to the wrong locations.  This, he explained, caused customers to become upset because they had scheduled surgeries and did not receive their equipment due to errors caused by Merit's failed attempt to integrate the two CRMs.  Cianna's Clinical Account Manager explained that the plan was to integrate the two companies' CRMs, but the integration failed to happen—with Merit and Cianna employees still using separate CRMs by the time he left Merit in October 2019.  As he explained, Cianna remained "on its own island" and its operations were "not integrated" with the rest of Merit Medical.

94.    ***Merit also failed to integrate Cianna's marketing platform.***  Similarly, notwithstanding Defendants' representations that the integration of Cianna was "complete" in April 2019, former senior employees of Merit confirmed that Merit also failed to integrate Cianna's critically important marketing platform.  In the medical device industry, marketing platforms are a critical component of a company's operations given the level of competition, the complexity of products, and the pace of innovation.  These platforms aid medical device companies in creating marketing materials to increase visibility and, by extension, sales.  Cianna's VP of Marketing explained that prior to the acquisition, Merit and Cianna used two different marketing

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1  platforms.   He explained that Merit planned on integrating Cianna's marketing

2  platform into its own after the acquisition.

3      95.    Specifically, prior to the acquisition, Cianna utilized a marketing

4  platform known as Showpad.  Cianna's VP of Marketing explained that this marketing

5  platform contained information about Cianna's marketing and pricing of its products.

6  His description was corroborated by the account of Cianna's VP of Sales, who added

7  that all of Cianna's strategy information and marketing materials were stored in its

8  marketing platform.   Merit did not use Showpad, but instead utilized a different

9  marketing platform.

10     96.    Cianna's VP of Marketing explained that Merit planned on integrating

11 Cianna's marketing platform into its own after the acquisition.  But those efforts stalled

12 and, as Cianna's VP of Marketing explained, Merit ultimately failed to integrate the

13 two companies' marketing platforms.  Cianna and Merit continued to use two separate

14 and unintegrated marketing platforms in June 2019—i.e., well after Lampropoulos'

15 representations to investors on that date that the integration was "complete."  Merit's

16 Senior Marketing Event Manager similarly confirmed that Merit failed to integrate

17 Cianna's marketing platform by the second quarter of 2019, and that the marketing

18 platforms remained unintegrated as of his departure from the Company in July 2019.[30]

19     97.    ***Merit also failed to integrate Cianna's medical meeting planner.***

20 Medical device companies regularly attend medical conventions and meetings to

21 promote their products.  In its quarterly SEC filings, Merit specifically stated that,

22

23 [30] Merit's Senior Marketing Event Manager worked for Merit for over 20 years, working his way up
   the ranks of the Company.  Starting in August 2015, he was a Marketing Communications Specialist,
24 and then a Senior Business Analyst in Executive Sales Support, before becoming Senior Marketing
   Communications Manager in May 2017 and holding that role until July 2019.  He reported to Kyle
25 Knowles, Vice President of Brand Marketing, and to Alex Lockovitch, Vice President of Corporate
   Product Management, both of whom reported to Justin Lampropoulos.  As Senior Marketing Event
26 Manager, he was responsible for marketing the ClariVein product line.  He was also responsible for
   all of Merit's 75-80 annual U.S. trade shows in coordinating with the executives, and other groups,
27 and served in that role until January 2020.

28

- 40 -

"[a]s part of our product sales and marketing efforts, we attend major medical conventions throughout the world."[31]   Cianna likewise attended and relied upon medical meetings as part of its marketing and sales efforts.  In fact, Cianna's VP of Marketing explained, Cianna attended more medical meetings than Merit.

98.    To facilitate these marketing efforts, medical device companies utilize medical meeting planners, which are important tools to manage the medical conferences in which the companies participate.  Cianna's VP of Marketing explained that Merit planned, but failed, to integrate Cianna's medical meeting planner with its own.  He stated that Merit hired a medical meeting planner consultant in April or May of 2019 to help with this intended integration, and he discussed the intended integration of the meeting planner with Lampropoulos' son during the first quarter of 2019.  However, as Cianna's VP of Marketing explained, the integration efforts fizzled out by June 2019, and Merit and Cianna employees continued to operate with two, separate and unintegrated meeting planners.

99.    ***Merit also failed to integrate Cianna's sales force.***  As described in detail above, the most critical part of the Cianna integration was that of its sales force.  Despite Defendants' repeated representations to investors that Merit was going to integrate and maintain Cianna's "entire" sales force, in truth, Merit failed to do so.  Cianna's top salespeople, who were responsible for nearly 25% of the company's annual revenue, all left Cianna shortly after the acquisition closed, resulting in poor financial results for Cianna in 2019.

100.   In touting the "completed" Cianna integration, Lampropoulos and Merit failed to disclose to investors any of these integration failures.  When investors began to learn the unfortunate truth and its impacts—as discussed further below (¶¶129-146)—Merit's stock plummeted.

---

[31] Merit Medical Form 10-K for the year ended December 31, 2018 filed with the SEC on March 1, 2019.

- 41 -

3. **As Defendants Were Ultimately Forced to Admit, Merit Had *Zero* ClariVein Orders During the Entire First Half of 2019 due to Pre-Existing Reimbursement and Regulatory Roadblocks**

101.    During the Class Period, Defendants also hid the true facts about their other major acquisition, Vascular Insights' ClariVein.  In the months leading up to the Class Period Defendants touted the acquisition, telling investors that ClariVein addressed a $700 million market and would singlehandedly generate $10 million to $11 million in additional revenues for Merit in the first year following the acquisition. As Merit marched through the first half of 2019, Defendants continued to lead the market to believe that nothing had changed in that assessment and, based on their experience tracking the performance of ClariVein for several months, their "confidence [was] built there."  As the Class Period progressed, Defendants continued touting Vascular Insights' integration into Merit, which supposedly "continued to drive growth," and the purported "strong sales" of Merit's stand-alone products, including ClariVein.

102.    Unbeknownst to investors at the time—but well known to Defendants—these statements were false and highly misleading.  <u>Merit's efforts to sell their "blockbuster" ClariVein product were a disaster from the outset, with Merit incredibly not completing a single order during the entire first half of 2019</u>.  As Lampropoulos would eventually be forced to disclose to investors in late 2019, "<u>we haven't had an order [for ClariVein] all year</u>"—an admission that sent Merit's share price tumbling by 30% in a single day.

103.    Meanwhile, the fact that Merit did not have a single order for ClariVein during the entire first half of 2019 was obviously well known to the Company's top executives, who had just paid $60 million to acquire the product.  Moreover, multiple high-level former Merit employees have described how these executives, including Defendants Lampropoulos and Parra, had instantaneous and constant access to ClariVein's sales information.

104.   Detailed sales information for ClariVein was displayed in real-time on large screen televisions that hung directly outside of Defendants Lampropoulos' and Parra's offices on the third floor of the Company's headquarters.  Several former employees described these screens, which live streamed sales data, in meticulous detail.  Merit's Vice President of Business Continuity, who reported directly to Lampropoulos and had an office on his same floor, explained that one of the screens was 60 inches by 60 inches and was mounted to the wall just outside and to the right of Lampropoulos' office, and streamed daily sales reports for Merit's different product lines.[32]   Merit's Senior Marketing Event Manager, who reported that he saw Lampropoulos every day and had an office on his same floor for most of his tenure, likewise said the screen constantly streamed daily sales information for each of the Company's products, broken down by daily, monthly, and quarterly numbers.  Merit's Senior Product Manager, who participated in weekly meetings and sometimes twice-a-week meetings in Lampropoulos' office, also confirmed that there was a screen positioned directly outside of Lampropoulos' office showing the daily orders that came in, including revenue and what was sold.[33]  The screens contained rolling charts that would show the sales for each product SKUs, as well as show Lampropoulos what products had orders for the day, the daily sales for each individual SKU, what products were shipped out, the quantity of material shipped out, the amount of any backorders, and the names of sales force leaders.

---

[32] Merit's Vice President of Business Continuity went to work for Merit in July 2016 after Merit acquired his previous company, DFINE, where he worked as a Corporate Compliance Officer since October 2011.  Because he came so highly recommended by DFINE and had so much compliance experience, Lampropoulos created his new position and title.  He was responsible for creating Merit's Compliance department with processes to ensure compliance with federal healthcare laws and regulations.  He stayed with Merit until September 2019.

[33] Merit's Senior Product Manager worked for Merit from February 2018 to July 2018.  He was responsible for managing Merit's microcatheter and guide wire portfolio.  He was also responsible for product development and for keeping existing product afloat.

105.   Lampropoulos regularly reviewed the data displayed on the screen immediately outside his office.  Merit's Project Manager explained, for example, that Lampropoulos looked at the screen, which showed product-line level information, every time he exited his office.[34]  Merit's Senior Marketing Event Manager further reported that there was a similar, second screen displaying the same information in front of CFO Parra's office.  Merit's Project Manager also confirmed that Parra, just like Lampropoulos, could see the sales information on the screens each time he exited his office.

106.   Merit used an integrated sales reporting software system called "Domo" that was accessible on demand by Merit's employees, including Defendants Lampropoulos, Parra, and other members of senior management.  Merit's Strategic Accounts Contract Manager explained that Domo tracked and stored all of the sales and order data for each of Merit's products on an up-to-date basis.[35]  He explained that, among other things, Domo tracked when orders were placed, by which customer, and for how much.  He further described that the Domo user could pull a report for the month for a particular account and see the product sales for that month.  He explained that this centralized database is where most Merit business analysts and executives went to find out about sales.  Merit's Strategic Accounts Contract Manager specifically confirmed that Lampropoulos, who he interacted with frequently, and Parra, each had full access to Domo and requested data from Domo frequently.

107.   Multiple witnesses have recounted how, in addition to viewing the sales and order data streamed on these screens, Lampropoulos had available and constantly reviewed the same information on his mobile phone.  Merit's Project Manager

---

[34] Merit's Project Manager worked for Merit from December 2016 until August 2019.  He acted as a liaison between R&D and production, which included helping to manage issues in the product coming out of certain facilities.

[35] Merit's Strategic Accounts Contract Manager worked for Merit from August 2016 until May 2019. He was responsible for handing all of Merit's contracts for ClariVein sales for the major organizations and purchasing groups.  Part of his job was to keep product pricing in line with Company standards.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

recounted how the same information that was displayed on the screen outside Lampropoulos' office was also contained on his mobile phone. Merit's Project Manager further described how, during meetings, Lampropoulos looked at his phone for this information and then talked about individual product sales. Merit's Senior Marketing Event Manager, who reported that he saw Lampropoulos every day at work and had known him for over 30 years, stated that he was "hooked on the sales system that they use."

108. In addition to their ability to access ClariVein's sales and order information at all times, Defendants also received regular reports with this same information, including an email at the end of each day with daily sales numbers. Merit's Senior Marketing Event Manager confirmed that an email detailing the daily sales numbers tracked by the Company's sales reporting system was sent to the Company's top executives, including Lampropoulos, at the end of every day with a link to get more detailed information on specific product reporting. In other words, throughout the Class Period, Defendants were informed on a <u>daily basis</u> that the Company had not booked <u>any</u> new orders of ClariVein.

109. On top of all of this, Lampropoulos and Parra also asked for and received additional, constantly updated periodic reports with quarter-over-quarter and year-over-year information synthesized from Domo. The business analyst team would run these reports with regularity and send them to the executives. Merit's Strategic Accounts Contract Manager described the executives' requests for periodic reports on sales as "constant" and reported that Lampropoulos regularly had the business analysts up in his office to produce them for him.

110. Based on this steady stream of information, Merit executives knew of the Company's extreme difficulties selling ClariVein following the acquisition. Merit's Senior Marketing Event Manager, who was a part of the marketing team for ClariVein, said there were constant discussions about the need to sell more ClariVein. He recounted that the status of sales of ClariVein product resulted in an "Oh My God"

issue at Merit during the first quarter of 2019, and that they were tracking first quarter sales of ClariVein to figure out why sales were not increasing.  He explained that there were constant discussions about having to sell ClariVein, adding that "it was pretty much every single day" discussions.  When asked about sales of ClariVein during the first two quarters of 2019, a Vascular Insights National Account Manager also described them as "disastrous."[36]

111.   Lampropoulos' obsession with his products' sales numbers was no secret. Merit's VP of Business Continuity said Lampropoulos "knew everything about sales" and was "aware every day of how sales were going."  Merit's Senior Marketing Event Manager explained that, in fact, it was well-known in the Company that Lampropoulos, specifically, logged into Domo several times a day.  Lampropoulos even touted his contemporaneous knowledge of the Company's sales during calls with investors, for example, telling investors on April 23, 2019 that he had talked to "2 or 3 or 4 of our salespeople every day."

