**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Brandon Marsh (SBN 268316)
bmarsh@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone:  (858) 997-0860
Facsimile:  (858) 369-0096

*Attorneys for Lead Plaintiffs the Atlanta Funds and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (SBN 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (SBN 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3472

*Attorneys for Lead Plaintiff Baton Rouge and Co-Lead Counsel for the Class*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
### SOUTHERN DIVISION

| | |
|---|---|
| IN RE MERIT MEDICAL SYSTEMS, INC. SECURITIES LITIGATION | No. 8:19-cv-2326-DOC-ADS<br><br>**LEAD PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>Hearing Date And Time: Not Specified By Defendants<br>Courtroom: 9D<br>Judge: David O. Carter |

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     SUMMARY OF ALLEGATIONS .....................................................................3

        A.      Defendants Announced The Cianna And ClariVein
                Acquisitions ..........................................................................................4

        B.      Defendants Misrepresented Cianna's Integration And
                Sales Force Retention...........................................................................5

        C.      Defendants Misrepresented ClariVein's Performance And
                Sales ......................................................................................................7

        D.      When The Truth Is Revealed, Merit's Stock Price
                Plummets, Analysts Excoriate Defendants, And
                Lampropoulos Reaps $6 Million By Dumping His Shares
                Ahead Of The News...............................................................................8

III.    ARGUMENT .....................................................................................................10

        A.      The Complaint Adequately Alleges Defendants' Material
                Misrepresentations And Omissions .....................................................10

                1.      Defendants Concealed Significant Departures In
                        Cianna's Sales Force...............................................................11

                2.      Defendants Concealed The Failed Cianna
                        Integration...............................................................................13

                3.      Defendants Concealed ClariVein's Sales
                        Impediments And Lack Of Orders ..........................................16

                4.      No Safe Harbor Applies ..........................................................18

        B.      The Complaint Raises A Strong Inference Of Scienter.....................19

                1.      The Complaint Raises A Strong Inference Of
                        Scienter Concerning Cianna ....................................................19

                2.      The Complaint Raises A Strong Inference Of
                        Scienter Concerning ClariVein................................................21

                3.      Defendants' Challenges To Scienter Fail ................................24

C.    The Complaint Adequately Alleges Loss Causation ..........................26

D.    The Complaint Adequately Alleges Section 20(a) Claims.................28

VI. CONCLUSION ...........................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)..................................................................................10, 17

*Brown v. China Integrated Energy, Inc.*,
875 F. Supp. 2d 1096 (C.D. Cal. 2012) .....................................................22, 24, 26

*City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*,
302 F. Supp. 3d 1028 (N.D. Cal. 2018) ................................................................16

*Desta v. Wins Fin. Hldgs Inc.*,
2018 WL 1136525 (C.D. Cal. Feb. 28, 2018)......................................................28

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ..............................................................................................26

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019) ..................................................................21

*Feyko v. Yuhe Int'l., Inc.*,
2013 WL 816409 (C.D. Cal. Mar. 5, 2013).........................................................11

*Gammel v. Hewlett-Packard Co.*,
2013 WL 1947525 (C.D. Cal. May 8, 2013) ........................................................23

*Ganino v. Citizens Utilities Co.*,
228 F.3d 154 (2d Cir. 2000)..................................................................................17

*In re Apple Computer, Inc.*,
127 F. App'x 296 (9th Cir. 2005) ..........................................................................15

*In re Coinstar Inc. Sec. Litig.*,
2011 WL 4712206 (W.D. Wash. Oct. 6, 2011) ....................................................24

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ................................................................19

*In re Daou Sys., Inc.*,
411 F.3d 1006 (9th Cir. 2005)..........................................................................15, 28

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................................18

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008).................................................................10, 27, 28

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
   791 F.3d 90 (D.C. Cir. 2015) ....................................................................................18

*In re Qualcomm Inc. Sec. Litig.*,
   2019 WL 1239301 (S.D. Cal. Mar. 18, 2019) ........................................................20

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017).................................................................19, 22, 23

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001) .......................................................................................20

*In re Sipex Corp. Sec. Litig.*,
   2005 WL 3096178 (N.D. Cal. Nov. 17, 2005)........................................................17

*In re Solarcity Corp. Sec. Litig.*,
   274 F. Supp. 3d 972 (N.D. Cal. 2017) .....................................................................15

*In re STEC Inc. Sec. Litig.*,
   2011 WL 2669217 (C.D. Cal. June 17, 2011) ..................................................11, 14

*In re VeriFone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012)....................................................................................20

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
   2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...............................................................15

*Karinski v. Stamps.com, Inc.*,
   2020 WL 281716 (C.D. Cal. Jan. 17, 2020) .............................................20, 25, 27

*Kelly v. Elec. Arts, Inc.*,
   71 F. Supp. 3d 1061 (N.D. Cal. 2014) .....................................................................15

LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
CASE NO. 8:19-CV-2326-DOC-ADS

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018), *cert. denied*,
   __, U.S.__, 139 S. Ct. 2615 (2019) ...............................................................*passim*

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)..............................................................................17, 18

*Loritz v. Exide Techs.*,
   2014 WL 4058752 (C.D. Cal. Aug. 7, 2014)..........................................................13

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................................................10, 21

*Mineworkers' Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018), *cert. denied*,
   __U.S.__, 139 S. Ct. 2741 (2019). ............................................................26, 27, 28

*New Mexico State Inv. Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011)..................................................................................24

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004)..................................................................................22

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014)............................................................................15, 23

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014), *overruled on other grounds by*
   *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015)..................................................................................................20

*Roberti v. OSI Sys., Inc.*,
   2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).........................................................19

*Roberts v. Zuora, Inc.*,
   2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) ..................................................15, 18

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001)....................................................................................26

*Roofer's Pension Fund v. Papa*,
2018 WL 3601229 (D.N.J. July 27, 2018)...........................................................24

*S. Ferry LP #2 v. Killinger*,
687 F. Supp. 2d 1248 (W.D. Wash. 2009).......................................................20, 21

*S. Ferry LP, No. 2 v. Killinger*,
542 F.3d 776 (9th Cir. 2008)..........................................................................22, 26

*S.E.C. v. Mozilo*,
2009 WL 3807124 (C.D. Cal. Nov. 3, 2009).......................................................14

*S.E.C. v. Yuen*,
2006 WL 1390828 (C.D. Cal. Mar. 16, 2006).....................................................18

*Schueneman v. Arena Pharm., Inc.*,
840 F.3d 698 (9th Cir. 2016)..................................................................*passim*

*Siracusano v. Matrixx Intiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011) ...................................19

*Skiadas v. Acer Therapeutics Inc.*,
2020 WL 4208442 (S.D.N.Y. July 21, 2020) ......................................................13

*Sudunagunta v. NantKwest, Inc.*,
2017 WL 8810760 (C.D. Cal. Sept. 20, 2017)......................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) .........................................................................10, 19, 23

*Turocy v. El Pollo Loco Holdings, Inc.*,
2017 WL 3328543 (C.D. Cal. Aug. 4, 2017).................................................*passim*

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
2017 WL 3097184 (N.D. Cal. June 22, 2017) .........................................15, 18, 21

*Webb v. Solarcity Corp.*,
884 F.3d 844 (9th Cir. 2018)................................................................................25

*Zucco Partners, LLC v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009)...............................................................................23

LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
CASE NO. 8:19-CV-2326-DOC-ADS

## I.   INTRODUCTION

This action features highly compelling evidence of securities fraud. Defendants' misrepresentations concerned two of the most important acquisitions in Merit's history—Cianna and ClariVein—and were so egregious that not only did the market slash the Company's stock price by over **50%** when the truth emerged, but analysts widely excoriated Defendants for misleading investors, declaring that Merit suffered from a significant "***management credibility issue***" and that it would take "***years***" for Defendants to regain investor trust. While Defendants repeatedly assured investors that Merit successfully integrated Cianna and had maintained its sales force—a fact that Defendants specifically told investors was "critical" to the acquisition's success—the truth was precisely the opposite.