112.   In addition to knowing, but failing to disclose, the absence of ClariVein orders during the first half of 2019, Defendants also knew, or were deliberately reckless in not knowing, of the undisclosed roadblocks preventing meaningful sales of ClariVein, including that (i) insurance companies consistently refused to provide reimbursement for ClariVein; and (ii) Merit was restricted by federal regulations from marketing ClariVein for its intended purpose of treating varicose veins.  But instead of disclosing these highly material facts, Defendants continuously concealed them. Even when finally forced to disclose in late July 2019 that ClariVein had had zero orders in the entire first half of 2019, Defendants continued to conceal the true reasons

---

[36] Vascular Insights National Account Manager, as referred to herein, was a former National Account Manager, Market Access for Vascular Insights from September 2016 until it was acquired by Merit in December 2018.  He then worked for Merit until October 2019.  He was responsible for working on reimbursements for the ClariVein product. Part of his job responsibilities included accompanying sales representatives in the field to ensure that they understood how reimbursement worked.  He has over thirty years' experience working in the pharmaceutical and medical device industry.

1  for the lack of orders by fabricating false reasons, claiming that a "short-term" issue

2  of "pipeline filling"—i.e., <u>excess prior orders</u>, was the cause. *See* ¶¶130-136.

3      113. ***Insurance companies were consistently denying reimbursement***

4  ***requests for ClariVein.*** Merit and Vascular Insights followed a "buy and bill" model

5  for the ClariVein product, whereby physicians first purchased ClariVein directly from

6  Vascular Insights (and after the acquisition Merit) and then, after using it with a

7  patient, sought reimbursement under a patient's health insurance policy. Insurance

8  payors, commercial and federal programs alike, were free to determine for themselves

9  whether they would provide reimbursement. When insurance payors denied claims,

10  physicians were not reimbursed, and the physicians lost money.

11      114. Unbeknownst to investors, nearly every insurance payor was denying

12  reimbursement coverage for ClariVein, which prevented meaningful new orders.

13  Vascular Insights witnesses have described how <u>insurance carriers were denying a</u>

14  <u>remarkable 80% of physicians' reimbursement claims submitted for ClariVein</u> and

15  how, by October 2018, shortly before the acquisition, less than 5% of ClariVein sales

16  were covered for reimbursement under any commercial insurance policy. These

17  reimbursement denials, which interfered with orders of ClariVein throughout the Class

18  Period, were well-known and documented by Vascular Insights and Merit employees.

19      115. Several Vascular Insights professionals detailed how the vast majority of

20  insurance payors denied reimbursement claims for ClariVein. The VI Area Manager

21  explained that about 80% of reimbursement claims for ClariVein were being denied

22  as outside of insurance coverage.[37] He stated that "every single commercial payor,

23

24  _____

25  [37] VI Area Manager, as referred to herein, was an Area Manager at Vascular Insights in the Mid-
     Atlantic region from February 2014 to October 2018. He was personally responsible for submitting

26  EOBs showing that Medicare was denying claims for coverage of ClariVein. He has vast experience
     in navigating reimbursement challenges with both Medicare and commercial insurance payors for

27  peripheral interventional medical devices and has over a decade of of experience selling medical
     devices.

28

1   with the exception of a couple of random one offs, had ClariVein as investigative or

2   experimental on their policy" and, thus, would be automatically denied for coverage.

3   The VI Territory Manager confirmed that commercial insurance carriers were not

4   covering the use of ClariVein in his territory.[38]   The VI Area Manager explained that

5   the major carriers that denied coverage included Tricare, Tricare Prime, Etna,

6   Humana, UnitedHealthcare, and Blue Cross.   He further explained that no national

7   insurance policies covered the product, physicians got tired of dealing with the

8   reimbursement issues, and Vascular Insights saw its sales go down.   By the time he

9   left Vascular Insights in October 2018, the situation was so dire that less than 5% of

10  ClariVein's sales were provided reimbursement coverage under any commercial

11  insurance policy nationwide.   The VI Area Manager explained that he knew these facts

12  through his experience, attendance at sales meetings, weekly conference calls with the

13  Vice President of Sales and the other sales representatives, and through discussions

14  with sales representatives who he spoke with regularly and who knew what

15  reimbursement requests were getting approved and denied.

16       116.   The VI Area Manager explained that Vascular Insight's sales

17  representatives were tasked in or about early 2018 with compiling explanation of

18  benefits (commonly referred to as an "EOB") from physicians.   EOBs are statements

19  sent by health insurance companies to physicians explaining what medical treatments

20  and services were (or were not) covered by the insurance company.   A total of

21  approximately 100 EOBs were obtained, and they came from all types of insurance

22

23

24  _____

25  [38] VI Territory Manager, as referred to herein, was a Territory Manager at Vascular Insights from
    October 2016 until the acquisition and then worked for Merit until December 2019.   He was

26  responsible for selling ClariVein as well as several legacy Merit medical supplies.   During his time
    at the Company, he reported to Chuck Blake, former Regional Sales Director; Kevin McGowan, VP

27  of Sales; and Keith Reinhard, Regional VP of Sales NE Merit Vascular.   He has over 19 years'
    experience in the vascular space.

28

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1    plans.  The VI Area Manager explained that 80% of the EOBs received reflected a

2    denial of coverage because ClariVein was outside of the insurance policy's coverage.

3         117.   Coverage was equally as dismal for federal coverage programs.  The VI

4    Area Manager reported that almost every single one of the Medicare Advantage Plans

5    was denying coverage for ClariVein.  The VI Sales VP further noted that Novitas, the

6    biggest Medicare Administrator Contractor, stopped providing reimbursement for

7    ClariVein in the second quarter of 2017.[39]  This was a substantial blow to ClariVein

8    because, as VI Area Manager reported, 30% to 45% of ClariVein prior sales had been

9    from Novitas before it stopped providing reimbursement.[40]  The VI Sales VP explained

10   that Novitas' denial of reimbursement coverage put ClariVein at a substantial

11   disadvantage to its competitors (including Medtronic) because, in the medical device

12   industry, there was a limited window for a company to prove a product's value and

13   worth, and ClariVein's window had closed.

14        118.   The widespread denial of reimbursement by both private and government

15   health insurance doomed all efforts by Merit to meaningfully generate new ClariVein

16   orders.  The VI Sales VP explained that, beginning in the second quarter of 2017, sales

17   of ClariVein markedly declined due to a lack of reimbursement.  Doctors and hospitals

18   became increasing reluctant to purchase ClariVein due to legitimate fears that they

19   would not be reimbursed.  The VI Sales VP explained that ClariVein quarterly sales

_____

[39] Vascular Insights' Vice President of Sales (or "VI Sales VP"), as referred to herein, was the Vice President of Sales, U.S. at Vascular Insights, and led Vascular Insights' U.S. sales team for four years, beginning in 2014, before being let go when Merit purchased the company.  While at Vascular Insights, he oversaw the sales team, and his direct reports included the two area directors that covered the east and west halves of the country and managed all of the sales representatives in the field, Paul Quetell and Jay Agee.  He has over 25 years of experience in sales and commercials leadership in the medical arena for both mature and start up organizations.

[40] Novitas Solutions, Inc. is an administrative services processing company for government-sponsored health care programs on behalf of the federal government.  It has two jurisdictions. Novitas' Jurisdiction L spans Delaware, Maryland, New Jersey, Pennsylvania, and the Washington D.C. Metro Area.  Novitas' Jurisdiction H spans Arkansas, Colorado, Louisiana, Mississippi, New Mexico, Oklahoma, Texas, and includes Indian Health Service (IHS) and Veterans Affairs (VA) nationally.

dropped by 50% in the second quarter of 2017 (from $4 million to $2 million), and then continued to decline further.  As the VI Area Manager wrote to Jay Agee (Vascular Insight's National Sales Director) in an email dated July 20, 2018, "we have missed our team quota by a significant amount every single month, we have consistently come in under 70% to plan."  Consistent with his email, the VI Area Manager confirmed that sales of ClariVein were declining in 2018.  The VI Sales VP similarly explained that a lack of reimbursement was the biggest obstacle to ClariVein's sales, with doctors stating that they were not re-ordering product because of the universal reimbursement denials.

119.    Following the acquisition, numerous Vascular Insights employees who joined Merit also told their new colleagues at Merit about the industrywide reimbursement barrier to selling ClariVein.  For example, the VI Territory Manager gave a presentation to Merit's entire sales team at a National Sales Conference in January 2019, which was attended by Merit's management group.  The VI Territory Manager—who explained that the reimbursement difficulties persisted from 2017 throughout his entire time at Merit which ended in December 2019—said that his January 2019 presentation detailed the "good, bad, and the ugly" about ClariVein.  He explained that "the ugly was the reimbursement" and he "told them about reimbursement issues right out of the gate."  He stated that he did not sugar-coat anything when it came to the reimbursement issues, including that "we don't have any commercial insurance covering us."  The VI Territory Manager also explained that Lance Thrash, who was responsible for reimbursement of Vascular Insights' products both before and after the acquisition, also gave a presentation on reimbursement at the same January National Sales Conference in 2019.[41]   The VI National Account Manager, who attended the January 2019 conference and recalled Mr. Thrash's

---

[41] Thrash went on to be Merit's Senior Director of Healthcare Economics and Reimbursement from December 2018 to July 2019 and then Vice President of Healthcare Economics and Reimbursement from July 2019 to February 2020.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1   presentation, confirmed that Mr. Thrash was clear that commercial reimbursement was

2   spotty and that Thrash did not "candy-coat anything" when discussing

3   reimbursements.

4       120.   The reimbursement struggles were so substantial that even Cianna's VP

5   of Sales learned about them.  He recalled how ClariVein's reimbursement challenges

6   were discussed by a franchise vice president during an April 2019 director's meeting

7   held in Richmond, Virginia to discuss Merit's Q1 2019 performance—a meeting that

8   was attended by the regional sales directors and Lampropoulos' son.[42]

9       121.   Merit was also advised of the reimbursement issues plaguing ClariVein

10  by Vascular Insights employees.  Between December 2018 and February 2019, the VI

11  Area Manager informed multiple Merit sales representatives about these very issues

12  when they reached out to him to ask him questions, in response to which he explained

13  to them the reimbursement issues and the denials from insurance carriers, such as

14  Tricare.  The VI Area Manager explained that Merit sales representatives, including a

15  Merit sales representative who worked in Richmond, Virginia, reached out to him in

16  December 2018 to discuss the ClariVein product.  In a written exchange with the Merit

17  sales representative on December 17, 2018, the VI Area Manager specifically told the

18  Merit sales representative that ClariVein was not covered by the national commercial

19  plans, with "<u>nothing National like BCBS [Blue Cross Blue Shield], UHC [United</u>

20  <u>Health Care], Cigna, etc.</u>"  The VI Area Manager further explained to the Merit sales

21  representative, who was tasked with selling ClariVein, that Medicare Advantage Plans

22  also did not cover ClariVein, with the VI Area Manager writing to the Merit sales

23  representative that there was "<u>nonpayment on the [Medicare] advantage plans</u>."  Even

24  more, he wrote the Merit sales representative that it was these "<u>reimbursement [issues]</u>

25  <u>that caused the company [Vascular Insights] to start a downward spiral</u>" before the

26

27  _____

28  [42] Cianna's VP of Sales explained that he believed the meeting occurred during the first three weeks of April 2019.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

acquisition. He warned the Merit sales representative that the absence of reimbursement is "gonna end up with a lot of pissed off doctors who have been told they have coverage, do the procedure then it get[s] denied! Trust me in this." He continued that "[i]t cost us and it will cost y'all at some point."

122. Not surprisingly, these well-founded warnings proved accurate, with Merit completing zero orders for ClariVein in the first half of 2019. The absence of orders was a cause of great concern within Merit's headquarters. The VI Territory Manager explained that "[t]hings started to turn pretty quick in the first quarter [of 2019]. They [Merit] were frustrated, and I was trying to tell them that this is the real life, we don't have reimbursement here." The VI Territory Manager further explained that Lampropoulos cannot credibly claim ignorance of these matters. As he colorfully noted, if Lampropoulos claims he did not know by the end of the first quarter of 2019 about the reimbursement issues negatively impacting Merit's ability to generate orders of ClariVein, then he is full of it.

123. The reimbursement issues plaguing ClariVein were so severe and deep-rooted that, immediately after the acquisition, Merit retained a lobbyist in an effort to get insurance plans to cover ClariVein reimbursement codes. Merit's Senior Marketing Event Manager recalled that these extraordinary lobbying efforts started by February 2019. Yet, Merit kept the reimbursement problem from investors on February 26, 2019—when they touted the acquired product—and throughout the remainder of the Class Period, shocking investors when they finally disclosed that they had no orders for ClariVein during the entire first half of the year.