As multiple eyewitnesses and Defendants' own admissions confirmed, at the same time that Defendants were assuring investors that (i) the Cianna integration was complete and was "as good of a transaction and transition that we have done" and "I don't know how you could do it any better, to be honest with you"; and (ii) Merit had accomplished the "critical" retention of the sales force, the Cianna integration was such a debacle that ***over half*** the integration items were never completed, and nearly ***one-quarter*** of the sales force had quit. And, while Defendants assured investors that its acquisition of ClariVein was driving growth with strong sales, in reality, Merit generated a remarkable ***zero ClariVein orders*** for the ***entire first half of 2019***. When Merit was finally forced to reveal the truth and corresponding disappointing financial results, Defendants frankly admitted that "***we fell on our face***" and the true state of the failed acquisitions was so dire that Merit required a complete reset of its growth-by-acquisition strategy—indeed, it was "***back to basics***." Facts like these are unusually probative at the pleading stage. They, along with numerous additional well-pleaded facts, require that Defendants' motion to dismiss be denied.

Defendants' motion, which relies principally on mischaracterizing the Complaint and attempting to rewrite facts such as the plain meanings of Defendants'

LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
CASE NO. 8:19-CV-2326-DOC-ADS

statements, fails for three principal reasons:

*First*, the Complaint details with great particularity how and why Defendants' statements were false and misleading when made. For example, Defendants repeatedly assured investors regarding the purported progress and success of Cianna's integration, including through highly material, specific statements that the integration was "complete," was "as good of a transaction and transition that we have done," and that Merit had "maintained the sales force." In truth, Merit had failed to complete over **50%** of the integration items, including for its most important systems and platforms, and suffered heavy sales force attrition, including top performers responsible for **22%** of Cianna's entire revenues and many of its largest accounts.

Defendants' motion does not deny that Defendants had a duty to inform investors of the undisclosed facts, but instead asserts that Defendants did, in fact, make full disclosure of all material facts. This is utterly false. Defendants' statements concerning Cianna sales force retention, for example, never mentioned any salesperson departures, let alone the material departures of nearly a quarter of the sales force. Defendants also contend that their statements about Merit's critical acquisition integrations could not possibly have been material. This is absurd. Cianna and ClariVein were critical integrations responsible for **half** of Merit's projected 2019 growth—indeed, Cianna was Merit's largest acquisition ever—and were the foundation of Merit's entry into the highly lucrative therapeutic device market. Analysts credited Defendants' statements about the landmark integrations and, when Merit finally revealed in October 2019 that the integrations had been abject failures and sales were low, analysts concluded Defendants had violated investors' trust and called for Defendants' outright removal while Merit's stock price fell precipitously.

*Second*, the Complaint amply alleges that Defendants made their misrepresentations knowingly, or at a bare minimum with deliberate recklessness. Defendants themselves stressed their personal involvement in these key transformative acquisitions and held themselves out to analysts and investors as fully

aware of their purported progress and success. For example, Lampropoulos repeatedly touted his tight-knit relationship with the Cianna sales force, including daily calls, trips to Southern California for in-person meetings, and the exchange of personal notes from "almost everybody on the [Cianna] sales team" about "being a part of Merit." He was clearly aware of the material sales force departures that he hid from investors. Defendants Lampropoulos and Parra also closely tracked the disastrous performance of ClariVein through their close watch of sales data streamed in real-time to 60" monitors outside each of their offices, as well as on their mobile phones, personal computers, and through regular written reports and presentations. And while motive is not required, Defendant Lampropoulos' highly unusual stock sales are compelling. Weeks before the truth emerged in October 2019, Lampropoulos unloaded over $6 million worth of his personal Merit stockholdings, selling more shares in just a few weeks than in the prior 13 years combined.

*Third*, the Complaint amply alleges loss causation. On July 25 and October 30, 2019, Merit's stock price plummeted by 25% and 29%, respectively, after the Company disclosed, among other things, integration delays, sales force attrition, a startling lack of sales and ClariVein orders, disappointing financial results, dramatically lowered revenue guidance for 2019, and the complete retraction of Merit's 2020 guidance. There can be no serious dispute that each of these disclosures was tied to Defendants' material misstatements and caused investor losses.

Defendants' motion to dismiss should be denied.

## II.   SUMMARY OF ALLEGATIONS

Defendants' purported summary of "Plaintiffs' Allegations" is less than a page (Br. at 7:16-8:12), distorts the Complaint, and omits whole categories of facts underscoring the falsity of Defendants' statements.[1] A fair review of the actual facts

---

[1] All "Br." references are to Defendants' moving brief (ECF No. 56). All "¶__" references are to the Consolidated Class Action Complaint (ECF No. 53)

establishes that the Complaint states claims for securities fraud.

## A. Defendants Announced The Cianna And ClariVein Acquisitions

Leading up to the Class Period, Merit executed an increasingly aggressive "growth-by-acquisition" strategy that entailed serial acquisitions to boost revenue.[2] In so doing, Defendants learned the critical importance of retaining specialized sales forces. ¶¶28-30. For example, after Merit's late 2016 acquisition of DFINE, members of DFINE's sales force terminated their employment, causing Merit's sales of DFINE's products to suffer. ¶29. As securities analysts noted, the benefits of the DFINE acquisition were delayed "stemming from integration challenges with respect to its specialized sales force." *Id.* Maintaining the acquired entity's sales force was particularly critical to Merit's post-acquisition sales success. *Id.* If such salespeople departed, it took "around *a year* or so" for Merit's generalized salespeople to learn to sell the acquired entity's specialized product. *Id.*

Thus, when Defendants announced Merit's acquisition of Cianna in October 2018, the critical importance of retaining Cianna's highly specialized sales force was front and center. ¶¶34-46. Not only was Cianna the Company's largest acquisition ever, but Cianna sold highly complex therapeutic devices used during surgery—devices that were far more sophisticated than the non-surgical "accessory" products Merit traditionally sold. ¶¶21, 28, 34-38. To effectively sell these devices, Merit

("Complaint"). All "Ex." references are to exhibits to the Declaration of Paul R. Bessette (ECF Nos. 56-1, 56-2). Unless otherwise noted, in this brief all emphasis is added, and all internal citations and punctuation are omitted.

[2] ¶¶25-27. Under the guise of "judicial notice" and "incorporation-by-reference," Defendants attempt to contradict the Complaint by submitting 16 exhibits and asking the Court to accept as true statements in those exhibits. *E.g.*, Br. at 5:6-16, 6:24-7:1. Defendants' request is improper. As the Ninth Circuit has explained, such tactics not only flout "the fundamental rule that courts must interpret the allegations and factual disputes in favor of the plaintiff at the pleading stage," but are part of a "concerning pattern in securities cases like this one." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998,1014 (9th Cir. 2018), *cert. denied*, __U.S.__,139 S. Ct. 2615 (2019).

needed to retain Cianna's sales force, which was thoroughly trained in the niche devices and had longstanding relationships with purchasers. ¶¶35-36, 39-40, 77, 79.

Given these issues, Lampropoulos repeatedly stressed to investors that Merit understood the importance of retaining Cianna's sales force after the acquisition. ¶¶39-40, 44, 46, 186-187. He stated he was personally "lead[ing Cianna's] efficient integration" and repeatedly emphasized Merit would keep "in place" Cianna's "entire sales force" of 19 highly trained and educated professionals because Merit had "learned lessons from our situations in the past." ¶¶36, 38-40, 189-190. He stressed the critical importance of doing so, explaining that the "returns" from the acquisition and, indeed, Merit's financial models, depended on the "maintenance of their sales force." ¶¶39-40; *see also* ¶45. Analysts reported that Lampropoulos' assurances touched on a "key" issue and "lessen[ed] the risk profile." ¶¶41-43, 185.