124. ***Merit determined that it could not market ClariVein for treatment of varicose veins.*** ClariVein was developed and used to treat enlarged veins close to the surface of one's skin and typically found in the leg, called varicose veins. Prior to the acquisition, Vascular Insights marketed ClariVein as a minimally invasive treatment for varicose veins. Immediately after the acquisition, however, Merit concluded that Vascular Insights' marketing efforts were inconsistent with ClariVein's FDA

1  approved indication, and that Merit would, thus, need to revamp how it marketed the
2  product to avoid breaking the law.

3       125.   Merit's Senior Marketing Event Manager oversaw Merit's marketing
4  efforts for ClariVein.  He explained that on or about December 14, 2018 he was
5  provided with the marketing materials used by Vascular Insights for purposes of
6  updating and rebranding after the acquisition.  By the second week of January 2019,
7  he was trying to get Merit's regulatory team to approve the marketing materials for
8  ClariVein, now rebranded as a Merit product.  But, as he explained, <u>Merit's regulatory</u>
9  <u>team refused to approve any marketing materials for ClariVein that mentioned</u>
10  <u>anything about treating varicose veins</u>.  He explained that this posed a problem: the
11  primary market for the products was vein treatment centers, and Merit's sales force
12  was now expected to attempt to establish relationships with vein treatment centers
13  without being able to explain that the product could be used to treat varicose veins.
14  As he explained, <u>walking into a vein center and trying to sell ClariVein without being</u>
15  <u>able to explain that it could treat varicose veins just could not be done</u>.

16       126.   Other witnesses have corroborated the Senior Marketing Event
17  Manager's account.  Merit's Senior Marketing Communications Manager, for
18  example, confirmed his knowledge that Vascular Insights had been marketing the
19  ClariVein product in ways that were inconsistent with the Instructions for Use ("IFU")
20  prior to their acquisition by Merit Medical.[43]  He further confirmed that, after Merit
21  Medical acquired Vascular Insights, they looked at how they could market the
22  ClariVein product for its intended use, as Merit Medical's Regulatory team did not
23  approve the marketing of ClariVein outside of its IFU.  He explained that Merit's
24  inability to market the ClariVein product the way that it wanted to limited Merit's sales

25  ────────────────

26  [43] Merit's Senior Marketing Communications Manager worked at Merit from July 2018 until
    September 2019.  He was responsible for leading all U.S. marketing and communication initiatives
27  for the Cardiac Interventions division of Merit Medical, including the strategic planning, and
    implementation of integrated marketing programs for new product launches, trade shows, physician
28  training programs, and public relations.

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

representatives' ability to sell the product for its intended use.  Merit's Senior Marketing Communications Manager further explained that he sat directly next to Merit's Senior Marketing Event Manager, who oversaw the marketing efforts of ClariVein.  He added that "the level of frustration that she was going through during that time was great. She was trying to get that [i.e., the marketing] set-up.  The way they wanted to market it, they couldn't."  He stated that Merit Medical was aware of this issue by late December 2018 or early January 2019, and that he was rather shocked when he found out.  He commented, "<u>I knew that they were unable to market the ClariVein the way they wanted to, which meant that their sales reps couldn't market it that way, which resulted in low sales</u>."

127.   The VI National Account Manager confirmed that Merit would not allow them to use Vascular Insights' ClariVein marketing materials.  He explained that, in February 2019, he had a conference call with Thrash, during which Thrash told him that Merit was not going to use Vascular Insights' marketing materials.  He added that, as a result, <u>Merit "didn't have much [materials] to market" ClariVein</u>.

128.   Merit's executives, including Lampropoulos, were promptly advised that the Company's most-recently acquired product could not be marketed for its intended purpose of treating varicose veins.  Merit's Senior Marketing Event Manager reported that Lampropoulos met with, among others, Merit's Chief Regulatory Officer and the Vice President of Regulatory and Clinical Affairs at Merit, Lorraine Hanley, to discuss the issue.  Merit's Senior Marketing Event Manager, who oversaw Merit's marketing efforts for ClariVein, reported that Lampropoulos knew that Merit determined that it could not market ClariVein for its intended purpose, varicose veins, by February or March 2019.   Remarkably, Lampropoulos again failed to disclose this critical information to investors when touting the supposedly successful integration and sales of Vascular Insights' ClariVein.

**G.    When the Truth Emerges, Merit's Stock Drops Precipitously, Analysts Disparage "Management Credibility," and Lampropoulos Dumps His Stock Just Before the End of the Class Period**

129.    The true facts about Merit's acquisitions began to trickle out on July 25, 2019, when the Company disclosed <u>zero</u> ClariVein orders for the first half of 2019, Cianna sales force "attrition," and the Company's resulting lackluster results for the second quarter of 2019 and reduction in 2019 financial guidance.  The Company's stock immediately crashed 25% in one day in response to this news.  Defendants, however, concealed the true extent of ClariVein's woes through false excuses about the reasons for the lack of orders, and further false representations that there was only a "little bit" and "not much" Cianna sales force attrition.  With Merit's stock price still artificially elevated, Lampropoulos then quickly dumped millions of dollars of Merit stock.  Just weeks later, Defendants were finally forced to admit that the Cianna and Vascular Insights acquisitions were essentially total failures, causing not only disastrous 2019 financial results, but also a complete reset in Company strategy.  Merit stock declined another 29% in one day.  Outraged securities analysts excoriated Defendants' credibility and called for their removal, cautioning investors not to trust them for at least "a few years" and to avoid buying the stock "until there have been some changes in the executive suite."

**1.    July 25, 2019: Merit Partially Reveals the Truth About Cianna Attrition and ClariVein Sales, Causing Merit Shares to Plunge by More Than 25%**

130.    The truth began to emerge on July 25, 2019, when Merit held an investor conference call after the close of trading.  During the call, Lampropoulos stunned investors by disclosing that, contrary to Defendants' prior representations, Merit "<u>hasn't had an order all year</u>" for its ClariVein product acquired from Vascular Insights.  This revelation stood in stark contrast to Merit's and Lampropoulos' repeated assurances during the course of the year, including when Lampropoulos told investors that Merit's standalone products, including ClariVein, were showing "strong sales" just three months earlier.  Given these poor results, Merit slashed its 2019

revenue guidance by $2.5 million—i.e., by roughly the same amount of the $2.3 million shortfall in ClariVein revenue during the first half of 2019.

131. Lampropoulos also could no longer hide that Merit had not, in fact, continued to keep Cianna's sales force intact. In this regard, Lampropoulos revealed for the first time that Cianna's sales force was experiencing "attrition" and, as a result, certain "areas [of the country] didn't have attention" from Cianna sales representatives.

132. In response to these revelations regarding Merit's recent landmark acquisitions, Merit's stock price plummeted by 25.25%, from a close of $54.85 per share on July 25, 2019 to close at $41.00 per share on July 26, 2019. This decline eliminated over $740 million in shareholder value in just one day.

133. Analysts were stunned by the Company's disclosures. Following the news, Piper Jaffray slashed its price target for Merit's stock by nearly 25%, calling the Company's July 25 disclosures "surprising" and stating that the "biggest reason" for the entire Company's poor revenues "was slower than expected sales from Cianna and ClariVein." Barrington Research similarly reported that "revenue associated with recent M&A" was the "primary driver" of Merit's second quarter revenue miss. Canaccord Genuity proclaimed that Merit was now "in the doghouse" and "penalty box," and cut its price target for Merit's stock by nearly 20%.

134. While the July 25 disclosures were themselves highly material, Defendants continued to conceal the full truth from investors in an effort to stave off an all-out freefall in the stock price. Although the Cianna salespeople responsible for nearly one-fourth of the company's sales had quit months earlier, leaving much of the company without any sales force whatsoever, Lampropoulos falsely stated that there had been only "a little bit" and "not much" attrition among Cianna's sales force. As explained above, this significant attrition caused sales in the critically important Western region to drop by 25% to 30%. ¶¶68-81. Lampropoulos also continued to hide from investors the highly material fact that the Cianna integration was far from

1   "complete," and that the attempted integration of the companies' systems was an

2   abject failure.  ¶¶67-100.

3       135.   Lampropoulos further lied to investors about the true reasons why Merit

4   "ha[d]n't had an order all year" for its ClariVein product.  Rather than admit the

5   truth—i.e., that doctors could not get reimbursed for the product and Merit determined

6   that it could not market the product for its intended use—Lampropoulos falsely

7   attributed the absence of orders entirely to a purported "short-term" problem of

8   "pipeline filling" by Vascular Insights' customers shortly before the acquisition.

9   According to Lampropoulos, this "pipeline filling" was the result of customers

10  purchasing excess product before the acquisition due to "fear by the distributor that

11  somehow they wouldn't be able to keep."   Lampropoulos further falsely assured

12  investors that Defendants had overcome this purported issue, stating that the

13  "thunderstorm has left" and ClariVein would still deliver blockbuster sales going

14  forward as ClariVein sales were already purportedly "ramping to our expectations."

15  Defendants again reaffirmed that, as they had previously asserted on February 26,

16  2019 and April 23, 2019, Vascular Insights' revenues for 2019 would total $10 million

17  to $11 million.

18      136.   Defendants' blatantly false statements helped stem the dramatic decline

19  in Merit's stock price.  Following Merit's July 25, 2019 investor call, securities

20  analysts noted that Defendant Lampropoulos "stressed that the company is 'not

21  changing our 2020 forecast.'"[44]  On July 26, 2019, analysts at Barrington reiterated

22  their "Outperform" investment rating for Merit's stock, taking solace in Defendants'

23  assurances that the absence of ClariVein orders "stems from some unusual order

24  patterns prior to the company's closing of the deal that have resulted in some excess

25  inventory among certain distributors of the products."  Based on the Company's

26  representations, Barrington concluded (incorrectly) that "the issues within the

27

28  _____

[44] https://www.fool.com/investing/2019/07/26/why-merit-medical-systems-is-tanking-today.aspx

ClariVein business" are "short term and will be worked through reasonably quickly." Likewise, the Barrington analysts credited Defendants' false assurances that the "Cianna revenue shortfall has more to do with timing than anything else."

> **2.**   **August-September 2019: After Falsely Reassuring Investors on July 25, Lampropoulos Dumps Nearly $6.5 Million of Merit Stock**

137.   Lampropoulos personally took full advantage of his misrepresentations and the market's ignorance of the full truth to unload significant holdings of Merit stock at artificially inflated prices.  Knowing the undisclosed, true facts—including that Merit had been, and would continue to be, unable to market or meaningfully sell ClariVein, and that the Company had been experiencing myriad issues with the Cianna integration as well as significant sales force attrition that was impacting Cianna sales—in August and September 2019, Lampropoulos unloaded over 200,000 shares of Merit stock at prices between $30.41 and $36.86 per share, reaping nearly $6.5 million in insider trading proceeds.

138.  Lampropoulos' stock sales on the heels of Defendants' July 25 disclosures were highly unusual in amount and timing and were completely out-of-line with his prior trading history.  These sales, which were not made pursuant to any preset trading plan and occurred in a matter of just three weeks, amounted to over 16% of Lampropoulos' holdings in Merit stock—the highest percentage of his annual sales to holdings in at least a decade.  A comparison of these sales to Lampropoulos' prior trading history underscores the highly unusual and suspicious nature of these sales.  In stark contrast to these $6.5 million in sales, Lampropoulos (i) did not sell a single Merit share during the 8-month control period immediately preceding the Class Period; (ii) did not sell a single Merit share on the open market for more than three years prior to the Class Period; (iii) sold only 3,125 shares in the six years prior to the Class Period, for net proceeds of only $27,370 (after converting the underlying stock options); and (iv) sold more shares during the Class Period than in all of the prior 13 years combined.  Moreover, Lampropoulos did not purchase a single share of Merit

1    stock during the second quarter of 2019, or any other quarter of the Class Period.  As

2    analysts duly noted, Lampropoulos' stock sales during the Class Period were so

3    suspicious that they understandably drew "the ire of investors."

4        139.   The following graphic illustrates how out of line Lampropoulos' August

5    and September 2019 stock dump was when compared to his prior trading:



16

17        **3.    October 30, 2019: Defendants Finally Disclose that Cianna and
          Vascular Insights Were Failed Acquisitions, Sending Merit
          Shares Plummeting 29% as Analysts Disparage Defendants'
          Credibility and Call for Their Removal**

18

19        140.   On October 30, 2019, after having successfully concealed the full truth

20   about the disappointing Cianna and ClariVein businesses, and with Lampropoulos'

21   stock sales accomplished, Defendants finally revealed that the failed integrations were

22   so far behind schedule, and revenues so low, that Merit would fall far short of its

23   guidance for 2019 and 2020.