Then, on December 17, 2018, Merit announced that it had completed another major acquisition—this time, of Vascular Insights' ClariVein product. ¶47. Defendants stated that the acquisition positioned Merit to exploit a $700 million market and would add $10 to $11 million in revenues for Merit in 2019 alone. ¶48. Analysts again credited Defendants' assertions. ¶49. Given Defendants' additional representations that they were never "in any hurry" to acquire companies, always "t[oo]k a hard look," were "very patient," and had a specialized and effective process for integrating acquired companies, analysts concluded that Merit "will integrate the asset quickly" and hiked their price target for Merit shares. ¶¶31-33, 49.

**B. Defendants Misrepresented Cianna's Integration And Sales Force Retention**

On February 26, 2019, the first day of the Class Period, Lampropoulos updated investors on the Cianna integration, saying it was going "as well as could be expected" and specifically assuring investors that "we kept the [Cianna] sales force in place" and "we haven't lost anybody." ¶¶51-55, 149-150. Lampropoulos reiterated that it was "critical" that Cianna's "highly trained, clinical personnel" were still

employed in the sales force because "as our products get more complicated, we need to have these folks who know how to sell, interface with surgeons, and have a strong knowledge of physiology and anatomy." ¶52. On April 23, Lampropoulos hailed a perfect integration of Cianna, proclaiming that "*the bottom line is, it's as probably as good of a transaction and transition that we have done*" and "*I don't know how you could do it any better, to be honest with you*." ¶¶56, 166-167. Lampropoulos further assured investors that Merit had "*maintained the sales force*" of Cianna, adding that it was "*a critical thing to do*." ¶¶57, 166-167. Analysts credited Defendants' statements, reporting that Merit had "completed the integration of Cianna" and that "[m]anagement said that the transition of the Cianna asset may be the 'best' that Merit has ever done. This is an encouraging assessment given the fact that Merit has done dozens of transactions over its 30-plus year history." ¶58.

Unbeknownst to investors at the time, the integration was an abject failure and Cianna's sales force had already suffered significant departures. ¶¶66-100. By the time of Defendants' April 23 false statements, (i) *nearly 25%* of Cianna's sales force had quit; and (ii) Merit had lost *60%* of Cianna's sales force in the critical Western region, including the region's veteran top performers who were single-handedly responsible for *75%* of the region's sales and *22%* of Cianna's total sales. ¶¶66-84. The Complaint details the value of the experienced employees who departed and how, as a result of this sales force attrition, Cianna suffered sales declines of *25-30%* in 2019 and the Western region went from Cianna's strongest performing region with the most sales of any region, to recording the least sales of all of Merit's regions— "a significant decline which [Merit] never recovered from." ¶81; *see* ¶¶66-84.

Defendants' statements claiming that Cianna's integration was complete were also false because, in truth, there was a wholesale lack of integration encompassing Cianna's most important information systems and platforms, including (i) its customer relationship management systems ("CRMs") (¶¶85-93); (ii) its critically important marketing platforms (¶¶94-96); (iii) its medical meeting planner (¶¶97-98);

and (iv) its sales force that experienced heavy sales force attrition (¶¶67-84, 99-100). Defendants' integration failures resulted in needless expenses and inefficiencies, delayed and misdirected orders, and lost opportunities. ¶¶91-93, 96-99. Far from being complete as of April 23, as Defendants stated, the integration of such key systems and platforms was not even complete by the end of the Class Period, as Merit belatedly admitted to stunned investors and analysts. ¶¶85, 140-146.

### C.    Defendants Misrepresented ClariVein's Performance And Sales

On February 26, 2019, at the start of the Class Period, Defendants updated investors regarding the status of the ClariVein acquisition. ¶¶60-62, 151-156. Defendants explained that, with months of experience after the acquisition's closing, ClariVein was "driv[ing] growth" and Defendants' "confidence [was] built." *Id.* Merit's experience with the ClariVein product was purportedly so strong that it, combined with Cianna's claimed performance, was the reason Merit took the extraordinary step of issuing full-Company revenue guidance all the way through the end of 2020. ¶¶62, 151-152. On March 1 and April 23, 2019, Defendants again asserted that ClariVein "continue[d] to drive growth" and Merit had "strong sales in stand-alone products," including ClariVein. ¶¶63-65, 160-161, 168-169.

In truth, the ClariVein acquisition was a disaster from the outset. At the same time Defendants were touting purportedly strong ClariVein's performance in Q1 and Q2 2019, the truth was precisely the opposite: ***Merit did not have a single order for ClariVein during the entire first half of 2019***. ¶¶102-111. Multiple former high-level Merit employees have confirmed that Merit could not sell the product because of two basic, undisclosed roadblocks preventing any meaningful sales. ¶¶112-128.

First, the country's largest commercial insurers, Medicare, and other government programs uniformly declined to cover ClariVein and, given Merit's "buy and bill" sales model, doctors refused to place new orders for ClariVein without reimbursement coverage. ¶¶113-114. Insurers denied a remarkable 80% of physicians' reimbursement claims submitted for ClariVein. ¶¶115-117. The problem

was so severe that, immediately after the acquisition, Merit took the extraordinary step of hiring a lobbyist specifically tasked with persuading the insurance industry to provide reimbursement coverage for ClariVein. ¶123; *see* ¶¶118-122.

Second, Merit concluded immediately after the acquisition that federal regulations prohibited Merit from marketing ClariVein for its intended purpose of treating varicose veins. As multiple high-level former Merit employees explained, Merit's regulatory team refused to approve any marketing materials for ClariVein that mentioned anything about treating varicose veins, and, as such, it was impossible for Merit's sales force to sell ClariVein to lucrative vein treatment centers. ¶¶124-128. Instead of disclosing to investors this material impediment to ClariVein sales, however, Defendants dissembled, telling investors in Merit's March 1, 2019 Form 10-K that it was only ***theoretically*** possible that "limits on reimbursement … ***could*** adversely affect our business and results of operations." ¶¶157-158.

Defendants Lampropoulos and Parra were well aware of the lacking ClariVein orders. ¶¶103-111, 193-197. Not only was ClariVein a lynchpin of Merit's transition to higher-margin therapeutic device sales, but Lampropoulos and Parra received and closely monitored a steady stream of ClariVein sales data. *Id.* As multiple former Merit employees attested, they (i) had 60" monitors outside each of their offices that displayed in real-time the daily, monthly, and quarterly orders for ClariVein (¶¶104-105); (ii) had this same information on their mobile phones (¶107) and (iii) on their computers through Merit's "Domo" real-time software system (¶¶106, 111); and (iv) received highly detailed ClariVein sales information through regular written reports and presentations, including daily email updates (¶¶108-110).

**D.    When The Truth Is Revealed, Merit's Stock Price Plummets, Analysts Excoriate Defendants, And Lampropoulos Reaps $6 Million By Dumping His Shares Ahead Of The News**

The truth about the disastrous Cianna and ClariVein acquisitions began to emerge on July 25, 2019, when Merit belatedly disclosed zero ClariVein orders for

the first half of 2019, Cianna sales force "attrition," and the Company's resulting lackluster results for the second quarter of 2019 and reduction in 2019 financial guidance. ¶¶130-131. On this news, Merit's stock price immediately plummeted by *over 25% in a single trading session*, from $54.85 to $41.00 per share. ¶¶132-133.