24       141.   Specifically, on October 30, 2019, Merit held an investor conference call

25   after the close of trading.  During the call, the Company disclosed that, contrary to

26   Defendants' prior statements that the Cianna integration was "complete" and

27   ClariVein was "ramping up" to meet expectations, in fact, it was "[c]lear" that Cianna

28   and Vascular Insights "didn't perform the way we wanted to" and, indeed, "it's taken

- 59 -

a lot more time and we've had to learn some painful lessons"—i.e., the integrations "caught up with us" and Defendants could no longer hide the truth.  Defendants further disclosed that "Cianna and ClariVein fell behind by $4 million and $3 million, respectively" for the third quarter—results that were the polar opposite of Defendants' representations in late July that Cianna and ClariVein would still deliver on Defendants' previously issued guidance amid already "ramping" sales, and a direct result of the detrimental attrition that occurred in Cianna's key Western region. Lampropoulos further admitted that the Company was "<u>nine or ten months behind where we thought it would be</u>" with ClariVein.  As Merit had only acquired Vascular Insights' assets ten months earlier, Lampropoulos effectively admitted that Merit had made <u>no</u> progress with ClariVein following the completion of the acquisition.

142.   As a result of Merit's failed Cianna and Vascular Insights deals, Merit (i) slashed its 2019 revenue guidance by approximately $27 million at the midpoint; (ii) cut its revenue guidance for "non-core" products, which included ClariVein and Cianna, by approximately 20%; and (iii) withdrew entirely its guidance for 2020. Merit made clear that these reductions and withdrawals were due to the acquisitions, which were such monumental failures that they would continue to materially harm the Company going forward.  For example, when a Piper Jaffray analyst ask about lower Company performance in the fourth quarter 2019, Parra responded by highlighting the cut to outlook based on Cianna and ClariVein.

143.   Due to the failed Cianna and Vascular Insights integrations, the Company was forced to announce a complete reset in the Company's business model, as it was returning, in its own words, "back to basics."  Lampropoulos announced that Merit was halting the "growth-by-acquisitions" strategy that Merit had vigorously advanced for years as the touchstone of the Company's growth.  In a surprising about-face, Lampropoulos explained that, going forward, the Company was "really slowing down" and "[n]ot trying to go out and do another deal."  Given the October 30, 2019 disclosures, Lampropoulos later summarized during Merit's June 22, 2020 Annual

Meeting of Shareholders that—far from Defendants' positive Class Period representations about the 2018 Cianna and ClariVein acquisitions—"we all know that in 2019, we stubbed our toe.  Some will say we fell on our face."

144.   Merit's stunning disclosures sent the Company's stock price plummeting. Immediately following the disclosures, Merit's stock price tumbled 29% in a single trading day, falling from a closing price of $29.11 on October 30 to close at $20.66 per share on October 31, 2019.  The disclosures eliminated $452 million in shareholder value.  All told, in just four short months, Merit stock lost more than 62% of its value as a direct result of Defendants' disclosures.

145.   Securities analysts were shocked by these disclosures, and specifically questioned management's credibility, with some even calling for the removal of the Company's senior management.  Analysts seized on the lagging Cianna and ClariVein acquisitions as the basis not only for the Company's poor overall third quarter results, but also for its forecast for fourth quarter 2019, commenting that Cianna and ClariVein were "the primary source of the shortfall"[45] and "lagging."[46]  Analysts at Piper Jaffray, who had once touted Merit stock as a "must own," slashed their price target for the stock by 25%, from $40 to $30 per share.  Piper Jaffray noted that a "big part of [Merit's] reduced outlook is weak performance from two of the recent acquisitions [Cianna and Vascular Insights' ClariVein]," and singled out Merit's "weakness in the acquired products" as "the biggest disappointment" driving this change.  Piper Jaffray also called out "the light performance in Cianna" as particularly "frustrating." Analysts at Barrington Research similarly reduced their price target for Merit's shares by 47%, stating that "the integration of recent transactions continues to plague near-term results at Merit" and that revenues from the "recent Cianna and Vascular Insights transactions continue to track well behind initial expectations."

---

[45] Piper Jaffray, "Another Shoe Drops Here in Q3; Sticking with OW" (October 30, 2019).

[46] Barrington Research, "Q3 Profitability Falls Well Short; Guidance Reduced Significantly – Again; Shares Likely to be Down Big; Reducing PT to $1 (from $59)" (October 31, 2019).

146.   The Company's disclosures were so striking, given Defendants' prior representations, that analysts specifically and explicitly questioned the credibility of Merit's management, including Lampropoulos.  In an analyst report published after the Company's second quarter 2019 disclosures, Piper Jaffray analysts observed that "there is a management credibility issue priced into shares of MMSI at the moment." This challenge to management's credibility only intensified following the Company's disclosure of its third quarter results.  The October 30 disclosures were so shocking in light of Defendants' prior representations that securities analysts took the remarkable and unusual step of calling for the removal of Merit's top executives.  In an October 31, 2019 report titled "Here's Why Merit Medical Systems Stock Is Tumbling Today," analysts at the securities analysis website *Motley Fool* concluded: "You probably don't want to try catching this falling knife until there have been some changes in the executive suite."  An October 30, 2019 analyst report by Canaccord Genuity concluded that, if management were to stay on, "[i]t will take a few years . . . for established investors to trust this management team again."

## V.   **DEFENDANTS' FALSE AND MATERIALLY MISLEADING STATEMENTS AND OMISSIONS**

147.   During the Class Period, Defendants made a series of materially false and misleading statements and omissions in violation of Section 10(b) and 20(a) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

### A.   **February 2019 Investor Conference**

148.   On February 26, 2019, the first day of the Class Period, Defendants provided an update to investors on Merit's 2018 acquisitions of Cianna and Vascular Insights.  Defendants Lampropoulos and Parra led the investor conference call, which was attended by investors and analysts covering the company, including Wells Fargo, SunTrust, Piper Jaffray, and Barrington Research, among others (the "February 2019 Investor Call").

149.    Lampropoulos began the February 2019 Investor Call by emphasizing the critical importance of the Cianna acquisition, which he noted was "the largest acquisition Merit has ever made."  Lampropoulos assured investors that the integration of Cianna was successfully proceeding as planned, explaining that "we are very pleased with the transition" and "the integration I think is going as well as could be expected."   When Piper Jaffray analyst Matthew Oliver O'Brien stated that "on Cianna, I would love to hear a little bit more about the integration there, sales force retention," Lampropoulos responded that "[o]n the Cianna business, the integration … is going as well as could be expected"; "everything is working quite nicely"; and "we've managed this correctly."

150.   Defendants' statements identified in ¶149 above touting Merit's supposed successful integration of Cianna were materially false and misleading, and omitted material facts.  Once Defendants chose to tout Merit's integration of Cianna, they were obligated (but failed) to disclose the adverse facts about their integration efforts.  Witnesses have recounted that 50% of the items planned for integration were not integrated, including Cianna's and Merit's customer relationship management platforms, marketing platforms, and meeting planners.  *See* ¶¶85-100.   When Defendants attempted to integrate these systems, they failed, which resulted in inefficiencies and operational setbacks.  *See* ¶¶85-100, 141-142.  In addition, as part of the integration, Merit had committed to maintaining Cianna's sales force, but that effort also failed, with over 20% of the sales force quitting shortly after the acquisition, including the Company's top performers in its core Western region, who were responsible for 22% of the Company's overall sales.  ¶¶67-84.  At the end of the Class Period, Merit finally admitted that the integration of Cianna had not proceeded successfully, and, indeed, "Cianna … just caught up with us."  Merit admitted that "[c]learly, they didn't perform the way we wanted to," and that "it's taken a lot more time and we've had to learn some painful lessons."  ¶141.

1      151.   During the February 2019 Investor Call, Lampropoulos also highlighted

2    the supposed success of the Company's acquisition of Vascular Insights and sales of

3    its product, ClariVein.  Lampropoulos specifically told investors that "we're generally

4    satisfied with the overall business."  He also assured the market that Merit's supposed

5    experience selling ClariVein after the acquisition was positive and demonstrated that

6    ClariVein would generate the anticipated $10 million to $11 million in sales during

7    2019.  When asked why Merit had taken the unusual step of providing not only

8    financial guidance for 2019, but also for all of 2020, Lampropoulos stated, "We've

9    had 2 or 3 months now of Cianna.  Our confidence is built there.  I would say the same

10   thing about Vascular Insights."

11      152.   Defendants' statements underlined in ¶151 were materially false and

12   misleading, and omitted material facts.  Once Defendants chose to tout Vascular

13   Insights' business and sales, they were obligated (but failed) to disclose the adverse

14   facts about those matters.  Among other things, despite Defendants' positive

15   proclamations regarding ClariVein, in truth, Merit had not received a single order for

16   ClariVein by this time.  ¶¶101-112.  Moreover, Defendants knew that Merit was and

17   would continue to be unable to generate meaningful sales of ClariVein because,

18   unknown to investors, (i) insurance payors were not providing reimbursement for the

19   product; and (ii) Merit determined that it could not market ClariVein for its primary

20   purpose of treating varicose veins because, as Defendants learned immediately after

21   the acquisition, Vascular Insights had marketed the product in a manner that exceeded

22   ClariVein's FDA approval.  ¶¶113-128.  Defendants were ultimately forced to admit

23   that the Company did not have a single order for ClariVein during the entire first half

24   of the year, had lackluster sales each quarter, and was nine to ten months behind

25   schedule on sales and integration.  ¶¶129-146.

26      153.   During the February 2019 Investor Call, despite these critical issues

27   preventing ClariVein orders, Defendants reiterated and reinforced their annual revenue

28   guidance for ClariVein.  Specifically, during the February 2019 Investor Call, Parra

1  told investors that the guidance for "ClariVein is $10 million to $11 million" in 2019

2  and "[w]e haven't changed the guidance."

3      154. Defendants' statement identified in ¶153 was materially false and

4  misleading, and omitted material facts. Defendants knew that the guidance they

5  provided for ClariVein was unattainable. There had been no orders for ClariVein,

6  which Defendants knew because, among other things, they had screens directly outside

7  their offices that showed the daily, monthly, and quarterly orders for each of Merit's

8  products. ¶¶101-112. They also knew that Merit's guidance was unattainable because

9  insurance payors were not providing reimbursement coverage for ClariVein. ¶¶113-

10 123. In addition, Merit determined that it could not market ClariVein for its primary

11 purpose of treating varicose veins because, as Defendants learned immediately after

12 the acquisition, Vascular Insights had marketed the product in a manner that exceeded

13 ClariVein's FDA approval. ¶¶124-128. Defendants ultimately admitted that the

14 Company did not have a single order for ClariVein during the first half of the year,

15 had lackluster sales each quarter, and was nine to ten months behind schedule on sales

16 and integration. ¶129-146. Further, Defendants ultimately withdrew their 2020

17 revenue guidance, and missed their 2019 guidance by 25%. ¶142.

18     **B.**    **February 2019 Press Release**

19     155. On February 26, 2019, Merit also issued a press release that updated

20 investors on the status of its acquired business (the "February 2019 Press Release").

21 The February 2019 Press Release singled out Vascular Insights, and said that it, along

22 with the Company's other recent acquisitions, "continue[d] to drive growth" for Merit.

23 Quoting Lampropoulos, the press release stated:

24         '2018 was an important and very positive year for the company and

25         included the closing of the Becton Dickinson deal, the acquisitions of
        Cianna Medical and <u>Vascular Insights</u>, and the execution of our global

26         growth and profitability plan,' said Fred P. Lampropoulos, Merit's

27         Chairman and Chief Executive Officer. '<u>Integration of these new
        businesses and sales of our core products continue to drive growth</u>….'

28

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

156.   Defendants' statement underlined in ¶155 above asserting that the integration of Vascular Insights supposedly "continue[d] to drive growth" was materially false and misleading, and omitted material facts.  Once Defendants chose to tout the integration of Vascular Insights and how it supposedly "continue[d] to drive growth," they were obligated (but failed) to disclose adverse information about these matters that cuts against the positive representations.  Among other things, there was not a single order for Vascular Insights' ClariVein during the entire first half of the year after the acquisition.  ¶¶101-112.  Moreover, Merit was unable to generate any orders of ClariVein because, unknown to investors, insurance payors were not providing reimbursement for the product.  ¶¶113-123.  In addition, Merit determined that it could not market ClariVein for its primary purpose of treating varicose veins because, as Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval.  ¶¶124-128.  As Defendants ultimately admitted, the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and were nine to ten months behind schedule on sales and integration.  ¶¶129-146.

## C.     March 2019 Form 10-K

157.   On March 1, 2019, Merit filed its Form 10-K for the year ended December 31, 2018 with the SEC, signed by Defendants Lampropoulos and Parra (the "2018 Form 10-K").  In the 2018 Form 10-K, Defendants claimed that it was merely a potential "risk factor" that "limits on reimbursement . . . may adversely affect the ability of hospitals and others to purchase our products, which could adversely affect our business and results of operations."