Defendants, however, continued to conceal the truth. Rather than disclose the significant Cianna sales force departures and failed integration, Lampropoulos falsely reassured investors that there had been "not much" attrition, *i.e.*, just "a little bit." ¶134. And rather than disclose the insurance and regulatory roadblocks to ClariVein sales, Lampropoulos falsely attributed the absence of orders to a "short-term" problem caused by "pipeline filing," *i.e.*, *too many* product orders prior to the acquisition. ¶¶135-136, 177-178. Defendants also falsely assured investors that ClariVein sales were now "ramping to our expectations." *Id.*

With the full truth about Merit's disastrous acquisitions still concealed and the stock price still artificially inflated, Lampropoulos sold his personal stock. ¶¶137-139, 199-200. While Lampropoulos had not sold a single share of stock over the past three-and-a-half years, he suddenly unloaded over $6 million worth of his personal holdings—*more than he had sold in the past 13 years combined*. *Id.*

On October 30, 2019, just weeks after Lampropoulos' insider sales, Merit disclosed that sales for ClariVein and Cianna had lagged so far behind that Merit was forced to slash year-end revenue guidance by $27 million and withdraw its guidance for 2020 entirely. ¶¶140-142. With investors and analysts demanding answers, Lampropoulos finally admitted that Merit was "*nine or ten months behind*" in integrating ClariVein. Given that Merit acquired ClariVein only ten months earlier, this meant Merit had made no progress whatsoever with the integration. ¶141. Merit also admitted the Cianna integration had in reality "*taken a lot more time*," taught "*some painful lessons*," and "*caught up with*" Merit. *Id.* The two debacles were so material that they completely halted Merit's growth-by-acquisitions strategy, as the Company "*fell on [its] face*" and was forced to go "*back to basics*." ¶143.

The revelations shocked investors and analysts alike. ¶¶144-146. Merit's stock price tumbled an additional 29% in a single day, falling from $29.11 to $20.66 and wiping out over $450 million in market capitalization. ¶144. All told, in just four short months, Merit's stock lost nearly two-thirds of its value. *Id.* Outraged analysts excoriated Defendants, stating that Merit suffered from a significant "***management credibility issue***" and calling for "***changes in the executive suite***." ¶¶145-146. In the wake of Defendants' misrepresentations, they concluded "***[i]t will take a few years … for established investors to trust this management team again***." *Id.*

## III.   ARGUMENT

In assessing a motion to dismiss under Rule 12(b)(6), courts consider the complaint in its entirety, "accept all factual allegations … as true," and construe them in the light most favorable to the plaintiffs. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). The Ninth Circuit holds that "a district court ruling on a motion to dismiss is not sitting as a trier of fact" and "so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). Thus, at the pleading stage, a securities plaintiff "need only allege enough facts to state a claim for relief that is plausible on its face." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 n.12 (2011).

### A.   The Complaint Adequately Alleges Defendants' Material Misrepresentations And Omissions

A statement is false or misleading "if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). "Even if a statement is not false, it may be misleading if it omits material information." *Khoja*, 899 F.3d at 1008-09. If a company chooses to "tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including by disclosing adverse information that cuts against the positive

information." *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016).

"[W]hether a … statement is misleading … is appropriately resolved as a matter of law only if the adequacy of the disclosure … is so obvious that reasonable minds [could] not differ." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *7-9 (C.D. Cal. June 17, 2011). Otherwise, "at the motion to dismiss stage the Court draws a reasonable inference that Plaintiffs' interpretation of [a statement] is correct." *Turocy v. El Pollo Loco Holdings, Inc.*, 2017 WL 3328543, at *14 n.2 (C.D. Cal. Aug. 4, 2017) (Carter, J.). Plaintiffs "can survive a motion to dismiss by alleging a single material misrepresentation." *Feyko v. Yuhe Int'l., Inc.*, 2013 WL 816409, at *4 n.2 (C.D. Cal. Mar. 5, 2013).

### 1. Defendants Concealed Significant Departures In Cianna's Sales Force

Defendants specifically and repeatedly assured investors that Merit maintained Cianna's sales force after the acquisition. Defendants asserted, for example, "we kept the [Cianna] sales force in place" and "we haven't lost anybody" (¶53). And then, in April 2019, they continued to reiterate that Merit had "maintained their sales force" because "that was a critical thing to do" (¶57).

In truth, and as explained above (6:13-23), Merit had experienced critical sales force departures within weeks of the acquisition, lowering Cianna sales. Cianna's most important salespeople had departed, including the sales representatives who were singlehandedly responsible for *22%* of Cianna's company-wide sales and all sales in *15* states. In light of these significant departures, Defendants' representations claiming that Merit had "maintained [Cianna's] sales force" were false and highly misleading, particularly given Defendants' repeated recognition of the "***critical***" importance of retaining all Cianna salespeople. *See Khoja*, 899 F.3d at 1009 ("once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information").

In addition, Defendants continued to mislead investors even after they finally admitted two months later that there had been some "attrition" among Cianna's sales force. ¶¶134, 173-174, 198. Rather than admit that nearly one-quarter of the specialized sales force had quit, leaving 15 states and many of Cianna's most important accounts without coverage and causing sharp sales declines of 25% to 30% in the critical Western region, Defendants continued to minimize and downplay the issue, falsely stating that there had only been "a little bit" "but not much" attrition. *Id.*; *see El Pollo Loco*, 2017 WL 3328543, at *9 (statements were misleading where true facts "were being explained away or minimized").

In their motion, Defendants nonetheless ask the Court to hold as a matter of law that their misstatements misled no one and omitted nothing. Their attempt fails.

*First*, Defendants contend (Br. at 12:13-19) that their misrepresentations could have been worse, as they never used the exact words that Merit had retained "every single Cianna salesperson." Defendants' contention is irrelevant. They unequivocally stated "we haven't lost anybody" and Merit "maintained their sales force" because "that was a critical thing to do." The statements were false and gave the obviously misleading impression that the members of Cianna's critically important, small sales force remained at Merit. When Merit disclosed attrition and lacking integration, the market reacted strongly to the revelation of the false statements. ¶¶130-133, 140-146.

*Second*, Defendants assert (Br. at 12:18-13:11) that their vague statement in April 2019 that "we've had a couple of situations where there were a couple of issues or things that we had to make some changes" somehow fully informed investors that nearly 25% of the sales force—including the most important salespeople in the most important sales geography for the largest acquisition in the Company's history—had departed. Not so. The language Defendants attempt to rely on does not state a single employee had left, let alone reveal the significant departures that had occurred.

Despite Defendants' assertions, disclosing sales force departures is not complicated or ambiguous. To use Defendants' analogy (Br. at 13:5-6), when the

Lakers lose a player, they issue a press release that says so directly. They do not state there were "a couple of situations." And if they lose one or more players responsible for 22% of the team's points—*e.g.*, LeBron James, who scored 22% of the Lakers' points per game in the 2019-2020 season—it would certainly not be "essentially" the same team. *Cf.* Br. at 13 n.12. In any event, even if there were ambiguity in Defendants' statements, "at the motion to dismiss stage of a securities fraud action, the court reads ambiguities in challenged statements in the plaintiff's favor." *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *3 (S.D.N.Y. July 21, 2020).

*Third*, contrary to Defendants' assertions (Br. at 13:12-14), it was false and misleading for them to state on April 23, 2019 that Cianna "sales continue to grow according to our expectations" (¶¶162, 164). In truth, in Q2 2019 (and Q3 2019), Cianna's sales were well below expectations as a result of the departures of core members of its sales force—facts that the Company was ultimately forced to reveal months later. ¶¶129-136, 140-146, 164. Analysts consistently reported on the low Cianna sales during the Class Period. ¶¶133, 145.

## 2. Defendants Concealed The Failed Cianna Integration

Defendants falsely and misleadingly told investors that the Cianna integration was "complete" as of April 23, 2019 and underscored that it was the "best" integration that Merit had ever completed. ¶¶56-57, 162-163, 166-167. Former Cianna and Merit executives have explained, however, that in truth Merit's attempted integration of Cianna was an abject failure. ¶¶85-99. Merit never completed half of the integration, resulting in inefficiencies, operational setbacks, and lagging performance, and ultimately admitted it was a failure. ¶¶85-99, 140-146, 191.