158.   Defendants' statement set forth in ¶157 above was materially false and misleading when made and omitted material facts.  Defendants merely "warned" that reimbursement limits could potentially occur in the future—i.e., that "limits on reimbursement may adversely affect the ability of hospitals and others to purchase our products, which could adversely affect our business and results of operations."  In

truth, the reimbursement issues with ClariVein were already significantly reducing hospitals' purchases and, as a result, reducing Merits' revenues.  ¶¶113-123.  Third party payors were almost <u>categorically</u> denying reimbursement coverage for ClariVein—indeed, by the time of the acquisition, less than 5% of ClariVein sales were covered for reimbursement under any commercial insurance policy, and claims for reimbursement for ClariVein were consistently denied.  ¶¶124-128.  As Defendants ultimately admitted on July 25, 2019, Merit had <u>zero</u> orders for ClariVein for the first half of 2019.  And, as Defendants additionally admitted on October 30, 2019, the barriers to ClariVein orders, including the debilitating reimbursement issues, were so severe that Merit missed its guidance for ClariVein sales by huge percentages and was "nine or ten months" behind overall.  ¶¶129-146.

159.  Defendants incorporated the false and misleading "risk factor" statement set forth in ¶157 above into Merit's subsequent Class Period Forms 10-Q, including Merit's first quarter 2019 Form 10-Q filed with the SEC on May 3, 2019, and Merit's second quarter 2019 Form 10-Q filed with the SEC on August 9, 2019.  Like Merit's 2018 Form 10-K, each of these Forms 10-Q was signed by both Defendants Lampropoulos and Parra.   The verbatim repetition of the "risk factor" misprensenetation in each of these Forms 10-Q was materially false and misleading and omitted material facts for the reasons set forth in ¶158.

**D.**   **March 2019 Letter to Investors**

160.  Also on March 1, 2019, Defendants published a letter to the Company's shareholders, which was authored and signed by Lampropoulos and attached to the Company's 2018 Form 10-K (the "March 2019 Letter").  In the March 2019 Letter, Lampropoulos again singled out the acquisition of Vascular Insights, and stated that it, along with the Company's other recent acquisitions, "continue to drive growth" for Merit.  The March 2019 Letter to investors stated:

> 2018 was an important and very positive year for our company. It included the closing of the Becton Dickinson deal, the acquisitions of

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

Cianna Medical and <u>Vascular Insights</u>, and the execution of our global growth and profitability plan. <u>Integration of these new businesses and sales of our core products . . . continue to drive growth</u>.

161.    Defendants' statement underlined in ¶160 above asserting that the integration of Vascular Insights supposedly "continue[d] to drive growth" was materially false and misleading, and omitted material facts.  Once Defendants chose to tout the integration of Vascular Insights and how it supposedly "continue[d] to drive growth," they were obligated (but failed) to disclose the adverse information about these matters that cut against their positive representations.  Among other things, there was not a single order for Vascular Insights' ClariVein during the entire first half of the year after the acquisition.  ¶¶101-112.  Moreover, Merit was unable to generate meaningful sales of ClariVein because, unknown to investors, insurance payors were not providing reimbursement for the product.  ¶¶113-123.  In addition, Merit determined that it could not market ClariVein for its primary purpose of treating varicose veins because, as Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval.  ¶¶124-128.  As Defendants ultimately admitted, the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and were nine to ten months behind schedule on sales and integration.  ¶¶129-146.

### E.    April 2019 Press Release

162.    On April 23, 2019, Defendants published a press release to announce Merit's first quarter 2019 results and provide an update on the status of the Company's integrations of its recent acquisitions (the "April 2019 Press Release").  The April 2019 Press Release stated that the Company's integration of Becton, Dickinson—an entity that Merit acquired in February 2018—was still not yet complete.  In contrast, the press release announced that the Cianna transition was complete, quoting Lampropoulos as stating: "'<u>The Cianna transition is complete and sales continue to grow according to our expectations</u>.'"

163.   Defendants' statement identified in ¶162 above that "[t]he Cianna transition is complete" was materially false and misleading, and omitted material facts. Contrary to Defendants' representation, witnesses have recounted that 50% of the items planned for integration were not integrated by at least April 2019, including Cianna's and Merit's customer relationship management platforms, marketing platforms, and meeting planners.  *See* ¶¶85-100.  When Defendants attempted to integrate their systems during the Class Period, they failed, which resulted in inefficiencies and operational setbacks.  *See* ¶¶85-100, 141-142.  In addition, as part of the integration, Merit was supposed to maintain Cianna's sales force, but that effort failed, with over 20% of the sales force quitting shortly after the acquisition, including the Company's top performers in its core Western region, who were responsible for 22% of the Company's overall sales.  ¶¶67-84.  At the end of the Class Period, Merit admitted that the integration of "Cianna … just caught up with us," that "[c]learly, they didn't perform the way we wanted to," and that "it's taken a lot more time and we've had to learn some painful lessons."  ¶141.

164.   Moreover, Defendants' statement identified in ¶162 above that Cianna "sales continue to grow according to our expectations" was also materially false and misleading, and omitted material facts.  Once Defendants chose to tout how Cianna's "sales continue[d] to grow according to [Merit's] expectations," they were obligated (but failed) to disclose the adverse facts about those matters.  Untold to investors at the time, over 20% of Cianna's sales force quit the Company shortly after the acquisition, including the Company's top performers responsible for sales in 15 of the states in the country; 75% of sales in Merit's most important sales region, the Western Region; and 22% of the Company's over-all, company-wide total sales.  *See* ¶¶67-84. As a result of these departures, the Western region went from Cianna's top sales performer to its worst performer, with the departures resulting in a decline of 25% to 30% in the region.  *See* ¶¶68-81.  The Company ultimately admitted that the Cianna sales force had suffered from "attrition," and also disclosed unexpectedly low sales for

the Cianna products in the second and third quarters of 2019, following the sales force departures.   *See* ¶¶129-146.   Defendants also admitted that the failed Cianna integration and low Cianna sales were so severe that they would continue in the future. Defendants informed investors of poor sales in the fourth quarter of 2019 and completely retracted all guidance for 2020.  *See* ¶¶129-146.

### F.   April 2019 Investor Conference

165.   Also on April 23, 2019, Merit hosted an investor conference call. Defendants Lampropoulos and Parra led the investor conference call, which was attended by investors and analysts covering the Company, including Wells Fargo, Needham & Company, SunTrust, Piper Jaffray, and Canaccord, among others (the "April 2019 Investor Call").

166.   During the April 2019 Investor Call, Lampropoulos continued to tout the successful integration of Cianna, repeatedly emphasizing to investors that the members of Cianna's all-important sales force remained with Merit.  When asked by an analyst for "some color around kind of the rollout so far" for Cianna, Lampropoulos responded:

> Well, first of all, I think with Cianna there's a couple of things I think that are important. We, as you will recall, . . . <u>we maintained their sales force. And we think that was a critical thing to do</u>.
>
> \*       \*       \*
>
> <u>But I guess the bottom line is, it's as probably a good of a transaction and transition that we have done. I think it may be the best one</u>. I mean we've done a lot of small deals. But I think that speaks volumes to Jill Anderson and her team. And just the way that our team has worked. We kept all the R&D people, <u>we kept the salespeople</u>, we've done, <u>I think they fit into the family actually quite easily</u>.  I've been down there several times. I'm going to head down there again soon.  So I think all in all, it was a transaction and a business that -- <u>I don't know how you could do it any better, to be honest with you. I think we've done it well</u>.

167.   The statements underlined in ¶166 above were materially false and misleading, and omitted material facts.  Contrary to Lampropoulos' assertions, over

20% of the sales force quit the Company shortly after the acquisition, including the Company's top performers responsible for Cianna's sales in 15 of the country's 50 states; 75% of sales in Merit's most important sales region, the Western region; and 22% of the Company's over-all, company-wide total sales.  ¶¶67-84.  As a result of these departures, the Western region went from Cianna's top sale performer to its worst performer, with their departures resulting in a decline of 25% to 30% in the region.  ¶¶68-81.  The Company finally admitted that the Cianna sales force suffered from "attrition," and also disclosed unexpectedly low sales for the Cianna products in the second and third quarters of 2019, following these departures.  *See* ¶¶129-146.  Defendants also admitted that the failed Cianna integration and low Cianna sales were so severe that they would continue in the future.  Defendants informed investors of poor sales in the fourth quarter of 2019 and completely retracted all guidance for 2020.  *See* ¶¶129-146.

168.   During the April 2019 Investor Call, Defendants also misled investors about Vascular Insights' ClariVein.  Specifically, Defendant Parra told investors during the April 2019 Investor Call that Merit had "strong sales in stand-alone products," which included ClariVein.

169.   Defendant Parra's statement identified in ¶168 above was materially false and misleading, and omitted material facts.  Once Defendants chose to tout their "strong sales" in stand-alone products, which included ClariVein, they were obligated (but failed) to disclose the adverse facts about those matters.  Among other things, there was not a single order for ClariVein during the entire first half of 2019.  ¶¶101-112.  Moreover, Merit was unable to generate meaningful sales of ClariVein because, unknown to investors, insurance payors were not providing reimbursement for the product.  ¶¶113-123.  In addition, Merit determined that it could not market ClariVein for its primary purpose of treating varicose veins because, as Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval.  ¶¶124-128.  As Defendants ultimately admitted,

the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and was nine to ten months behind schedule on sales and integration.  ¶¶129-146.

170.   During the April 2019 Investor Call, Defendant Lampropoulos also stated, in response to an analyst's question about Merit's 2019 and 2020 guidance, that "I don't see anything that has changed," and that "[t]here are always headwinds but I think there are more tailwinds.  We're feeling the breeze to our back."

171.   Defendant Lampropoulos' statements identified in ¶170 above were materially false and misleading, and omitted material facts.  Defendants knew that they encountered substantial setbacks selling ClariVein and that the guidance they provided for ClariVein was unattainable.  There had been no orders for ClariVein, which Defendants knew because, among other things, they had screens directly outside their offices that showed the daily, monthly, and quarterly orders for each of their products. ¶¶101-112.  They also knew that their guidance was unattainable because insurance payors were not providing reimbursement coverage for the product.  ¶¶113-123.  In addition, Merit determined that it could not market ClariVein for its primary purpose of treating varicose veins because, as Defendants learned immediately after the acquisition, Vascular Insights had marketed the product in a manner that exceeded FDA approval.  ¶¶124-128.  Defendants finally admitted that the Company did not have a single order for ClariVein during the first half of the year, had lackluster sales each quarter, and were nine to ten months behind schedule on sales and integration. ¶¶129-146.  Further, Defendants ultimately withdrew their 2020 revenue guidance, and missed their 2019 guidance by 25%.  ¶¶129-146.

### G.   July 2019 Investor Conference

172.   On July 25, 2019, Defendants hosted an investor conference call to discuss the Company's results for the second quarter of 2019 (the "July 2019 Investor Conference").  Defendants Lampropoulos and Parra led the call, which was attended by investors and analysts covering the Company, including Wells Fargo, Needham &

Company, SunTrust, Piper Jaffray, Barrington Research, and Canaccord, among others (the "April 2019 Investor Call").

173.   During the July 2019 Investor Call, Lampropoulos and Merit misleadingly downplayed and minimized the severe problems plaguing their latest acquisitions.  Specifically, while finally admitting that there had been attrition among Cianna's sales force, Lampropoulos assured investors that there only had been "a <u>little bit</u> of attrition but <u>not much</u>."

174.   Defendants' statement identified in ¶173 above was materially false and misleading, and omitted material facts.  It was misleading to tell investors that there was merely "a little bit" and "not much" attrition among Cianna's sales force when, in reality, over 20% of the sales force quit the Company shortly after the acquisition, including Cianna's top performers responsible for sales in 15 of the country's 50 states; 75% of sales in Merit's most important sales region, the Western region; and 22% of the Company's over-all, company-wide total sales.  ¶¶67-84.  As a result of these departures, the Western region went from the Company's top sale performer to its worst performer, with their departures resulting in a decline of 25% to 30% in the region.  ¶¶68-81.  The departures led to unexpectedly low sales for Cianna products in all of the second, third, and fourth quarters of 2019, and a resulting complete retraction of Merit guidance for all of 2020.  *See* ¶¶129-146.

175.   During the July 2019 Investor Call, Lampropoulos and Merit also misrepresented and downplayed the true causes for the dearth of ClariVein orders during the first half of 2019.  Lampropoulos falsely and misleadingly asserted that "pipeline filling" was the cause for the lack of orders for the entire first half of the year.  Specifically, he stated that "[w]e haven't had an order all year <u>because of pipeline filling from the former customer or fear by the distributor that somehow they wouldn't be able to keep it</u>."  Lampropoulos further claimed that there were no further impediments to Merit immediately achieving ClariVein orders, and that instead, "pipeline filling" was a "short term" issue.  Lampropoulos stated that "if you look at

1  all the events that took place, I think we have explained them. <u>They are short term or</u>

2  <u>those storms are over</u>."