In response to the Complaint's detailed allegations, Defendants attempt to rewrite the meaning of their statements. But a dispute over a statement's meaning is a "question for the trier of fact." *Loritz v. Exide Techs.*, 2014 WL 4058752, at *6-8 (C.D. Cal. Aug. 7, 2014). Defendants nonetheless assert that when Lampropoulos stated that Merit's "transition [wa]s complete" and it was "as good of a transaction

and transition that we have done," he was supposedly referring *only* to billing and shipping practices. Br. at 11:19-12:12. Yet Lampropoulos' own words contradict Defendants' contention. Lampropoulos used the term "transition" broadly to include, for example, employee retention of "the R&D people" and "the salespeople," which he falsely claimed Cianna "kept." ¶¶166-167. According to Lampropoulos, the "transition" also included the development and sales of "new products" and "new projects underway" at Cianna. ¶56 & Ex. 4 at 8. Because he used the term broadly, analysts understood it as encompassing the complete integration of Cianna, and in fact concluded—without qualification or limitation—that "MMSI has completed the integration of Cianna." ¶58; *see STEC*, 2011 WL 2669217, at *8 ("Particular statements made by analysts underscore the plausibility and reasonableness of the false impression that Plaintiffs allege Defendants' statements conveyed.").

Defendants also assert that essentially all of their statements falsely updating investors on the progress and success of the Cianna integration were "immaterial as a matter of law." Br. at 17:9-18:11. This contention fails on multiple levels.

*First*, "the materiality and misleading nature of a misstatement or omission is usually a question for the trier of fact, and such an argument is rarely successful on a motion for summary judgment, and even more rarely successful on a motion to dismiss." *S.E.C. v. Mozilo*, 2009 WL 3807124, at *9 (C.D. Cal. Nov. 3, 2009).

*Second*, statements to investors about Merit's largest acquisition ever, which Defendants represented was the "best" transaction and transition the Company had ever done, driving up to *40%* of the entire Company's 2019 revenue growth, were clearly material. Indeed, the Cianna integration was the cornerstone of the Company's strategic shift to sell higher margin products by breaking into the larger and more lucrative therapeutic device market. ¶¶33-36. Given the importance of Cianna, analysts repeatedly asked about the progress of the Cianna integration, issued nearly a dozen reports addressing the subject, and grasped onto and repeated Defendants' material statements in analyst reports. ¶¶40-44, 50-58, 185; *see El Pollo*

*Loco*, 2017 WL 3328543, at *14 (materiality "evidenced by the repeated questions posed by analysts").

*Third*, Defendants' statements touting the progress and success of Cianna's integration were not only capable of objective verification, but precisely the sort of statements that courts regularly sustain as highly material to investors. *E.g.*, *Union Asset Mgmt. Holding AG v. SanDisk LLC*, 2017 WL 3097184, at *1-2 (N.D. Cal. June 22, 2017) (statements that integration was "going quite well" and "largely completed" were not puffery); *Roberts v. Zuora, Inc.*, 2020 WL 2042244, at *9-10 (N.D. Cal. Apr. 28, 2020) (rejecting similar puffery challenge).

*Fourth*, Defendants' puffery assertions improperly attempt to isolate phrases and take them out of context. This is not how materiality is analyzed. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 66281, at *17 (N.D. Cal. Jan. 4, 2017) (courts do not "assess the statements … in a vacuum, plucking the statements out of their context").[3]

*Finally*, Defendants' cited cases—none of which involves a merger or integration—are easily distinguishable.[4]

---

[3] Defendants are wrong (Br. at 18:9) that their statement that Cianna "had a little bit of attrition, but not much" was "immaterial puffery." *See In re Daou Sys., Inc.*, 411 F.3d 1006, 1020 (9th Cir. 2005) (a "discrepancy" between employee attrition statements and the truth is actionable). This is particularly so because Defendants specifically told investors that maintaining the sales force was the "critical thing to do."

[4] For example, in *Intuitive Surgical*, "the market already knew of the difficulties facing Intuitive through [earlier reports]." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1056, 1060 (9th Cir. 2014). Also unlike this case, the complaint in *Apple* failed to allege Defendants' knowledge of adverse facts, and the court's unpublished opinion did not even address materiality. *In re Apple Computer, Inc.*, 127 F. App'x 296, 301 (9th Cir. 2005). The statements at issue in *Solarcity* and *Kelly* concerned the quality of video game components and "general statements about demand." *In re Solarcity Corp. Sec. Litig.*, 274 F. Supp. 3d 972, 995 (N.D. Cal. 2017); *Kelly v. Elec. Arts, Inc.*, 71 F. Supp. 3d 1061, 1070 (N.D. Cal. 2014).

### 3. Defendants Concealed ClariVein's Sales Impediments And Lack Of Orders

Defendants' statements touting the success of their integration and sales of ClariVein were materially false and misleading because, unbeknownst to investors at the time, Merit had pre-existing impediments to sales that prevented any new orders of ClariVein.[5] Indeed, the Company received *zero ClariVein orders in the entire first half of 2019.* ¶¶101-136, 192-197. Rather than disclose these facts, Defendants made false and misleading statements on July 25, 2019 concealing the true reasons for the lacking ClariVein orders, fabricating benign excuses that gave the impression that any sales roadblocks had been eliminated and new sales in Q3 were "ramping." Confronted with the Complaint's detailed allegations documenting their ClariVein misstatements, Defendants seek to rewrite their statements and otherwise distort the facts. Br. at 14:14-17:5. These tactics fail, for several reasons.

*First*, Defendants' contention that they never admitted having zero ClariVein orders in the first half of 2019 (Br. at 14:16-15:4) is simply false. During the July 25, 2019 investor conference call, Lampropoulos explicitly admitted that "*we haven't had an order [for ClariVein] all year*." ¶¶102, 130, 135, 175-176. He specifically attributed this lack of orders to both customers *and* distributors. ¶¶175-176; Ex. 7 at 5. That Lampropoulos later, in a *different* portion of the investor conference call, gave the example of "one situation" where a South Korean customer had delayed its orders (Ex. 7 at 8-9), in no way alters the plain meaning of his admission. Defendants also point to meager ClariVein revenues in 2019 (Br. at 14:19-15:1), but *revenue* does not evidence *orders*—indeed, Defendants explained the revenue was from *earlier* orders "that we have just started to deliver." Ex. 7 at 5.

*Second*, Defendants attempt to argue that they withdrew their ClariVein

---

[5] Defendants' motion does not dispute that Merit's Form 10-K misled investors about a core impediment to ClariVein sales. ¶¶157-159. There is thus no need to entertain Defendants' challenges to other statements. *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1041 n.7 (N.D. Cal. 2018).

guidance on July 25, 2019. Br. at 16:11-24. In truth, Defendants reassured investors on July 25 that low sales were just a "short-term" issue that were "the result of excess inventory of some of the distributors prior to our acquisition" and that "we have made it past that, and sales are ramping to our expectations," *i.e.*, increasing to meet pre-existing guidance. ¶¶134-136, 175-180, 198. Defendants' notion that they somehow withdrew or lowered full-year ClariVein guidance (Br. at 16:16-18), when they never said so and no analyst reported lowered ClariVein guidance, is baseless.

*Third*, Defendants attempt to rewrite their statement that ClariVein "continued to drive growth" by improperly interjecting their own interpretation of what "investors understood." Br. at 15:5-18; *see Berson*, 527 F.3d at 986-87 (reversing dismissal where, "[w]ith the benefit of hindsight and some help from the briefs, we can see how this exchange might be interpreted" as defendants contend, but "it's far from clear that a reasonable investor could have decoded this meaning at the time").

*Fourth*, Parra's statement during the April 2019 earnings call that Merit had "strong sales in stand-alone products" was neither literally true nor immaterial, as Defendants assert. Br. at 15:19-16:10. Once Defendants chose to tout strong sales in ClariVein as part of the stand-alone products category, they were required, but failed, to inform investors there were no new ClariVein orders and continuing impediments to ClariVein sales. *Khoja*, 899 F.3d at 1009; *Berson*, 527 F.3d at 985.