3      176.   Defendants' statements identified in ¶175 above were materially false

4  and misleading, and omitted material facts.  It was false and misleading for Defendants

5  to state that the dearth of ClariVein orders during the first half of the year was due to

6  "pipeline filling," when, in fact, (i) nearly all commercial insurance companies refused

7  to cover ClariVein, causing doctors and hospitals not to order the product (¶¶113-123);

8  (ii) Merit determined that it could not market ClariVein for its primary purpose

9  because the FDA had not cleared the product to treat varicose veins (¶¶124-128); and

10  (iii) Merit had made no progress in integrating Vascular Insights—it was, as the

11  Company later admitted, "nine to ten months behind" (¶¶129-146).  Further, the dearth

12  of ClariVein orders during the first half of the year was not caused by a "short-term"

13  problem that had been resolved; rather, it was caused by long-standing and persistent

14  impediments to the sale of the ClariVein product—namely, a lack of reimbursement

15  and an inability to market the product to treat varicose veins.

16      177.   Parra similarly misled investors during the July 2019 Investor Call by

17  falsely attributing the "sales shortfall for ClariVein" to "pipeline filling," and also by

18  claiming that there were no further impediments to Merit achieving its forecasted $10

19  to $11 million in revenue for ClariVein for the year.  Repeating the "pipeline filling"

20  story, he falsely assured investors that ClariVein's lackluster sales were "<u>the result of</u>

21  <u>excess inventory of some of the distributors prior to our acquisition</u>."  Parra further

22  told investors that the Company had solved all issues adversely impacting sales,

23  explaining, "<u>We believe we have made it past that, and sales are ramping to our</u>

24  <u>expectations</u>."

25      178.   Defendants' statements identified in ¶177 above were materially false

26  and misleading, and omitted material facts.  The dearth of ClariVein orders during the

27  first half of the year was not caused by a "short-term" problem that had been resolved;

28  rather, it was caused by long-standing and persistent impediments to the sale of the

product. Once Defendants chose to discuss why there were no orders of ClariVein, they were required (but failed) to disclose the true reasons for the absence of orders, (i) nearly all commercial insurance companies refused to cover ClariVein, causing doctors and hospitals not to order the product (¶¶113-123); (ii) Merit determined that it could not market ClariVein for its primary purpose because the FDA had not cleared the product to treat varicose veins (¶¶124-128); and (iii) Merit had made no progress in integrating Vascular Insights—it was, as the Company later admitted, "nine to ten months behind" (¶¶129-146).

179.   Defendants also continued to mislead investors during the July 2019 Investor Call by reaffirming their revenue guidance for ClariVein of $10 million to $11 million for 2019.

180.   Defendants' statement identified in ¶179 was materially false and misleading, and omitted material facts.  At the time this statement was made, there had been no orders for ClariVein, which Defendants knew because, among other things, they had screens directly outside their offices that showed the daily, monthly, and quarterly orders for each of their products.  ¶¶101-112.  Defendants also knew that their guidance was unattainable because the critical factors preventing orders, i.e., insurance payors were not providing reimbursement coverage for the product, and Merit's inability to market the ClariVein for its primary purpose of treating varicose veins, were not abating.  ¶¶113-128.  Indeed, Merit was ultimately forced to disclose that Defendants were nine to ten months behind schedule on the integration and there was a massive gulf between the promised $10 million to $11 million in sales, and the reality of Defendants' inability to sell the product.  Defendants ultimately reported that the Company missed the full-year 2019 guidance for Vascular Insights by approximately the same percentage it missed guidance each quarter during the Class Period: 30%.  ¶¶129-146.

# VI.   ADDITIONAL SCIENTER ALLEGATIONS

181.   A host of facts, in addition to those discussed above, raise a strong inference that Defendants knew or were deliberately reckless in not knowing that their Class Period misrepresentations were false or misleading when made.

182.   ***The Cianna and Vascular Insights acquisitions were critical to Merit's business strategy and revenue growth in 2019 and beyond.***   As Defendants repeatedly recognized both before and during the Class Period, the Cianna and ClariVein acquisitions were critical to Merit's business.  ¶¶34-65.  For example, on October 1, 2018, Defendants Lampropoulos and Parra devoted an entire investor conference call to promoting the highly important Cianna acquisition.  ¶¶38-40.  During the call, Defendants claimed intense personal knowledge of Cianna and its sales force, making clear that they were keenly focused on Cianna's 2018 and 2019 performance given that the over-$200 million Cianna acquisition was "the largest transaction we've ever done."  ¶38.  Lampropoulos stated that Cianna was centrally important to Merit's business not only because it would purportedly drive an estimated substantial $50 million to $56 million in revenues in 2019 alone, but also because, strategically, the acquisition would bring Merit firmly within the therapeutic device market.  ¶¶34-43.  Lampropoulos also stated that the ClariVein acquisition was strategically important as it would allow Merit to tap into the $700 million global market for therapeutic relief for varicose veins, and would generate a substantial $10 million to $11 million of revenue in 2019.  ¶¶47-49.

183.   Cianna and Vascular Insights were highly important to the Company's near- and long-term revenue growth as well, which was critical given the Company's near-singular focus on revenue growth as its key financial metric.  Indeed, in February 2019, months after the Cianna and Vascular Insights acquisitions were complete, Defendants specifically cited purported success with Cianna and Vascular Insights thus far while providing the Company's guidance for 2019 and 2020.  ¶62. Defendants Lampropoulos and Parra grounded <u>half</u> of the entire Company's growth for 2019 in

the purported success of Cianna and ClariVein alone.  ¶¶53, 62.  For months thereafter, Lampropoulos and Parra then continued to provide false updates regarding the Cianna and Vascular Insights acquisitions and reiterate the completely unattainable ClariVein guidance for 2019.  ¶¶50-65.

184.   In sum, the central importance of these acquisitions to Merit's growth strategy—and the fact that they were the lynchpin of the Company's purported 2019 revenue growth—raises a strong inference that Defendants were at least deliberately reckless in falsely representing the businesses' performance during the Class Period.

185.   *Analysts were keenly focused on the success of the acquisitions throughout the Class Period, consistently keeping them front and center for Defendants Lampropoulos and Parra in numerous quarterly investor conference calls.*  Given the importance of the Cianna and ClariVein acquisitions to Merit's business—and the significant amount of money that Merit paid for these acquisitions, a total of $260 million—the market focused closely on the integration of the companies into Merit, the success of the acquisitions, and whether they were providing the meaningful injection of revenue that Defendants Lampropoulos and Parra promised.  ¶¶34-65.  Securities analysts were also particularly focused on Cianna and ClariVein given the issues that Defendants had had integrating and executing on other recent acquisitions, such as DFINE.   ¶¶28-30.   In every single quarterly investor conference call immediately before and during the Class Period, analysts repeatedly asked for updates on Cianna and Vascular Insights.  *See* ¶¶34-65.  Rather than tell the truth, Defendants responded to analyst questions by claiming that these acquisitions were "night and day" compared to prior acquisitions like DFINE, and assured them that the acquisitions were progressing smoothly, profitably, and in line with expectations.  ¶¶39-43.  Analysts, in turn, issued dozens of reports addressing this subject and relying on Defendants' positive representations.  ¶¶40-46, 49, 58, 65.  The intense and consistent interest from analysts, and Defendants Lampropoulos' and Parra's false and misleading responses to the analysts' questions, further illustrate that

1    Defendants were at a minimum deliberately reckless in mispresenting the highly
2    material truth regarding the troubled Cianna and Vascular Insights businesses.

3         186.   ***Lampropoulos made specific, repeated representations to investors***
4    ***about how Merit maintained the members of Cianna's all-important sales force,***
5    ***holding himself out as personally knowledgeable on the subject.***   In touting the
6    Cianna acquisition, Lampropoulos flaunted the knowledge and skill of Cianna's sales
7    force, emphasizing how critical it was for Merit's revenues that the members of
8    Cianna's sales force remain with Merit after the acquisition.  ¶¶34-46.  During Merit's
9    October 1, 2018 conference call held to announce the Cianna acquisition, for example,
10   Lampropoulos stated that Merit maintaining Cianna's sales force was so critically
11   important to Merit that the Company's financial "models … and the [financial] returns
12   reflect the maintenance of the sales force."  ¶39.  He also emphasized that he had a
13   tight-knit relationship with the Cianna sales force, communicated with them
14   frequently, and was apprised of what was happening in their ranks.  For example, on
15   July 25, 2019, Lampropoulos stated that he "talk[s] to 2 or 3 or 4 of our sales people
16   every day," and that he calls his sales people "often, because I like to do it and I like
17   to talk to my troops."  *See* ¶¶40, 44, 54.  Lampropoulos also told investors that he
18   "received 15 or 20 letters from the [Cianna] sales force saying how excited they are to
19   be part of the Merit team."  Even as early as Merit's announcement of the Cianna
20   acquisition on October 1, 2018, Lampropoulos told investors that he was planning "a
21   call with the [Cianna] sales force tonight" and that he would be traveling to Los
22   Angeles to meet with the sales force in person.

23        187.   Based on this purported deep personal knowledge of the Cianna sales
24   force as part of pre-acquisition diligence, post-acquisition integration, and his routine,
25   consistent interaction with them during the Class Period, Lampropoulos knew, or was
26   at a bare minimum deliberately reckless in not knowing, that his repeated
27   misrepresentations regarding the composition of the sales force were false and
28   misleading when made.

188. ***The timing and importance of the departures of Cianna's top salespeople in its most important region, among additional sales departures, further show scienter.*** Three of Cianna's top four salespeople companywide, who were the top performers within its most critical region, left Merit within weeks following the acquisition—all <u>before</u> Lampropoulos' false statement to investors during the April 23, 2019 conference call that Defendants had "<u>maintained the sales force,</u>" as well as his further false statements in July 2019. ¶¶57, 67-84, 134. These top performers in Cianna's Western region generated <u>75%</u> of sales for that region and over <u>20% of</u> the Company's <u>total</u> company-wide sales for Savi SCOUT in 2018, and provided Cianna's only sales coverage for broad portions of the country, including the entire pacific northwest, Arizona, Colorado, Northern California, New Mexico, North Dakota, South Dakota, Utah, and Wyoming. ¶¶67-84. As Merit employees explained, these sudden departures "decimated" sales in the critical Western region. ¶76. And these departures were in addition to others that, in total, covered more than 15 states and accounted for 20% of the entire Cianna sales force all before April 15, 2019. ¶¶67-84. Following these critical departures, Cianna sales predictably declined 25-30%, which was reflected in sales reports that Lampropoulos had unmitigated access to. ¶¶80-84. The timing and significance of these departures, and the negative impact they had on Merit's ability to successfully sell Cianna products, further supports the inference that Lampropoulos knew, or was deliberately reckless in not knowing, that his statements regarding Cianna sales force retention were false and misleading when made.

189. ***Lampropoulos represented that he was personally and deeply involved in the Cianna integration process, purporting to know when the transition was "complete."*** Lampropoulos told investors that, consistent with the "Meritizing" process, he did a significant amount of due diligence on Cianna prior to the acquisition and that he was personally and intimately familiar with the business and Cianna's planned integration with Merit. ¶¶31-32, 38. For example, during an investor conference call to address the Cianna acquisition on October 1, 2018, Lampropoulos

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

stated that "[w]e've known this company for a long time.  We followed it."  ¶38.  He stated further that "we spent a lot of time [on the acquisition], and we've known these guys for a while . . .  [T]his is not something that jumped up on the table."  Regarding Cianna's founder, Lampropoulos stated that he had "known Jill Anderson and her team for several years," and "I think Jill Anderson and her staff did a wonderful job of building the business."  During a February 26, 2019 earnings call with investors, Defendant Lampropoulos told investors that he "did due diligence" on Cianna, and "did a lot of work on the operations, the manufacturing, [and the] sales force."  ¶¶53-54.

190.  Given Lampropoulos' purported personal involvement and self-proclaimed knowledge of the Cianna integration process, he either knew that the transition was not complete at the end of the second quarter of 2019 or, at minimum, was deliberately reckless in stating otherwise.  Further, Merit employees have confirmed that Merit had in fact failed to complete 50% of the items planned for integration.  ¶¶85-100.  Merit employees have also confirmed that Lampropoulos attended meetings during which he was provided with materials and information on Cianna's sales and marketing systems.  ¶¶86, 90.  Given such facts, Lampropoulos either knew, or was reckless in not knowing, the egregious failures in the Cianna integration process and that his contrary representation that the integration was "complete" was false when made.

191.  *Merit's extreme failure to integrate Cianna stood in stark contrast to Lampropoulos' false statement that the Cianna transition was "complete."*  Multiple former Merit employees attest that, contrary to Defendants' Class Period statements, Merit was severely behind in its integration of Cianna.  ¶¶67-100.  It was obvious inside Merit that Defendant Lampropoulos' April 23, 2019 statement that the integration had been "complete" by the end of the first quarter 2019 was false when made.  Indeed, even by the second quarter, Merit and Cianna had still failed to complete 50% of the items planned for integration under the Company's established

plan, including transitioning Cianna's most critical systems necessary for successfully marketing, selling, and tracking its products.   ¶¶85-100.   In fact, at the time Lampropoulos claimed the integration was "complete," Cianna's Vice President of Marketing and other Merit executives were reporting that, instead, Merit had not integrated Cianna's CRM platform, marketing platform and meeting planner.   ¶¶85-100.   That these numerous and significant integration failures existed before Lampropoulos represented that the Cianna integration was "complete" further supports a strong inference of scienter.