*Finally*, far from "immaterial" (Br. at 18:12-19:7), ClariVein's sales were so poor that the Company ultimately missed its 2019 revenue guidance for ClariVein by 30% (¶¶141, 192), a magnitude that amply shows materiality. *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 166 (2d Cir. 2000) (statements about 1.7% of revenues not immaterial); *In re Sipex Corp. Sec. Litig.*, 2005 WL 3096178, at *2 (N.D. Cal. Nov. 17, 2005) (2% of revenue "cannot be said to be immaterial as a matter of law at the pleading stage"). Plus, even if, as Defendants contend, the sales shortfalls were "quantitatively small" (and they were not), they were "significan[t] to a particularly important segment of" the Company's business and thus material. *Litwin v.*

*Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011); *see S.E.C. v. Yuen*, 2006 WL 1390828, at *37 (C.D. Cal. Mar. 16, 2006) (similar; quoting SEC Staff Accounting Bulletin No. 99 concerning materiality). Here, ClariVein sales were 10% of Merit's entire 2019 revenue growth assumptions and a lynchpin of its strategic shift to sell higher-margin therapeutic devices.[6] Likewise, Defendants' related statements representing "strong sales" and "tailwinds" for ClariVein were material for the same reasons. *See In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 109 (D.C. Cir. 2015) ("very strong" sales are material for even a "rather small component of the company's total portfolio"); *Zuora*, 2020 WL 2042244, at *9 ("tailwinds" statements are material); *SanDisk*, 2017 WL 3097184, at *1 ("qualitative pronouncements about the strength of" acquired products are material).

### 4. No Safe Harbor Applies

Defendants' "falsity" arguments (Br. at 9:13-19:7)—and, indeed, their entire motion (*see, e.g.*, Br. at 1:4-14)—are largely grounded in their erroneous views that (i) the Complaint focuses on misstatements of revenue guidance, and (ii) Merit's disappointing financial performance occurred only after guidance was issued. However, the Complaint clearly concerns Defendants' misrepresentations of ***present*** fact concealing Cianna's already-occurring sales force losses and integration failures, and ClariVein' ***present*** revenue woes, lacking orders, and sales impediments.

Contrary to Defendants' assertions (Br. at 9:12-11:18), only 5 of the 27 alleged false statements are tethered to guidance. These are (i) Defendants' guidance for ClariVein, which was at all times false and misleading due to undisclosed pre-existing sales impediments resulting in ***zero ClariVein orders*** in the first half of 2019

---

[6] ¶¶34-35, 47-49, 182-184. Defendants' related attempts to argue Cianna's performance was immaterial (Br. at 18:22-19:7) are readily disproved by the Complaint's ample allegations, including reactions by securities analysts. ¶¶133, 145-146, 206, 213; *see In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 520 (S.D.N.Y. 2013) (analyst reactions support an inference of materiality at the pleading stage).

(¶¶153, 177, 179); and (ii) Defendants' false statement in April 2019 that nothing had changed regarding 2019 revenues when, in truth, Cianna revenues continued to decline and there had been zero ClariVein orders thus far (¶170).

Defendants' safe-harbor arguments (Br. at 9:13-11:18) fail. To begin with, the "allegation[s] of falsehood relates to non-forward-looking aspects of the statement[s]." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1142 (9th Cir. 2017). Plus, each of the challenged statements omitted material facts; and the safe harbor does not apply to omissions or misstatements, like those here, made with actual knowledge. *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015). Finally, Merit's boilerplate "cautionary language"—which was itself misleading (*see* ¶¶157-159)—never disclosed the omitted facts, which continued unabated throughout the Class Period. *See Siracusano v. Matrixx Intiatives, Inc.*, 585 F.3d 1167, 1181-82 (9th Cir. 2009) (misleading "risk factors" actionable), *aff'd*, 563 U.S. 27 (2011); *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) ("cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

### B.   The Complaint Raises A Strong Inference Of Scienter

Scienter is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." *Schueneman*, 840 F.3d at 705. A "strong inference" "need not be irrefutable … or even the most plausible," and no "smoking-gun" is required. *Tellabs*, 551 U.S. at 324-26. The test is simply "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Id*. at 322-23 (emphasis in original). The Complaint readily satisfies this standard.

### 1.   The Complaint Raises A Strong Inference Of Scienter Concerning Cianna

As the Ninth Circuit has explained, where defendants make specific misstatements about specific matters they purport to know, "[i]t is unclear what further facts plaintiffs would need to plead to create a stronger inference that [they]

had access to [the] information [they] discussed publicly." *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014). This is particularly apt here. Defendants made specific misrepresentations about Cianna's integration and sales force, including that "the integration … is going as well as could be expected" and was "as good of a transaction and transition that we have done" in large part because "we maintained their sales force." In making these statements, Lampropoulos assured investors that he did "a lot of work [in reviewing] the operations, the manufacturing, sales force," including visiting Cianna's Aliso Viejo headquarters and attending meetings with the sales force in Southern California. ¶¶38-40, 53-54, 186-187, 189-190. Defendants' specific misstatements about specific matters they purportedly knew about strongly support scienter. *Reese*, 747 F.3d at 572; *see In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 708 (9th Cir. 2012) ("public statements celebrating the merger as an unprecedented success" support scienter); *Karinski v. Stamps.com, Inc.*, 2020 WL 281716, at *15 (C.D. Cal. Jan. 17, 2020) (that defendants "regularly referenced [relevant] conversations they had" supports scienter).

Moreover, Lampropoulos' misstatements were made in response to analyst inquires and designed to quell serious concerns about integration risk. ¶¶25-51, 56-57, 62, 64, 149-152, 166-167, 170-171, 185; *see In re Qualcomm Inc. Sec. Litig.*, 2019 WL 1239301, at *11 (S.D. Cal. Mar. 18, 2019) (that defendants "issued specific [statements] … in response to questions from analysts and investors" contributed to a strong scienter inference); *S. Ferry LP #2 v. Killinger*, 687 F. Supp. 2d 1248, 1259 (W.D. Wash. 2009) (that defendant "repeatedly reassured investors—in the face of *direct questioning*" evidenced "knowledge of the integration [problems]") (emphasis in original). And when Defendants were forced to reveal the truth, analysts called for their removal, questioned their "credibility," and stated it would take "years" for investors to regain their trust. ¶¶146, 213; *see In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76 (2d Cir. 2001) (analyst criticism and questioning of management's credibility after truth emerged contributed to a strong inference of scienter).

Defendants' suggestion (Br. at 22:6-13) that Lampropoulos was completely in the dark about the integration failures and sales force—something he said was of "critical" importance—is neither plausible nor credible. Not only is the notion undercut by his own statements touting his knowledge (*e.g.*, ¶¶186-190), but as multiple former Merit and Cianna employees have explained, Lampropoulos and Parra received weekly, monthly, and quarterly sales reports with performance figures broken out by region that clearly showed the dramatic revenue decline in the critical Western region; had access on all their devices to the Company's centralized DOMO software that tracked sales by region; and were told directly before each earnings call about the Western region's deteriorating sales. ¶¶80, 82-83, 106-111, 188, 194; *SanDisk*, 2017 WL 3097184, at *1-2 ("If the defendants were aware of the undisclosed information, the most logical explanation for their failure to disclose it … was that they intended to conceal it.").

Moreover, the integration was so problematic that customer information became a jumbled mess resulting in misdirected orders, delayed surgeries, and angry customers; the Company had to pay for duplicative platforms and systems; and Merit was forced to hire an outside consultant for help. ¶¶91-93, 97-98; *see Matrixx*, 563 U.S. at 49 (defendants' responses to internal concerns, like hiring consultant, strongly supports scienter inference). Finally, even if, as Defendants now suggest, Lampropoulos was somehow totally in the dark, "it would be at least actionably reckless to reassure the public about these matters at all." *S. Ferry*, 687 F. Supp. 2d at 1260; *see Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019) (touting "intimate knowledge" on subject "was at least deliberately reckless not to investigate the accuracy of their statements").