192.  ***Defendants have admitted that there were <u>zero</u> orders of ClariVein during the entire first half of 2019, and that Merit was <u>nine to ten months</u> behind schedule.***   While Defendants Lampropoulos and Parra showered investors with positive affirmations regarding Vascular Insights' performance before and early in the Class Period, the truth was that the undisclosed impediments to ClariVein sales were so extreme and persistent that, as Merit has since disclosed, <u>Merit did not have a single order for ClariVein during the entire first half of 2019</u>.   ¶¶101-112.   The Company was forced to report sorely disappointing sales for ClariVein of 25%-32% below guidance in both the first and second quarters, but assuaged investors by falsely reporting in July 2019 that "sales are ramping to our expectations" and falsely maintaining the reported guidance figures.   ¶¶129-136.   Given the intractable, undisclosed impediments to ClariVein sales, the Company was ultimately forced to report on October 30, 2019 that 2019 had, in truth, essentially been a lost year as Merit was "9 or 10 months behind" schedule for ClariVein.   ¶¶140-146.   Subsequently, the Company reported full-year 2019 Vascular Insights sales a substantial 30% below guidance—further underscoring the ongoing sales impediments and the lack of any "ramping."   The severity of the problems plaguing ClariVein and the gross divergence between Defendants' representations and the internal truth underscore how Defendants' statements were knowingly or recklessly false when made.

193.   ***Lampropoulos and Parra had access to and received real-time sales information reflecting the absence of any ClariVein orders.***  Defendants had access to—and did access—facts contradicting their false statements to investors about ClariVein sales.  ¶¶101-112.  Numerous former Merit and Vascular Insight employees have confirmed this.  For example, Merit's Vice President of Business Continuity, Senior Product Manager, Project Manager, and Senior Marketing Event Manager all reported that outside of Lampropoulos' office was a large video screen mounted to the wall which streamed daily sales information, including incoming orders (or lack thereof), for each of Merit's products, including ClariVein.  ¶¶104-107.  Merit's Project Manager, who worked near Lampropoulos, and on the same floor as him, reported further that Lampropoulos looked at the screen each time he came out of his office.  ¶105.  Merit's Senior Marketing Event Manager, who also had an office on the third floor, reported that there was a second screen displaying the same information in front of Defendant Parra's office.  ¶105.

194.   In addition to having direct access to the screens that projected sales data, the Executive Defendants also had access to the Company's centrally located platform called "Domo" that tracked and stored Merit's sales and orders.  ¶¶80, 106-111.  The Domo system tracked reports for all sales numbers and was routinely updated to show when orders were placed, by which customer, and for how much.  ¶106.  According to former Merit employees, Defendant Lampropoulos had access to Domo at all times throughout the Class Period, including through his smartphone.  ¶107.  Merit's Project Manager reported that Defendant Lampropoulos had the information at his disposal at all times, and that Lampropoulos would often bring up sales numbers on his smartphone during meetings to discuss individual product sales.  ¶107.  Further, Merit's Senior Marketing Event Manager stated that Lampropoulos was "hooked on the sales system."  ¶107.  He also reported that Defendant Lampropoulos logged into the sales reporting system a few times a day, and that it was general knowledge within the Company that Lampropoulos checked the sales numbers so frequently.  ¶¶106-

107.   Likewise, Merit's Strategic Accounts Contract Manager also confirmed that Defendants Lampropoulos and Parra had full access to Domo and requested data from it frequently.   ¶106.   With such access to and use of the pertinent internal sales data, Defendants Lampropoulos and Parra were certainly aware that ClariVein was suffering from devastatingly poor sales results, including <u>zero</u> orders during the entire first half of 2019.

195.   ***Defendant Lampropoulos received regular reports showing the lack of ClariVein sales, including zero sales in the first half of 2019.***   Former Merit employees attest that Lampropoulos regularly received reports with product sales numbers.   ¶¶106-110.   For example, Merit's Senior Marketing Event Manager explained that Lampropoulos received ClariVein sales numbers in daily emails, and that an email detailing the daily sales numbers tracked by the Company's sales reporting system was sent to the Company's top executives, including Lampropoulos, at the end of every day with a link to get more detailed information on specific product reporting, including ClariVein.   ¶108.   Merit's Strategic Accounts Contract Manager further confirmed that Lampropoulos asked for financial reports over prior quarters and years, including forecasting, and that this information would be pulled and provided to Lampropoulos using information synthesized from Domo.   ¶109.   Merit's Strategic Accounts Contract Manager similarly explained that Defendant Lampropoulos always worked with business analysts on the sales numbers, and that the analysts were constantly producing periodic reports for him.   ¶109.   Given that Lampropoulos was constantly involved with Merit's sales numbers, Merit's VP of Business Continuity said Lampropoulos "knew everything about sales" and was "aware every day of how sales were going."   ¶111.   Indeed, the VI National Account Manager reported that the issues with ClariVein orders were so "disastrous" that there were constant discussions about the need to sell more ClariVein.   ¶110.   The fact that Lampropoulos was continually informed of the status of product sales, including those of ClariVein, further underscores that Defendant Lampropoulos was certainly aware

1  that ClariVein was suffering from devastatingly poor sales results, including <u>zero</u>

2  orders during the entire first half of 2019.

3      196.  ***The Executive Defendants knew that insurance payors were refusing to***

4  ***reimburse doctors for ClariVein.***  Commercial insurance payors, Medicare advantage,

5  and private payors were almost uniformly denying coverage for ClariVein, which

6  blocked orders of the ClariVein product.  ¶¶113-123.  Multiple witnesses have stated

7  that insurance carriers were denying 80% of physicians' reimbursement claims and

8  that these reimbursement denials caused ClariVein sales to plummet.  ¶¶114-116.

9  Vascular Insights' inability to obtain reimbursement and the direct and deleterious

10  effect this had on ClariVein sales was discussed with Merit during Merit's National

11  Sales Conference in January 2019.  In addition, immediately following the acquisition,

12  Defendants were specifically and directly told by multiple former Vascular Insights

13  employees that payors were not reimbursing doctors for using ClariVein, which made

14  sale of the product exceedingly difficult.  ¶¶113-123.  These facts further support a

15  strong inference of scienter.

16      197.  ***Lampropoulos was specifically informed that Vascular Insights***

17  ***improperly marketed ClariVein, and Merit determined that it could not market the***

18  ***product for its primary use, thereby driving down sales.***  Before the acquisition,

19  Vascular Insights marketed ClariVein as a treatment for varicose veins.  ¶¶124-128.

20  Merit knew that Vascular Insights' marketing of ClariVein violated the law because

21  the product was not approved for treatment of varicose veins, and this prevented sales

22  because the primary market for ClariVein was vein treatment centers.  ¶¶124-128.

23  Without being able to describe what the product could do for treating vein disease,

24  marketing materials were simply useless in drumming up demand for ClariVein.  ¶125.

25  Lampropoulos was specifically told about this issue, with Merit's Chief Regulatory

26  Officer and the Vice President of Regulatory and Clinical Affairs at Merit meeting and

27  discussing the issue with him by March 2019.  ¶128.

28

198.   ***Defendants Lampropoulos and Parra continued to issue false statements after acknowledging that members of Cianna's sales force had quit and no one was ordering ClariVein.***   On July 25, 2019, Merit admitted that there had been attrition among the members of Cianna's sales force, and there were no orders of Vascular Insights' ClariVein.   ¶¶130-133.   Yet, Defendants Lampropoulos and Parra continued to make materially false and misleading statements to investors meant to assure them that these issues were minor and temporary.   ¶¶134-136.   They assured that the "attrition" among Cianna's sales force was "only a little bit" and "not much" when, in reality, a critical component of the Company's sales force, which covered 15 states and drove over 20% of its sales, had all quit, driving down sales.   ¶134. Lampropoulos and Parra further falsely assured investors that the dearth of ClariVein orders was merely a "short-term" issue because sales were already "ramping to our expectations" and prior shortfalls were the result of "pipeline filling."   ¶135.   In truth, there was no "ramping."   It was internally obvious that the low sales and complete dearth of any new orders in the first half of 2019 were due to deep, persistent problems blocking sales, and the "pipeline filling" excuse was a false deflection to cover up such endemic sales problems.   ¶¶113-128.   The Executive Defendants' July 2019 attempts to cover up the truth regarding Cianna and Vascular Insights further shows their scienter.

199.   ***Defendant Lampropoulos sold $6.5 million in Merit Medical stock at the same time that he misrepresented facts to investors.***   During Merit's July 25, 2019 earnings conference call, Lampropoulos assured investors that the issues Merit was experiencing with ClariVein were the result of a "short-term" problem with "pipeline filling" but that the "thunderstorm has left," and that, regarding Cianna, there has only been "a little bit" of attrition in the sales force.   ¶¶130-136.   Those false assurances propped up the price of Merit's stock.   Had Lampropoulos told investors the truth, the Company's stock price would have cratered even further, as it ultimately did after the October 30, 2019 disclosures.   ¶¶140-146.   Lampropoulos personally took advantage

1  of the ongoing deceit by selling an astonishing $6.5 million worth of his personal
2  shares within weeks of the July 25, 2019 false statements.  ¶¶137-139.

3        200.   Lampropoulos' sales were particularly unusual.  Indeed, Lampropoulos
4  had not made a single sale during the three-and-a-half years prior to his Class Period
5  sales.  His sales during this short three-week period dwarfed those of the preceding
6  six-year period and exceeded all those of the past thirteen years combined.  ¶138.
7  Between August and September 2019, Lampropoulos unloaded $6.5 million worth of
8  Merit shares (constituting 16% of his total holdings, the highest such percentage—
9  measured annually—in at least a decade) in a matter of just three weeks.  ¶¶137-139.
10  These sales were not pursuant to a 10b5-1 trading plan, but rather were open market
11  transactions that he chose to execute.  Specifically, he sold 40,000 shares at $36.86 on
12  August 15, 2019, and then sold 161,817 shares at $30.41 and $30.72 on September 6,
13  2019.  By selling these shares when he did, as opposed to after Merit's corrective
14  disclosures on October 30, 2019, Lampropoulos avoided the 29% decline in Merit's
15  stock that the company's other shareholders suffered that day.  Not surprisingly,
16  analysts  contemporaneously  recognized  the  highly  suspicious  nature  of
17  Lampropoulos' personal sales, commenting, for example, that the sales "[have] drawn
18  the ire of investors."

19        201.   The foregoing facts, particularly when considered collectively (as they
20  must be), support a strong inference of Defendants' scienter.

21  **VII.   LOSS CAUSATION**

22        202.   During the Class Period, Defendants' materially false and misleading
23  statements and omissions artificially inflated the price of Merit common stock and
24  maintained existing inflation in the stock price.  The July 25 and October 30, 2019
25  disclosures revealed the relevant truth and removed the artificial inflation.  As a result
26  of their purchases of Merit stock during the Class Period, Lead Plaintiffs and the other
27  Class members suffered economic loss.

28

203.   Merit's common stock reached a Class Period peak price of $62.60 on April 11, 2019, then lost approximately 67% of its value to close at $20.66 at the end of the Class Period.

**Disclosures on July 25, 2019**

204.   On July 25, 2019, after the close of trading, Merit held its second quarter conference call with investors and analysts.  During the call, Defendants disclosed that Merit "ha[d]n't had an order all year" for Vascular Insights' ClariVein product.  In addition, Lampropoulos revealed for the first time that Cianna's sales force had suffered "attrition" and, as a result, "areas [of the country] didn't have attention" from Cianna sales representatives.  The Company's partial disclosures (¶¶130-136) stood in stark contrast to the Company's statements during the Class Period, including Defendants' statements touting ClariVein's post-acquisition success and assuring investors that Cianna's entire sales force remained with the Company.

205.   These revelations took investors by surprise.  Canaccord Genuity cut its price target for Merit's stock by nearly 20% (from $63 to $53), explaining that the "stock hits the penalty box" and is "in the doghouse."  Piper Jaffray likewise cut its price target for Merit's stock by nearly 25% (from $75 to $58 per share), calling the Company's disclosures "surprising" and stating that "[t]he biggest reason for the top-line shortfall in the quarter (roughly $3M below our estimate) was slower than expected sales from Cianna and ClariVein."