## 2. The Complaint Raises A Strong Inference Of Scienter Concerning ClariVein

As the Ninth Circuit instructs, "[t]he most direct way" to show scienter is through allegations of "contemporaneous reports or data, available to the party,

which contradict the statement." *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1230 (9th Cir. 2004). In fact, allegations of "actual access to the disputed information" "may independently satisfy the PSLRA." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008).

Here, Defendants' actual access to and use of real-time sales data, including on their devices and large monitors directly outside their offices, showing that ClariVein had zero new orders for the entire first half of 2019, strongly supports scienter. ¶¶80, 104-111, 193-195; *see El Pollo Loco*, 2017 WL 3328543, at *17 (Carter, J.) (strong inference of scienter because Defendants' "had access to and … used data tracking in real time the decline of sales and transactions"). The inference is bolstered by Lampropoulos' admissions to investors of his contemporaneous knowledge of sales information. ¶¶111, 186; *see Quality Sys.*, 865 F.3d at 1145 (scienter when "executives themselves told investors they had real-time access to, and knowledge of, sales information").

Defendants' attempts to cover up the truth reinforces their scienter. For example, when Defendants were forced to disclose the absence of any new ClariVein orders, they continued to mislead investors by falsely blaming "pipeline filling" (*i.e.*, excess orders ahead of the acquisition) while assuring that the issues had resolved quickly and sales were now "ramping" up. ¶¶129-136, 192, 198. Similarly, when Defendants were forced to admit to "attrition" in Cianna's sales force, they continued to mislead investors by falsely stating that there had only been a "little bit" of attrition "but not much." *See Brown v. China Integrated Energy, Inc.*, 875 F. Supp. 2d 1096, 1124 (C.D. Cal. 2012) ("evidence of concealment is strongly indicative of scienter").

Moreover, after touting to investors that the $60 million ClariVein acquisition was for the purpose of tapping into a $700 million market for varicose veins treatment (¶¶1, 47-49, 182), Lampropoulos and other Merit executives were promptly advised (and were likely irate to learn) that, immediately after closing the acquisition, Merit's regulatory team independently determined that the Company was totally prohibited

from marketing ClariVein for its intended use of treating varicose veins. ¶¶124-128; *see Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at *21 (C.D. Cal. May 8, 2013) ("It is far from implausible that a corporate executive who had spent months building excitement and momentum around important, new technology products might recklessly misrepresent the inability to deliver on those promises.").

Defendants incorrectly assert (Br. at 20:23-21:5) that Plaintiffs must allege how Defendants were specifically "told" about ClariVein's reimbursement denials and marketing roadblock or show a "document or witness" that put Defendants "on notice."[7] The Supreme Court directly rejected these assertions in *Tellabs*, when it held that no "smoking-gun" is required to show scienter. 551 U.S. at 324-26. Rather, "deliberate recklessness" is the standard. *Schueneman*, 840 F.3d at 705. Defendants' assertion is without merit in any event: five witnesses "establish that members of executive-level management, including individual defendants, had access to and used reports documenting in real time" the lack of ClariVein orders. *See Quality Sys.*, 865 F.3d at 1145 (reports automatically delivered to executives and "habit of continually monitoring the Company's" financials supported scienter).[8] Further, ClariVein's 80% reimbursement denials were of such concern that Merit hired a lobbyist to sway

---

[7] Defendants also inject the faulty inference (Br. at 21:7-12) that "lagging" sales at a particular time would not alert Defendants to the falsity of annual guidance. However, *zero orders* for six months is entirely different from sales "lagging on a particular day, week or month" that "could be offset by sales of other products."

[8] Defendants' citations (Br. at 20-21 n.24) say nothing to the contrary. For example, in *Intuitive Surgical*, the plaintiffs offered only "impressions of witnesses." 759 F.3d at 1061-62. Here, the Complaint's multiple witnesses all had direct access to Defendants Lampropoulos and Parra, physically saw them access the reports, sent reports directly to them, discussed the reports directly with them, and described the contents of the reports that conflicted with Defendants' statements. *See, e.g.*, ¶¶103-111. Likewise, in *Zucco*, the court found access to a database insufficient to support an inference that defendants knew the data was *manipulated. Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 1000-01 (9th Cir. 2009). Unlike *Zucco*, there is no allegation here about manipulated data; rather, Defendants had access to *unmanipulated* information directly contradicting their statements.

the insurance industry. ¶123; *Schueneman*, 840 F.3d at 708 ("Defendants' own response to the issue contributes to an inference of scienter.").

In any event, contrary to Defendants' assertion (Br. at 21:13-22), the Complaint details a reliable account of when Lampropoulos was "told" about the marketing roadblock: that of the Senior Marketing Event Manager who worked for Merit for over 20 years, knew Lampropoulos for over 30 years, saw Lampropoulos every day, had an office on the same floor, was responsible for all of ClariVein's product marketing, and interacted extensively with Merit's regulatory team. ¶¶96, 104, 107, 125-128; *see In re Coinstar Inc. Sec. Litig.*, 2011 WL 4712206, at *9 (W.D. Wash. Oct. 6, 2011) (rejecting argument that former employee, who did not attend meetings, "was not in a position to know the Defendants' personal awareness" because witness was "alleged to be in a position to report on these facts and, on a motion to dismiss, the Court assumes [p]laintiff's allegations are true").

Viewed collectively, as they must be, these facts and the numerous additional facts alleged in the Complaint establish a strong inference of scienter.

### 3. Defendants' Challenges To Scienter Fail

Because the Complaint raises a strong inference of scienter, Defendants' various challenges to scienter can be rejected quickly.

*First*, to prevail, Defendants must raise a more compelling inference that explains how they misled investors only innocently. They do not even attempt to do so, which should end the inquiry. *New Mexico State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1099 (9th Cir. 2011) (reversing dismissal where defendant "fails to suggest a more compelling innocent inference"); *China Integrated*, 875 F. Supp. 2d at 1124 ("China Integrated offers no scenario under which the alleged facts would be suggestive of non-fraudulent intent."); *Roofer's Pension Fund v. Papa*, 2018 WL 3601229, at *24 (D.N.J. July 27, 2018) ("Defendants fail to articulate an innocent basis for their ignorance of the roadblocks facing integration ….").

*Second*, Defendants claim (Br. at 20:8-15) that Cianna's and ClariVein's

impact on Merit's overall revenue was not "dramatic" enough. Yet, revenue from these two critical acquisitions was to comprise 50% of Merit's entire 2019 revenue growth. ¶¶53, 62, 183. The revenue shortfall that followed was so severe that Defendants slashed their 2019 guidance substantially and entirely withdrew their guidance for 2020. ¶¶142, 145-146. Thus, the shortfall was highly material.[9]

*Third*, Defendants argue (Br. at 22:22-26:3) that Lampropoulos' insider stock sales somehow "negates" a scienter inference. To begin, "insider trading is not required to establish scienter." *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at *12 (C.D. Cal. Sept. 20, 2017). Here, however, Lampropoulos' highly unusual and suspicious stock sales reinforces a strong inference of scienter. After not selling a single share on the open market for over 3 years, Lampropoulos drew the "ire" of investors by unloading $6.5 million worth of his shares over a three week period in summer 2019—***more shares than in the prior 13 years combined***—just weeks before disclosing the truth and causing Merit's stock price to plummet 29%. ¶¶137-139, 199-200; *see Stamps.com*, 2020 WL 281716, at *16 (suspicious stock sales support scienter "even if the sales would alone be insufficient"). None of Defendants' cases presents such extraordinary facts.