206.   Analysts connected the disclosures to Merit's integration failures.  For example, in its July 25, 2019 report lowering its price target for Merit shares, Canaccord Genuity noted that the "integration" of "recent deals seem[ed] to catch up with Merit in Q2."  The following day, Barrington issued a report similarly lowering its price target for Merit's stock and noting that "[w]e suspect that integration of recent transactions . . . ultimately proved disruptive to the sales process."

207.   In response to the partial disclosures, Merit's stock price suffered an immediate and highly material drop.  The stock price dropped by 25.25% in a single

day, on abnormally high trading volume of more than 6.2 million shares—the highest trading volume in a year—from a close of $54.84 per share on July 25, 2019 to $41.00 per share on July 26, 2019. This massive and immediate decline erased over $740 million in shareholder value.

208. During the July 25, 2019 conference call, Defendants continued, however, to conceal from the market the full extent of Cianna's integration failures and the persistent, long-standing roadblocks to sell Vascular Insights' ClariVein product. Defendants nowhere disclosed during the July 25 conference, among other things, that Cianna's top performers in its most important sale region all left the Company in short succession after the acquisition, leaving substantial parts of the country without sales coverage and causing sales in this most critical region to drop by 25% to 30%.

209. Rather than disclose these critical facts, Defendants instead falsely assured investors that, while there had been attrition among the Cianna sales force, there had only been "a little bit" and "not much." As to ClariVein, Defendants falsely assured investors that the difficulties plaguing sales of ClariVein were "short term" and caused by "pipeline filing" by customers who feared that they "they wouldn't be able to keep" the product after the acquisition. In addition, Defendants continued to reaffirm their 2019 revenue guidance for ClariVein of $10 million to $11 million, notwithstanding that the Company had not had a single order for the product all year long.

210. As explained above, Defendants' damage control and false excuses worked, as analysts took comfort in Defendants' false assurances. ¶¶134-136. Defendant Lampropoulos used the ongoing deceit as an opportunity to sell millions of dollars in Merit stock at artificially elevated prices, and in transactions that were completely contrary to his prior trading history. ¶¶137-139.

**Disclosures on October 30, 2019**

211.   On October 30, 2019, after the market closed, Merit made a series of disclosures about the failed integrations and disastrous financial performance from Cianna and ClariVein.  Among other things, the Company revealed that Cianna and Vascular Insights were <u>not</u> performing as expected and, indeed, the Company was "nine or ten months behind where we thought [the Vascular Insights performance] would be," and that Cianna "fell behind" following the loss of the company's most important sales people.  *See* ¶¶140-143.  The Company revealed that the monumental acquisition failures had forced a complete reset in the entire Company's business strategy, proclaiming that it was "back to basics" for Merit, and it was halting its longstanding, core growth-by-acquisition strategy.

212.   These partial disclosures (¶¶140-143) caused the Company's stock price to decline.  On October 31, 2019, the price of Merit common stock fell 29%, or $8.45 per share (from a closing price of $29.11 on October 30 to a closing price of $20.66 on October 31), erasing $452 million in shareholder value, again on abnormally high trading volume of over 7 million shares.

213.   The disclosures shocked and outraged securities analysts.  Multiple analyst firms slashed their price target for the stock, squarely attributed the Company's surprisingly dire performance to the failed Cianna and Vascular Insights acquisitions, and specifically and openly questioned senior management's credibility.  For example, in an October 30, 2019 analyst report, Canaccord Genuity noted that "<u>[i]t will take a few years . . . for established investors to trust this management team again</u>."  The October 30 disclosures were so shocking in light of Defendants' prior representations that securities analysts took the remarkable and unusual step of calling for the removal of Merit's top executives, concluding: "<u>You probably don't want to try catching this falling knife until there have been some changes in the executive suite</u>."

214.   Defendants' wrongful conduct, as alleged herein, directly and proximately caused the damages suffered by Lead Plaintiffs and other Class members.

1   The lack of reimbursement coverage for ClariVein, and Merit's inability to market

2   ClariVein to treat varicose veins, proximately caused a lack of new orders and

3   lackluster sales for the ClariVein product.   ¶¶101-128.   In addition, the sudden

4   departure of Cianna's top sales representatives in its most important Western region

5   following the acquisition negatively impacted sales for the Cianna products. ¶¶67-84.

6   As witnesses have explained, following the termination of these critical sales

7   representatives, sales in the Western region fell from the top to the worst, with sales

8   dropping off in that region from 25-30%.  ¶¶68-81.

9        215.   Had Defendants disclosed complete, accurate, and truthful information

10  concerning these matters during the Class Period, Lead Plaintiffs and other Class

11  members would not have purchased or otherwise acquired Merit's securities or would

12  not have purchased or otherwise acquired these securities at the artificially inflated

13  prices that they paid.  It was also foreseeable to Defendants that misrepresenting and

14  concealing these material facts from the public would artificially inflate the price of

15  Merit's securities and that the ultimate disclosure of this information, or the

16  materialization of the risks concealed by Defendants' material misstatements and

17  omissions, would cause the price of Merit's securities to decline.

18        216.   The significant and repeated declines in Merit's stock price were a direct

19  result of the nature and extent of Defendants' misrepresentations finally being revealed

20  to investors and the market.  The timing and magnitude of the declines in the

21  Company's share price negate any inference that the losses suffered by Lead Plaintiffs

22  and the other Class members were caused by changed market conditions,

23  macroeconomic or industry factors, or Company-specific facts unrelated to

24  Defendants' violations of the federal securities laws.  The following graphic shows the

25  performance of a $100 investment in Merit's stock price prior to the Class Period as

26  compared to two major market indexes:

27

28

$100 Investment in Merit Medical Systems Common Stock Compared to S&P 500 and Industry Peer Group

[1] S&P 500 Health Care Equipment & Supplies Industry GICS Level 3 Index

## VIII. **THE INAPPLICABILITY OF THE STATUTORY SAFE HARBOR**

217.   The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the false and misleading statements pleaded in this Complaint.  With little exception, none of the misstatements complained of herein was a forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions existing at the time or prior to when the statements were made.

218.   To the extent that any of the false or misleading statements alleged herein are forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  As set forth in detail above (¶¶66-128), then-existing facts contradicted Defendants' statements.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosure made by

1  Defendants was insufficient to insulate Defendants from liability from their materially
2  untrue and misleading statements.

3      219.   Defendants are also liable for any forward-looking statements because at
4  the time each of those statements was made, the particular speaker knew that the
5  particular forward-speaking statement was false, and the false forward-looking
6  statement was authorized and approved by an executive officer of Merit who knew
7  that the statement was false when made.

8  **IX.    THE PRESUMPTION OF RELIANCE**

9      220.   At all relevant times, the market for Merit's common stock was efficient
10  for the following reasons, among others:

11          a.    Merit's stock met the requirements for listing, and was listed and
12                actively traded on the NASDAQ Stock Market, a highly efficient
13                and automated market;

14          b.    As a regulated issuer, Merit filed periodic reports with the SEC and
15                the NASDAQ Stock Market;

16          c.    Merit regularly communicated with public investors via
17                established market communication mechanisms, including through
18                regular dissemination of press releases on the national circuits of
19                major newswire services and through other wide-ranging public
20                disclosures, such as communications with the financial press and
21                other similar reporting services; and

22          d.    Merit was followed by numerous securities analysts employed by
23                major brokerage firms who wrote reports which were distributed
24                to those brokerage firms' sales force and certain customers. Each
25                of these reports was publicly available and entered the public
26                marketplace.

27      221.   As a result of the foregoing, the market for Merit's common stock
28  reasonably promptly digested current information regarding Merit from all publicly

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS

1   available sources and reflected such information in the price of Merit's common stock.

2   All purchasers of Merit common stock during the Class Period suffered similar injury

3   through their purchase of Merit common stock at artificially inflated prices, and a

4   presumption of reliance applies.

5       222.   A class-wide presumption of reliance is also appropriate in this action

6   under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v.*

7   *United States*, 406 U.S. 128 (1972), because the claims asserted herein against

8   Defendants are predicated upon omissions of material fact for which there is a duty to

9   disclose.

10   **X.   CLASS ACTION ALLEGATIONS**

11      223.   Lead Plaintiffs bring this action as a class action pursuant to Federal Rule

12   of Civil Procedure 23(a) and 23(b)(3) on behalf of all persons who purchased Merit

13   common stock during the Class Period (the "Class").  Excluded from the Class are

14   Defendants and their immediate families, the officers and directors of the Company at

15   all relevant times, members of their immediate families, and Defendants' legal

16   representatives, heirs, successors, or assigns, and any entity in which defendants have

17   or had a controlling interest.

18      224.   The members of the Class are so numerous that joinder of all members is

19   impracticable.  Throughout the Class Period, Merit shares were actively traded on the

20   NASDAQ Stock Market.  As of February 2019, there were approximately 55 million

21   shares of Merit common stock outstanding.  While the exact number of Class members

22   is unknown to Lead Plaintiffs at this time and can only be ascertained through

23   appropriate discovery, Lead Plaintiffs believe that there are at least [hundreds-of-

24   thousands] of members of the Class.  Class members who purchased Merit common

25   stock may be identified from records maintained by Merit or its transfer agent(s) and

26   may be notified of this class action using a form of notice similar to that customarily

27   used in securities class actions.  Disposition of their claims in a class action will

28   provide substantial benefits to the parties and the Court.

225. Lead Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

226. Lead Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

227. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

      a.    whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

      b.    whether the Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

      c.    whether Defendants acted with scienter; and

      d.    the proper way to measure damages.

228. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

# XI.   CLAIMS FOR RELIEF UNDER THE EXCHANGE ACT

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5**
**(Against All Defendants)**

229. Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

230. This Count is asserted on behalf of all members of the Class against Merit and the Executive Defendants for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

231. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

232. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and others similarly situated in connection with their purchases of Merit common stock during the Class Period.

233. Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiffs and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with deliberate recklessness; and employed devices and artifices to defraud in connection with the purchase and sale of Merit common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiffs and the Class, regarding, among other things, Cianna's integration success and sales force and ClariVein orders; (b) artificially inflate and maintain the market price of Merit common stock; and (c) cause Lead

Plaintiffs and other members of the Class to purchase Merit common stock at artificially inflated prices and suffer losses when the true facts became known.

234.   Merit and the Executive Defendants are liable for all materially false and misleading statements made during the Class Period, as alleged above.

235.   As described above, Defendants acted with scienter throughout the Class Period, in that they acted either with intent to deceive, manipulate, or defraud, or with deliberate recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Merit stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

236.   Lead Plaintiffs and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Merit common stock, which inflation was removed from its price when the true facts became known. Lead Plaintiffs and the Class would not have purchased Merit common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' materially misleading statements.

237.   As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Merit common stock during the Class Period.

### COUNT II

**For Violations of Section 20(a) of the Exchange Act**
**(Against Defendants Lampropoulos and Parra)**

238.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

239.   This count is asserted on behalf of all members of the Class against the Executive Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

- 96 -

240.   The Executive Defendants acted as controlling persons of Merit within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

241.   By reasons of their high-level positions of control and authority as the Company's most senior officers, the Executive Defendants had the authority to influence and control, and did influence and control, the decision-making and the activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein. The Executive Defendants were able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Merit during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein. The Executive Defendants were provided with, or had unlimited access to, copies of the Company's press releases, public filings, and other statements alleged by Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

242.   Each of the Executive Defendants spoke to investors on behalf of the Company during the Class Period. Therefore, each of the Executive Defendants was able to influence and control, and did influence and control, directly and indirectly, the content and dissemination of the public statements made by Merit during the Class Period, thereby causing the dissemination of the materially false and misleading statements and omissions of material facts as alleged herein.

243.   As set forth above, Merit violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

244.   By virtue of their positions as controlling persons of Merit and as a result of their own aforementioned conduct, the Executive Defendants are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiffs and the other members of the Class who

purchased or otherwise acquired Merit securities.   As detailed above, during the respective times, these Executive Defendants served as officers and/or directors of Merit.

245.   As a direct and proximate result of the Executive Defendants' conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchase or acquisition of Merit common stock.

## XII.   PRAYER FOR RELIEF

246.   WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a.   Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b.   Awarding compensatory damages in favor of Lead Plaintiffs and other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

c.   Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d.   Awarding such equitable, injunctive or other further relief as the Court may deem just and proper.

## XIII.  JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED:  June 30, 2020

**SAXENA WHITE P.A.**

*/s/ David R Kaplan*
David R Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Brandon Marsh (SBN 268316)
bmarsh@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA  92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Attorneys for Lead Plaintiffs the Atlanta*
*Funds and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER**
**& GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (Bar No. 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (Bar No. 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars
Los Angeles, California 90067
Tel: (310) 819-3470

*Attorneys for Lead Plaintiff Employees'*
*Retirement System of the City of Baton*
*Rouge and Parish of East Baton Rouge and*
*Co-Lead Counsel for the Class*

CONSOLIDATED CLASS ACTION COMPLAINT
8:19-cv-02326-DOC-ADS