*Fourth*, Defendants' scienter argument (Br. at 19:11-15) focuses almost entirely on citing the higher standard required for demonstrating scienter for "*forward-looking statements*," which requires a showing of "actual knowledge." But, as the Ninth Circuit has specified, for all other statements—such as the vast majority of statements at issue here—plaintiffs may allege scienter through *either* "knowledge" *or* "deliberate recklessness." *Schueneman*, 840 F.3d at 705. Defendants also inexplicably cite the 2002 *Vantive* decision (Br. at 19:16-19) to make a sweeping statement about what the PSLRA requires, but the Ninth Circuit has clarified that, in

_____

[9] Defendants attempt to rely on *Webb*, but the 10% sales impact there that was "so subtle that it appears that even the company's specialized accounting division and professional auditors missed it" stands in stark contrast to the 50% of expected revenue growth at issue here. *Webb v. Solarcity Corp.*, 884 F.3d 844, 857 (9th Cir. 2018).

light of *Tellabs*, *Vantive* was "too demanding and focused too narrowly in dismissing" individual allegations. *S. Ferry*, 542 F.3d at 784. Contrary to Defendants' contentions, "[i]n assessing the allegations holistically as required by *Tellabs*, the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *Id.*

*Fifth*, the cases Defendants offer to assert "fraud by hindsight" (Br. at 22:14-21) are inapt. Contrary to the "optimistic predictions" in *Ronconi v. Larkin* 253 F.3d 423, 430 (9th Cir. 2001), about what "'would' occur in the future," here Plaintiffs allege contemporaneous facts, including witness accounts and other information, showing Defendants knew their statements were false when made. Many of these facts, like ClariVein's sales roadblocks, preceded the Class Period, and Defendants learned of them before or right after the start of the Class Period. *E.g.*, ¶¶112-128. Others, like Cianna's sales force departures, began shortly after the acquisitions and hastened during the Class Period, with an immediate, obvious impact. *E.g.*, ¶¶85-99.

*Finally*, Defendants concede (by not disputing) that scienter is sufficiently alleged for and imputed to Merit. *See China Integrated*, 875 F. Supp. 2d at 1122 (finding strong inference of corporate scienter "[e]ven absent detailed allegations about the level of detailed knowledge [of] corporate officers and directors").

## C.    The Complaint Adequately Alleges Loss Causation

To plead loss causation, a plaintiff need only "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 337 (2005). "[T]here are an infinite variety of ways" to do so. *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753-54 (9th Cir. 2018), *cert. denied*, __U.S.__, 139 S. Ct. 2741 (2019). For example, a plaintiff may allege "that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* at 754. There is thus no need to allege that the "fraud itself" was revealed. *Id.* "So long as the complaint alleges facts that, if taken as true, plausibly establish loss causation,

a Rule 12(b)(6) dismissal is inappropriate." *Gilead*, 536 F.3d at 1057.

The Complaint far exceeds these standards. The Complaint details how, on July 25, 2019, Merit announced a revenue miss, and revealed for the first time that it "ha[d]n't had an order all year" for ClariVein (¶¶130, 204), starkly contradicting Defendants' previous statements and omissions throughout the Class Period (*see, e.g.*, ¶¶59-65). Lampropoulos further revealed that—contrary to his prior statements (*see, e.g.*, ¶¶53, 57)—the Cianna sales force had suffered "attrition," leaving "areas [of the country]" without sales force "attention" (¶¶131, 204). In response to these disclosures, Merit's stock price plummeted over 25%, with analyst reports identifying "slower than expected sales from Cianna and ClariVein" as the "biggest reason" for the Company's disappointing revenues. ¶¶132-133, 207.

Additionally, on October 30, 2019, Defendants revealed that the integrations were far behind schedule, woefully deficient, and resulting in such disappointing sales that the Company was forced to slash its revenue guidance for 2019 and withdraw entirely its guidance for 2020. ¶¶141-143, 211. Once again, these disclosures contradicted Defendants' prior assurances about the progress and performance of the acquisitions, and directly relate to the facts about which Defendants misled investors—*viz.*, the deficient Cianna integration, the departures within the Cianna sales force, and the fundamental impediments to ClariVein sales. ¶¶52, 56, 135. In response, Merit's stock price plummeted another 29%. ¶¶144, 212. Analysts again easily linked Cianna and ClariVein as "the primary source of the shortfall" in Merit's third quarter performance and a "big part of [Merit's] reduced outlook." ¶¶133, 145, 213. These facts are more than sufficient to plead loss causation. *First Solar*, 881 F.3d at 753-54; *Stamps.com*, 2020 WL 281716, at *17-18 (loss causation exists when disclosures "relate to" the subject of misstatements).

Defendants erroneously contend (Br. at 27:24-26) that Plaintiffs must show that Merit "cure[d] the alleged misstatements" by confessing to specific problems with the "integration of Cianna" and ClariVein's "regulatory or insurance problems."

However, Merit disclosed the failed integrations, as well as lowered sales due to the integration, regulatory, and insurance problems. ¶¶140-146. In any event, "[d]isclosure of the fraud is **not** a *sine qua non* of loss causation," and a plaintiff adequately pleads loss causation by showing "that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *First Solar*, 881 F.3d at 753-54.

Contrary to Defendants' assertions (Br. at 26:18-27:20), the corrective disclosures clearly revealed new information. For example, Lampropoulos' vague and scant references to "changes" in "situations" did not even begin to inform the market of the gravity of the sales force exodus that significantly undermined sales. In any event, "whether [disclosures] presented previously undisclosed information to the market and caused further decline in the company's stock price are factual questions and need not be resolved at the pleading stage." *Desta v. Wins Fin. Hldgs Inc.*, 2018 WL 1136525, at *7, 9 (C.D. Cal. Feb. 28, 2018); *see Gilead*, 536 F.3d at 1057 (a "district court ruling on a motion to dismiss is not sitting as a trier of fact" and "[t]here is no exception to this rule for the element of loss causation").

Finally, Merit's disclosure of other news (Br. at 28:5-13) does not change the loss causation analysis at this stage. "A plaintiff is not required to show that a misrepresentation was the *sole* reason for the investment's decline in value in order to establish loss causation." *Daou*, 411 F.3d at 1025 (emphasis in original).

**D.    The Complaint Adequately Alleges Section 20(a) Claims**

Having alleged a primary violation under Rule 10b-5, the Complaint states claims for control-person liability under Section 20(a). ¶¶238-245.

**VI. CONCLUSION**

Defendants' motion should be denied in its entirety.[10]

---

[10] Defendants did not specify the date and time of a hearing for their motion. *See* ECF No. 57; Local Rule 7-4. If a hearing would aid the Court, Lead Plaintiffs are available at the Court's convenience.

Dated: September 28, 2020

Respectfully submitted,

**SAXENA WHITE P.A.**

*/s/ David R. Kaplan*
David R Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Brandon Marsh (SBN 268316)
bmarsh@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone: (858) 997-0860
Facsimile: (858) 369-0096

*Attorneys for Lead Plaintiffs the Atlanta Funds and Co-Lead Counsel for the Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

*/s/ Jonathan D. Uslaner*
Jonathan D. Uslaner (SBN 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (SBN 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3472

*Attorneys for Lead Plaintiff Baton Rouge and Co-Lead Counsel for the Class*

**CERTIFICATE PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULE 5-4.3.4(a)(2)(i)**

I, David R. Kaplan, am the ECF User whose ID and password are being used to file the foregoing document. In compliance with Local Rule 5-4.3.4(a)(2)(i), I hereby attest that Jonathan D. Uslaner concurs in this filing's content and has authorized the filing.

Dated: September 28, 2020

/s/ David R. Kaplan
David R. Kaplan

LEAD PLAINTIFFS' OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS
CASE NO. 8:19-CV-2326-DOC-ADS

**PROOF OF SERVICE VIA ELECTRONIC POSTING PURSUANT TO CENTRAL DISTRICT OF CALIFORNIA LOCAL RULES AND ECF GENERAL ORDER NO. 10-07**

I HEREBY CERTIFY that, on September 28, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users. I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 28, 2020.


*/s/ David R. Kaplan*
David R. Kaplan