Paul R. Bessette (Bar No. 139675)
pbessette@kslaw.com
Michael J. Biles (Bar No. 186600)
mbiles@kslaw.com
Joseph N. Akrotirianakis (Bar No. 197971)
jakro@kslaw.com
KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Tel: (213) 443-4355

S. Saliya Subasinghe (*pro hac vice*)
ssubasinghe@kslaw.com
KING & SPALDING LLP
500 W. 2nd Street, Suite 1800
Austin, TX 78701
Tel: (512) 457-2000

*Counsel for Defendants*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE MERIT MEDICAL SYSTEMS, INC. SECURITIES LITIGATION | Case No. 8:19-cv-02326-DOC-ADS<br>*[Honorable David O. Carter]*<br><br>DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT<br><br>Date: None Set<br>Time: Under Submission<br>Place: Courtroom 9D<br><br>Complaint Filed: June 30, 2020<br>Trial Date: None Set |

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................ 1

ARGUMENT .................................................................................................................... 4

I.    Defendants did not make any false or misleading statements. ............................. 4

    A. Cianna Salesforce .................................................................................... 4

    B. Cianna Integration .................................................................................. 9

    C. ClariVein Sales ...................................................................................... 11

II.    Defendants' forward-looking statements are protected by the PSLRA safe harbor provision. ............................................................................... 13

III.    Plaintiffs have failed to plead the necessary strong inference of scienter. ......... 14

    A. The CAC fails to plead any particularized facts about Lampropoulos' or Parra's state of mind. ......................................................................... 14

    B. Lampropoulos' stock sales do not support scienter. ................................. 18

IV.    Plaintiffs have failed to adequately plead loss causation. .................................. 20

V.    Plaintiffs have failed to plead control-person liability against the Individual Defendants. ..................................................................................... 21

CONCLUSION ............................................................................................................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Apple Computer, Inc.*,
127 F. App'x 296 (9th Cir. 2005) ...................................................................................4, 10

*In re Coinstar Inc. Sec. Litig.*,
No. C11-133, 2011 WL 4712206 (W.D. Wash. Oct. 6, 2011)........................................ 16

*Convergent Wealth Advisors LLC v. Lydian Holding Co.*,
No. 12-CV-1199, 2012 WL 2148221 (S.D.N.Y. June 13, 2012) ..................................... 7

*Glazer Capital Mgmt. v. Magistri*,
549 F.3d 736 (9th Cir. 2008)........................................................................................17

*In re Hansen Natural Corp. Sec. Litig.*,
527 F. Supp. 2d 1142 (C.D. Cal. 2007)........................................................................20

*Hershfang v. Citigroup*,
767 F. Supp. 1251 (S.D.N.Y. 1991) ..............................................................................14

*Howard v. Everex Sys., Inc.*,
228 F.3d 1057 (9th Cir. 2000)......................................................................................21

*Karinski v. Stamps.com*,
2020 WL 281716 (C.D. Cal. Jan. 17, 2020)..............................................................20, 21

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
540 F.3d 1049 (9th Cir. 2008)......................................................................................20

*Mineworkers' Pension Scheme v. First Solar Inc.*,
881 F.3d 750 (9th Cir. 2018)....................................................................................18, 21

*Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*,
No. CV 13-08440, 2015 WL 1775221 (C.D. Cal. Apr. 14, 2015) ....................... 2, 16, 18

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014)......................................................................................13

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014).......................................................................................17

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

*Roberts v. Zuora, Inc.*,
  No. 19-CV-03422-SI, 2020 WL 2042244 (N.D. Cal. Apr. 28, 2020) .............................11

*Skiadas v. Acer Therapeutics Inc.*,
  2020 WL 4208442 (S.D.N.Y. July 21, 2020).....................................................................7

*In re Syntex Corp. Sec. Litig.*,
  95 F.3d 922 (9th Cir. 1996).........................................................................................4, 7, 9

*Turocy v. El Pollo Loco Holdings, Inc.*,
  No. SACV 15-1343, 2017 WL 3328543 (C.D. Cal. Aug. 4, 2017)...........................*passim*

*Union Asset Mgmt. Holding AG v. SanDisk LLC*,
  No. 15-CV-01455-VC, 2017 WL 3097184 (N.D. Cal. June 22, 2017) .........................11

*In re Vantive Corp. Sec. Litig.*,
  283 F.3d 1079 (9th Cir. 2002).........................................................................................20

**Statutes**

15 U.S.C. § 78u-4(b) (PSLRA) ...............................................................................*passim*

15 U.S.C. § 78u-5(c) (Safe Harbor)...........................................................................14

**Other Authorities**

Fed. R. Civ. P. 12(b)(6) .................................................................................................2

## INTRODUCTION

Plaintiffs have failed to meet their pleading burden to state an actionable claim for securities fraud. Plaintiffs allege that Defendants knew that Merit's 2019 revenue guidance in the range of $1.01 billion to $1.03 billion was unattainable because of alleged undisclosed problems with the recent acquisitions of Cianna and Vascular Insights' ClariVein product line. The fatal flaw in this theory—which Plaintiffs cannot avoid—is that Merit only missed its revenue guidance from these two acquisitions by approximately $3 million—less than 0.3% below the low-end of the guidance range. Courts in this Circuit have held that such a small percentage "miss" is immaterial as a matter of law. Br. at 18:17–21, 19:1–5.[1]

Plaintiffs' allegations concerning undisclosed acquisition problems are also flawed as they are based on mischaracterizations of both the public record and Defendants' actual statements. For example, Plaintiffs contend that Lampropoulos' statement on February 26, 2019 that he was "pleased" with the progress of the Cianna integration was false because "over 20% of the [Cianna] sales force quit[ ] shortly after the acquisition." CAC ¶¶ 149–150.[2] But Plaintiffs acknowledge that only one Cianna salesperson resigned prior to February 26, 2019,[3] and there are no factual allegations that the Cianna integration was not going well as of that date. Plaintiffs also contend that three Cianna salespeople resigned in March and April 2019, but Lampropoulos told investors during the April 23, 2019 call that Merit "had to make some changes" to the salesforce. Lampropoulos' statement that Merit "essentially" maintained the Cianna salesforce with "some changes" was not misleading—Merit had retained 15 of Cianna's 19 salespeople. Plaintiffs concede this, but then claim that the three Cianna salespeople who resigned were as important to Merit as Lebron James is to the Los Angeles Lakers. That is absurd. Plaintiffs' own allegations

---

[1] "Br." refers to Defendants' Memorandum of Points and Authorities in support of their Motion to Dismiss (Dkt. No. 56).

[2] "CAC" refers to Plaintiffs' Consolidated Class Action Complaint (Dkt. No. 53).

[3] CAC ¶¶ 75 (alleging Sales Rep 4 "left Merit in January 2019"), 72 (alleging "Sales Rep 1 quit Merit in March 2019"), 73 (alleging "Sales Rep 2 … quit Merit in March 2019"), 74 (alleging "Sales Rep 3 stated that he quit … on April 15, 2019").

show that the four Cianna salespeople who resigned were at best average—Plaintiffs contend that they comprised "nearly 25%" of Cianna's salesforce, but generated just "22% of Cianna's total sales." Opp. 6:15-20. [4] Merit has over 6,300 employees with hundreds of medical products generating nearly $1 billion in annual sales. The three salespeople generated about $7.1 million in total sales in 2018, hardly the stuff of legends for a Company with nearly $1 billion in annual sales. Their resignations had a negligible impact on Merit, which reported $49.5 million in Cianna sales in 2019—a miss of just $464,000 (less than 1%) from its guidance range of $50 million to $56 million. Plaintiffs' allegation that the departure of the three Cianna salespeople caused "Cianna [to] suffer[] sales declines of **25–30%** in 2019," Opp. 6:20–21 (emphasis in original), is also plainly false. Cianna had 2018 sales of $32.184 million, and 2019 sales of $49.536 million—more than a 53% growth rate. Plaintiffs cannot manufacture a fraud claim by misrepresenting the facts, and their attempt to do so underscores why they have failed to meet the strict pleading requirements of the PSLRA.

Plaintiffs also double down on their false allegation that Lampropoulos told investors on the April 23 call that Merit's integration of the Cianna acquisition was complete. Opp. at 13:17–18. Lampropoulos never made this statement. Rather, he said that Merit was "through the transition period. By that I mean we are shipping inventory out of Salt Lake and out of Richmond. We're doing all the billing." *See* Ex. 4, Apr. 23, 2019 Earnings Call at 3.[5] Lampropoulos never stated that Merit had completed the

---

[4] "Opp." refers to Plaintiffs' Opposition the Motion to Dismiss (Dkt. No. 58).

[5] "Ex. __" refers to documents attached to the Bessette Declaration (Dkt. Nos. 56–1, 56–2). *See* Br. at 4 n.2 (explaining why the Court can take judicial notice of these documents); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Ixia*, No. CV 13-08440, 2015 WL 1775221, at *14–*15 (C.D. Cal. Apr. 14, 2015) ("Plaintiffs object to Ixia's request for judicial notice; they assert the court cannot rely on Exhibits … to contradict the allegations in the complaint … The objection lacks merit. Where a document has been incorporated by reference in a complaint, a court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

integration of all Cianna's processes and systems. Again, Plaintiffs cannot state an actionable claim by making up their own facts.

Plaintiffs nevertheless use the same tactic for the ClariVein acquisition. They allege that Defendants' positive statements about this acquisition were rendered false when Merit supposedly admitted on July 25, 2019 that "[w]e haven't had an order [for ClariVein] all year." CAC ¶ 175. But once the Court reviews the entirety of the Company's statements, as it must, it is obvious that Merit never said that it had no ClariVein orders or sales in the first half of 2019. Rather, Merit said there was an isolated instance of delayed orders from one customer in South Korea. Indeed, Merit reported over $3.2 million in ClariVein sales in the first half of 2019. *See* Ex. 9, 2Q19 10 Q at 12. Plaintiffs' reliance on the false allegation that Merit had "zero sales in the first half of 2019," CAC ¶ 195, when Merit actually disclosed $3.2 million in first-half sales—which they don't allege was false—further undermines their credibility and demonstrates that they have failed to plead falsity under the PSLRA.

Plaintiffs' attempt to plead a strong inference of scienter also fails. Although they rely on more than a dozen anonymous sources, not one of these individuals states that he or she had a conversation or shared a document with an Individual Defendant that placed him on notice that he made a false statement. While Ninth Circuit precedent does not require a "smoking gun," it does require plaintiffs to identify specific facts that present a cogent and compelling inference that a defendant knew that his statement was materially misleading. It is the quality, not the quantity, of the sources that matter. Here, Plaintiffs' sources merely provide generalized facts that would apply to every diligent CEO and CFO (*i.e.*, regularly attended meetings, closely monitored sales, and the like). This is plainly insufficient.

Finally, Lampropoulos' stock sales are likewise insufficient to raise a strong inference of scienter. Plaintiffs ignore that the timing of these sales undermines a fraudulent

---

12(b)(6). Further, a court can consider the entire document, not simply the portion on which plaintiffs rely.") (citations and internal quotation marks omitted).

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

inference because they occurred months *after* Merit's stock price declined on July 25, 2019 after reporting disappointing 2Q19 results. Moreover, Lampropoulos sold just 16% of his holdings (and did so only after the alleged corrective disclosure on July 25, which Plaintiffs allege drove down Merit's stock price by 25%, CAC ¶ 129), a percentage that numerous courts in the Ninth Circuit have concluded is insufficient to raise a strong inference of scienter.

## ARGUMENT

### I.    Defendants did not make any false or misleading statements.

Plaintiffs repeatedly misrepresent Defendants' words in an effort to support their fraud theory. This Court must ignore these false characterizations and instead examine Defendants' full statements in the context in which they were made, giving special consideration to contemporaneous qualifying or clarifying language. *In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 929 (9th Cir. 1996). The context of Defendants' statements, including their own clarifications, makes clear that Plaintiffs have failed to adequately plead falsity.

### A.    Cianna Salesforce

Plaintiffs allege that Merit misrepresented that it would retain 100% of Cianna's specialized sales force, when four of Cianna's 19 salespeople had resigned between January 2019 and April 2019. As an initial matter, the loss of four salespeople that represented (at most) less than 1% of Merit's total revenues is immaterial as a matter of law. *See In re Apple Computer, Inc.*, 127 F. App'x 296, 304 (9th Cir. 2005) (noting that revenue impacts of "10% or less are not generally actionable").

Beyond that, Merit never represented that it would retain 100% of Cianna's sales force. On October 25, 2018, Lampropoulos told investors that "[w]e continue to be very excited about the prospects for the business and the addition of the Cianna R&D team as well as *most of the Cianna sales force.*" Oct. 25, 2018 8-K (Exhibit 99.1) (emphasis added), *available at* https://www.sec.gov/Archives/edgar/data/856982/000085698218000072/earningreleaseq32018.htm (last visited Oct. 22, 2020). This forward-looking statement was true—Merit did retain most of Cianna's sales force.

Plaintiffs also fail to distinguish between Lampropoulos' statements on February 26, 2019, when Merit was only a few months into its Cianna integration, and his statements months later on April 23, 2019 and July 25, 2019. This is a crucial distinction, as the falsity of a statement concerning a specific point in time must be judged by the conditions when it was made, not based on hindsight and subsequent events.

In February 2019, Merit had just recently acquired Cianna. Plaintiffs argue that, when asked about the Cianna integration, Lampropoulos stated during the February 26 earnings call that "we're seeing the stability, as I mentioned earlier, in the sales force and in the operating staff, and by that I mean by stability, we hadn't lost anybody." *See* Ex. 1, Feb. 26, 2019 Earnings Call at 10; Opp. at 5:24-27, 11:13-15, 12:14-16. Plaintiffs contend that this was materially misleading because one short-term member of Cianna's 19-member salesforce had departed by this date. *See* Opp. at 6:13-23; CAC ¶ 75. Plaintiffs' own allegations establish that Sales Rep 4 (the only Cianna salesperson who had resigned prior to February 26) had only been employed at Cianna for about 10 months. CAC ¶ 75. And Plaintiffs do not provide any information about how much in sales this person generated. There is no factual basis to conclude that Sales Rep 4 was any more important than any of the other 6,300 employees at Merit. Moreover, Plaintiffs' argument ignores Lampropoulos' very next sentence, where he clarified that "and those who have gone or been on the operational side that we already have replacements for…" *See* Ex. 1, Feb. 26, 2019 Earnings Call at 10–11 (emphasis added); *see also* Br. at 4 n.2 (explaining that the earnings call transcripts are incorporated by reference in the CAC and are the proper subject of judicial notice). Thus, investors understood that there had been some departures, but that Merit had secured replacements. Lampropoulos' statement was not materially misleading. In fact, his other statements in that very same earnings call further clarify what he meant— for example, he stated that "in terms of the sales force, everybody is *essentially* still online." *Id.* at 6 (emphasis added). He also stated that "in terms of the sales force…we've *essentially* had no turnover in that particular area." *Id.* (emphasis added). Lampropoulos informed

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

investors by these statements in February 2019 that Merit had retained materially all of the Cianna salesforce, which is demonstrably true.

The alleged departure of a single salesperson within a single business unit is consistent with Lampropoulos' statement that Merit "essentially had no turnover" and that "everybody is essentially still online." Ex. 1, Feb. 26, 2019 Earnings Call at 6. Consequently, Plaintiffs fail to plead that Lampropoulos made a materially false statement during the February 26 earnings call.

Plaintiffs likewise fail to adequately plead that Lampropoulos' statements on the April 23, 2019 earnings call were false when made. They allege that four of the 19 original Cianna salespeople had departed by this time, and that these four (who accounted for 21% of the original Cianna salesforce) generated $7.1 million of Cianna's $32.2 million in total 2018 sales (*i.e.*, approximately 22% of 2018 Cianna sales).[6] CAC ¶¶ 71–75.[7] Thus, Plaintiffs contend it was false or misleading for Lampropoulos to state on April 23 that "we maintained their sales force." CAC ¶ 166. But Plaintiffs again ignore Lampropoulos' qualifying language where he explained that there had been a few changes in the sales force:

> We've maintained the sales force, we've essentially had no fallout other than we've had a couple of situations where there were a couple of issues or things that we had to make some changes, but our goal to maintain the sales force, maintain the R&D and develop new products out of Cianna, I think is moving along.

---

[6] Plaintiffs' factual allegations show the 21% of the salesforce that left were, collectively, average salespeople as they generated only their proportionate share of 2018 Cianna sales (*i.e.*, 22%), and undermines their conclusory assertions that the departing salespeople were superstars who had an outsized impact on 2018 Cianna sales and "the loss of even one key salesperson [was] extraordinarily impactful." CAC ¶ 76.

[7] Plaintiffs assert that "*nearly 25%* of Cianna's sales force had quit" prior to Merit's April 23, 2019 earnings call. Opp. 6:15-16. The actual loss was only 21% (*i.e.*, 4 ÷ 19 = 0.21). So, not only do Plaintiffs mischaracterize Defendants' statements, they also overinflate the attrition percentage in an effort to advance their fraud claim. Such tactics should not be rewarded.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

*See* Ex. 4, Apr. 23, 2019 Earnings Call at 3.  Plaintiffs argue that this statement is "vague" and "does not state that a single employee had left."  Opp. at 12:20-26.  But this argument ignores the context and plain meaning of Lampropoulos' words—any reasonable investor who heard Lampropoulos' statement that Merit "essentially had no fallout other than we've had a couple of situations where … we had to make some changes" understood that there had been some attrition in the Cianna sales force.  Lampropoulos' words have no other possible interpretation.[8]  *See* CAC ¶ 166 (explaining that "[w]e kept **all** the R&D people, we kept the salespeople") (emphasis added).[9]

Plaintiffs also argue that it was false or misleading for Lampropoulos to state on July 25, 2019 that the Cianna sales force had experienced "a little bit of attrition, but not much."  *See* Ex. 7, July 25, 2019 Earnings Call at 11.  Again, this statement must be viewed in context:[10]

Cecilia Furlong, Analyst:

And I just wanted to ask, just following up on Cianna and recent progress,

but **could you just talk about how you're rolling it out to your own sales force in the US** and where you are in that process?

---

[8] Plaintiffs argue that Lampropoulos' statements were ambiguous, and thus must be interpreted in the light most favorable to Plaintiffs.  *See* Opp. at 13 (citing *Skiadas v. Acer Therapeutics Inc.*, 2020 WL 4208442, at *3 (S.D.N.Y. July 21, 2020).  But as the court in *Skiadas* explained, a statement is only ambiguous if it is "capable of being understood in two or more possible senses or ways."  *Id.*  Here, Lampropoulos unambiguously disclosed in the July earnings call that there had been "some changes" to the Cianna salesforce.  Ex. 7, July 25, 2019 Earnings Call at 11.

[9] Lampropoulos' use of the phrase "**kept all**" to refer to the retention of the R&D people in the first part of the sentence contrasts with his use of the phrase "**kept**" to refer to the salespeople, and lends itself to only one reasonable interpretation: "kept the salespeople" does not mean kept "all" the salespeople.  *Cf. Convergent Wealth Advisors LLC v. Lydian Holding Co.*, No. 12-CV-1199, 2012 WL 2148221 at *3 (S.D.N.Y. June 13, 2012) ("When the plain, common, and ordinary meaning of the words lends itself to only one reasonable interpretation, that interpretation controls the litigation.").

[10] *In re Syntex Corp. Sec. Litig.*, 95 F.3d at 929 (holding that the court must review the challenged statements in their full context on a motion to dismiss).

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

Fred Lampropoulos:

Yeah, Cecilia, thank you very much. I think the thing that we had shared previously was that we decided to stay and we maintain the sales force. I think that was the right thing to do. **We've had a little bit of attrition, but not much and we are now starting to roll the Merit sales force and fill in the areas that didn't have the attention**.

*Id.* (emphasis added).  Both the analyst's question and Lampropoulos' answer are focused on Merit's expansion of Cianna's products to Merit's larger sales force, not on the degree to which the Cianna salesforce was retained.  Moreover, Lampropoulos talked specifically about some attrition in the sales force—he characterized the Cianna attrition as not material because Merit's other salespeople would fill in the areas that needed attention.  Plaintiffs argue that losing 20+% of the sales force would be catastrophic to Merit, and thus it had a duty to shout these departures from the rooftops.  They allege that "as a result of this sales force attrition, Cianna suffered sales declines of *25-30%* in 2019" (Opp. 6:19-23).  But that is just not true.  Merit grew Cianna sales by more than 53% in 2019.  Cianna's 2018 sales were $32.1 million, CAC ¶ 71, and 2019 sales were $49.5 million.  Ex. 15, 2019 10-K at 42.  Merit's total 2018 revenue was $882.8 million.  *See* Ex. 15, 2019 10-K at 42.  Thus, the departure of Sales Reps 1–4 with just over $7 million in sales is not at all analogous to the Lakers losing LeBron James (who scored 22% of the Lakers' points), but rather like the Lakers trading away a scout team player.[11]

Plaintiffs' fraud claim boils down to quibbling over whether the loss of four of Cianna's 19 salespeople can be described accurately as "not much" attrition.  Given that Lampropoulos' statement was made in the context of how Merit would be able to fill these

---

[11] Companies have no duty to disclose the departure of salespeople, whether they are as valuable as Lebron is to the Lakers or as normal team members like Sales Reps 1–4 were to Cianna.  Instead, SEC regulations only require the disclosure of the departures of a registrant's "principal executive officer, president, principal financial officer, principal accounting officer, principal operating officer, or any person performing similar functions…" *See* Item 5.02 of Form 8-K, Securities and Exchange Commission, 2020.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

vacancies with their own salespeople, it was entirely reasonable for him to describe these departures that way. Moreover, Merit's actual financial performance demonstrates that he was right.

## B.    Cianna Integration

Plaintiffs also argue that Defendants have tried to "rewrite" their own statements to defend themselves. *See* Opp. at 1:28–2:1. Not true—Plaintiffs are the ones who are misrepresenting Defendants' actual statements. The Court can see that easily by just reviewing the actual statements. *In re Syntex Corp. Sec. Litig.*, 95 F.3d at 929. A good example is when Plaintiffs attack Lampropoulos for stating in April 2019 that "the Cianna **transition** is complete…" CAC ¶ 162 (emphasis added). Yet in their Opposition, Plaintiffs falsely argue that he represented that the Cianna "**integration**" was complete. *See* Opp. at 1:13–14 (emphasis added).

Transition is not the same thing as integration. "Transition" means the "passage from one state, stage, subject or place to another: Change." *See* Merriam-Webster dictionary, *available at* https://www.merriam-webster.com/dictionary/transition (last visited Oct. 13, 2020). Lampropoulos' use of the word "transition" does not convey that Merit had fully completed all of the complex and lengthy steps necessary to fully integrate (*i.e.*, "to firm, coordinate, or blend into a functioning or unified whole") Cianna's processes and procedures. *Id.* The word "transition" conveys an initial step in the integration process—that Cianna's employees, assets and inventory have moved over to Merit. This is exactly what Lampropoulos explained he meant by the word "transition," stating that "I mean we are shipping inventory out of Salt Lake City and out of Richmond. We're doing all the billing." *See* Ex. 4, Apr. 23, 2019 Earnings Call at 3. Plaintiffs do not allege that either of these representations was false. Instead, they rely on an alleged list of long-term integration goals that they claim were only half-way completed by April 2019. *See* CAC ¶ 163. But these items all relate to *integration*, not *transition*. Nothing in the CAC or in the Opposition contradicts Defendants' statements regarding the Cianna transition.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

But even if there was an investor who was confused about whether Merit had completed the Cianna integration by April 23, 2019, Merit disclosed in its SEC filings a few days later that the integration process was still ongoing.  On May 3, 2019, Merit reported that "our integration of the Cianna Medical operations continues according to our expectations." 1Q19 10-Q at 30, *available at* https://www.sec.gov/ix?doc=/Archives/edgar/data/856982/000085698219000049/mmsi-3312019x10q.htm (last visited Oct. 22, 2020).

The only other statements concerning the Cianna transition that Plaintiffs challenge are Lampropoulos' comments that the transition was "probably a[s] good of [a] transaction and transition that we have done… I think it maybe the best one." *See* Ex. 4, Apr. 23, 2019 Earnings Call at 8.  This type of general optimistic opinion statement is classic corporate puffery that is immaterial as a matter of law.  *See In re Apple*, 127 F. App'x at 301 (noting that "statements by an officer that a company had 'substantial success' integrating its sales force, that a merger was moving 'faster than we thought,' and that '[b]y moving rapidly to a fully integrated sales force, we are leveraging our combined knowledge and expanding scope of network solutions' are 'statements of corporate optimism' and are not actionable").  Plaintiffs counter that it must be material because the Cianna transaction was vitally important to Merit.  *See* Opp. at 14:20-15:2.  But this misses the point of the puffery doctrine—the test is not whether the subject of the statement is important to investors, but whether the statement is the type of positive promotional language that investors expect from executives.[12]  *See In re Apple*, 127 F. App'x at 304 (noting that test is whether statements are "optimistic opinions, not guaranteed factual promises").

---

[12] Similarly, Plaintiffs argue that these statements were material because analysts asked questions about the Cianna integration. *See* Opp. at 14 (citing *Turocy v. El Pollo Loco Holdings, Inc.*, No. SACV 15-1343, 2017 WL 3328543 at *14 (C.D. Cal. Aug. 4, 2017)).  Plaintiffs' reliance on this case is misplaced, as the issue is not whether the Cianna acquisition was material to investors generally, but whether Defendants' vague positive statements about the success of the transition were factual, specific, and material, and thus not puffery.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs cite two cases involving the integration of an acquired business as support that these types of statements are material. *See* Opp. at 15:5–9. Both cases are easily distinguishable. In *Union Asset Mgmt. Holding AG v. SanDisk LLC*, No. 15-CV-01455-VC, 2017 WL 3097184, at *1 (N.D. Cal. June 22, 2017), the plaintiffs argued that it was materially misleading for defendants to state that the integration was "going quite well." But as the Court in *SanDisk* explained, these statements would be considered immaterial corporate puffery except for the exceptional circumstances in which they were made, *i.e.*, the defendants were touting the successful integration as the means of saving their company from recent negative events. *Id.* Plaintiffs have not alleged any such exceptional circumstances here.

The court's holding in *Roberts v. Zuora, Inc.*, No. 19-CV-03422-SI, 2020 WL 2042244, at *9 (N.D. Cal. Apr. 28, 2020) was similarly narrow. In that case, the Court held that defendants' statements concerning integration were material because the defendants' failure to integrate two products led to customers not being able to use either product. *Id.* Here, Plaintiffs do not allege that the incomplete integration tasks rendered Merit unable to sell its products. Moreover, both *Zuora* and *SanDisk* deal explicitly with corporate *integrations*—which, as previously explained, are distinct from Defendants' statements about the Cianna *transition*.

Finally, even if the statement is taken literally as a factual representation, Plaintiffs have not pled any facts suggesting that the transition was not "the best one" that Merit had completed, as all of Plaintiffs' allegations relate to integration, not transition. For these reasons, they have failed to adequately plead any misstatement or omission concerning the Cianna integration.

**C.    ClariVein Sales**

Plaintiffs argue that it was misleading for Defendants to continue to tout the potential performance from Merit's acquisitions because they knew as of July 25, 2019 that there had not been any orders of ClariVein, the key product Merit obtained in the Vascular

Insights acquisition. *See* Opp. at 14:1-18:11. Plaintiffs base their claim on Lampropoulos' statement below (Ex. 7, July 25, 2019 Earnings Call at 5):

> In some of the ClariVein, which were short a little bit more than $2 million. There were some products that we have just started to deliver in the last 30 days. We haven't had an order all year, because of pipeline filling from the former customer for fear by the distributor that somehow they wouldn't be able to keep it.

*See* CAC ¶ 102. Plaintiffs claim this statement revealed that there had been no ClariVein sales in the first half of 2019 because of alleged insurance and regulatory issues. *See* Opp. at 16:14-24. Plaintiffs again ignore, or misrepresent, what Defendants actually said.

Lampropoulos never said that Merit had not sold any ClariVein products. Instead, he said that "**in some** of the Clarivein… **there were some products** that we just started to deliver in the last 30 days." *See* Ex. 7, July 25, 2019 Earnings Call at 5 (emphasis added). The ClariVein line consisted of multiple products, including ClariVein IC and ClariVein OC, that were sold to many different distributors. *Id.* Parra relayed that some of these distributors were just now reaching the point in the year where they were placing orders for certain products, as they exhausted their current inventory. Lampropoulos explained during the same call that Parra was referring to one distributor in South Korea that had just placed its first order of the year. *Id.* at 9. Defendants never stated nor implied that there weren't any orders or sales of ClariVein products in the first half of 2019.

In fact, Merit reported substantial ClariVein sales in the first half of 2019—$3.2 million in the six-month period ended June 30, 2019. Br. 14:19–15:1. Plaintiffs backpedal in the Opposition by attempting to draw a distinction between "orders" and "sales," suggesting that Merit recognized the $3.2 million in first-half of 2019 ClariVein sales from "earlier orders," presumably received in 2018. Opp. 16:21-24. Not only are there no facts to support this new and implausible theory, it directly contradicts their allegations in the CAC, where Plaintiffs specifically allege (falsely) that "Lampropoulos received regular

reports showing the lack of ClariVein *sales*, including *zero sales* in the first half of 2019." CAC ¶ 195 (emphasis added). Plaintiffs cannot amend their allegations in their Opposition.

When viewed in context, Defendants' statements concerning ClariVein provided accurate snapshots and candid outlooks of Merit's strategy for selling these products. More importantly, Plaintiffs have failed to adequately plead any particularized facts to show falsity.

## II. Defendants' forward-looking statements are protected by the PSLRA safe harbor provision.

Plaintiffs argue that only 5 of the 27 alleged misstatements qualify as forward-looking because these were the only ones that concerned earnings guidance. *See* Opp. at 18:20–21. This misunderstands the law—statements do not have to involve earnings guidance to be considered forward-looking. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014) (explaining that forward-looking statements include not only financial projections, but also "plans and objectives of management for future operations" and "future economic performance"). Not only were Defendants' statements concerning revenue guidance forward-looking, but so were their statements concerning the future benefits of the Cianna acquisition and the future potential of ClariVein. *See* CAC ¶¶ 175, 177, 179. These are all forward-looking statements under the law because they concern expected future benefits to Merit.

Plaintiffs do not dispute that Merit specifically warned investors about the risks associated with these acquisitions. These disclosures were both copious and detailed. For example, the very first risk factor identified on the first page of Merit's 2019 10-K concerned "risks relating to managing growth, particularly if accomplished through acquisitions, and the integration of acquired businesses." *See* Ex. 15, 2019 10-K at 1. The Company detailed the many possible challenges of acquisitions including the loss of key employees and the potential problems with integrating the two businesses. *Id.* at 1–3. Thus, when Defendants opined on the future benefits of the Cianna and Vascular Insights

13

acquisitions, investors were fully aware that there could be major integration issues that could materially impact Merit.

Instead of arguing that these risks were not fully disclosed, Plaintiffs argue that there were misrepresentations or omissions of present facts at the time the forward-looking statements were made. *See* Opp. at 5:22-8:23. These include the alleged sales force departures, lack of orders, and integration issues. *See* Opp. at 5:22 –8:23. But Plaintiffs fail to plead facts showing that these issues were material when Defendants made their forward-looking statements or that Defendants knew that they could not achieve the future results they projected. Br. at 9:17–10:4 (citing 15 U.S.C. § 78u-5(c)(1)). Every company faces headwinds when trying to achieve its revenue projections, that is the very nature of business. If some negative information automatically invalidated projections, then every company's missed projections could form the basis for a securities fraud lawsuit. Thus, "[s]tatements about future events that are plainly expressions of opinion and *not* guarantees are *not* actionable under the federal securities laws." *Hershfang v. Citigroup*, 767 F. Supp. 1251, 1256 (S.D.N.Y. 1991) (citation omitted).

The PSLRA's safe harbor protects Merit's forward-looking statements because Defendants warned investors about the risks of integration, and Plaintiffs have not alleged any actual knowledge of falsity when the projections were made.

**III. Plaintiffs have failed to plead the necessary strong inference of scienter.**

      **A. The CAC fails to plead any particularized facts about Lampropoulos' or Parra's state of mind.**

Plaintiffs fail to plead the necessary strong inference of scienter under the exacting requirements of the PSLRA, which requires Plaintiffs to allege particularized facts for each Individual Defendant that shows what, how, and when he knew the alleged concealed information, including specifics or corroborating details of time, persons, places, and subjects. *See* Br. at 19:11–19. The CAC is simply devoid of particularized, *contemporaneous* facts showing that either Lampropoulos or Parra had any information indicating that he

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

knew or recklessly disregarded that any challenged statement was false or misleading when made. *See* Br. at 19:11–22:21.

Although the presence of confidential witnesses can bolster scienter allegations, not all confidential witnesses are created equal. The Court must analyze each confidential witness and each defendant individually. Although the CAC contains the allegations of numerous confidential witnesses, not a single one identifies contemporaneous facts showing that Lampropoulos or Parra knew or recklessly disregarded that any challenged statement was false or misleading when made. *See* Br. at 19:11-22:21. For example, Plaintiffs argue that "five witnesses 'establish that members of executive-level management, including individual defendants, had access to and used reports documenting in real time' the lack of ClariVein orders." Opp. at 23:12–14, n.8 (asserting that "multiple witnesses all had direct access to Defendants Lampropoulos and Parra, physically saw them access the reports, sent reports directly to them, discussed the reports directly with them, and described the contents of the reports that conflicted with Defendants' statements") (citing CAC ¶¶ 103–111). But the CAC is devoid of the necessary particularized contemporaneous facts to support the Plaintiffs' conclusory assertions. *See* Br. at 20:16–21:12.[13]

---

[13] Plaintiffs' reliance on *El Pollo Loco*—for its confidential witness allegations—is inapposite. In *El Pollo Loco*, Former Employee 1 ("FE1") alleged that customer complaints about recent price increases were in "Operation Dashboard" reports provided to defendants; FE2 alleged that the "Operation Dashboard" contained adverse "sales information" withheld from shareholders which FE2 had personal knowledge of because FE2 entered that information into the "Operation Dashboard;" and FE3 "had personal knowledge" that at least one individual defendant reviewed the "Operation Dashboard" on his iPad during weekly meetings. *El Pollo Loco*, 2017 WL 3328543, at *16. This Court held that the allegations of the three confidential witnesses established that "members of executive-level management—including the individual defendants—had access to and … used data tracking in real time the decline of sales and transactions." *Id.* at *17 ("Indeed, the Company itself advertised Operation Dashboard as providing information on 'sales performance, speed-of-service metrics, and food and labor cost controls.'"). Here, unlike FE2's allegations in *El Pollo Loco*, Plaintiffs do not allege that any confidential witness had personal knowledge of the information contained in the "reports" because they

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

Similarly, Plaintiffs argue that the CAC "details a reliable account of when Lampropoulos was 'told' about the marketing roadblock" for ClariVein sales. Opp. at 24:3–9 (citing CAC ¶¶ 96, 104, 107, 125–128). But, again, the cited paragraphs do not contain any supporting facts. *See* Br. at 21:2-5, 21:23-22:5. Simply put, Plaintiffs do not identify one conversation or document that placed Lampropoulos or Parra on notice about the alleged marketing or insurance reimbursement issues that they claim impacted ClariVein sales in the first half of 2019.[14]

Having failed to identify any specific conversation or document that put Lampropoulos or Parra on notice that any of their statements was false when made, Plaintiffs argue that "where defendants make specific misstatements about specific matters they purport to know, '[i]t is unclear what further facts plaintiffs would need to plead to create a strong inference that [they] had access to [the] information [they] discussed

---

participated in generating those reports, or even received the alleged reports. Similarly, unlike FE3's allegations, Plaintiffs do not allege that any confidential witness had personal knowledge that Lampropoulos or Parra participated in periodic or specific meetings that discussed the relevant facts and that Lampropoulos or Parra reviewed the alleged reports during these meetings. Moreover, allegations that sales information was displayed on TV screens (CAC ¶ 104) or was emailed daily (with "a link to get more detailed information on specific product reporting") to a mailing list, which included Lampropoulos (*id.* ¶ 108), does not establish that individual defendants had "actual access to the disputed information" and "used reports documenting in real time the decline in sales during the Class Period," *El Pollo Loco*, 2017 WL 3328543, at * 16; *see also* Br. at 20:16–21:12.

[14] Plaintiffs' reliance on *Coinstar* is also misplaced. Opp. at 24:9–13. In *Coinstar*, the company's former Chief Accounting Officer (CW1) alleged "that Coinstar internally reforecasted projections downward." *In re Coinstar Inc. Sec. Litig.*, No. C11-133, 2011 WL 4712206, at *9 (W.D. Wash. Oct. 6, 2011) (noting that "CW1 is alleged to be in a position to report on these facts"). The relevant allegation in *Coinstar* concerned the internal reforecast of projections downward and scienter was imputed to the individual defendant (who was the Corporate Vice President, Finance and Treasurer) based on the confidential witness allegations of the former Chief Accounting Officer. Here the connection between the individual defendant and the confidential witness is much more tenuous: the Chairman and CEO of Merit and a marketing event manager (who is not alleged to have attended meetings with or reported to Lampropoulos), which undermines the reliability of the CW's allegations and her personal knowledge of Lampropoulos' state of mind. *Cf. Ixia*, 2015 WL 1775221, at *20.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

publicly.'" Opp. at 19:26–20:2 (citing *Reese v. Malone*, 747 F.3d 557, 572 (9th Cir. 2014)). *Reese* "is distinguishable from situations where information may have been obscured from high-level executives." *Reese*, 747 F.3d at 572 (citing *Glazer Capital Mgmt. v. Magistri*, 549 F.3d 736, 743–49 (9th Cir. 2008) (no strong inference of scienter on the part of the CEO in the absence of facts showing he was personally aware of illegal payments or that he was actively involved in details of Asian sales)). Unlike Lampropoulos, defendant "Johnson [in *Reese*] is not like the CEO of a large enterprise, who may be removed from the details of a specific business line or remote business activity. As … Unit Leader, Johnson was directly responsible for the … operations. In this role, not only would Johnson be aware of corrosion problems, but she would be among the first to know." *Id.* Lampropoulos is the CEO of a company with hundreds of different products, more than $1 billion in sales and over 6,300 employees, not the head of the business unit directly responsible for Cianna sales. It is unreasonable to presume that Lampropoulos knew about alleged marketing and insurance reimbursement issues that supposedly impacted sales of just one product line representing less than 1% of Merit's revenue.

Plaintiffs' reliance on this Court's prior decision in *El Pollo Loco* is misplaced; Plaintiffs' allegations here bear no resemblance to the detailed facts alleged in *El Pollo Loco* and which resulted in the Court's denial of the motion to dismiss in that action.[15]

---

[15] In *El Pollo Loco*, plaintiffs identified a specific presentation that the Chief Marketing Officer provided to the board that revealed that management's decision to end the restaurant's $5 combo meals, "and the resulting increase in prices and the loss of value, was having a negative material effect on customer traffic and sales." *El Pollo Loco*, 2017 WL 3328543, at *3. In this presentation, management told the board that it would be "ambitious" to achieve sales growth of 2.5%. *Id.* at *8. Contrary to the information management provided to the board, management issued a press release and conducted a conference call two days later that concealed the adverse impact of the higher menu prices and falsely stated that "El Pollo Loco was on track to report system-wide comparable restaurant sales growth of approximately 3.0% to 5.0% for fiscal year 2015." *Id.* at *3 (citations omitted). Seven days after the board presentation and five days after the conference call, the three individual defendants and El Pollo Loco's controlling shareholder sold stock generating over $132.4 million. *Id.* at *4. El Pollo Loco later revealed the truth, when it admitted that higher menu prices adversely impacted sales and

*First*, Plaintiffs do not identify a specific meeting that Lampropoulos or Parra attended where they obtained information contrary to their public statements. The *El Pollo Loco* plaintiffs provided specific detail about a board presentation that revealed information directly contradicting information defendants provided to shareholders a few days later.

*Second*, the facts concealed in *El Pollo Loco* (*i.e.*, management's decision to remove its $5 combo deal) were essential to the company's revenues. *El Pollo Loco*, 2017 WL 3328543, at *9. In contrast, the fraud Plaintiffs allege here concerns a few newly acquired products that comprised a small fraction of Merit's medical product offerings and total sales.

*Third*, the magnitude of the missed projections was significantly higher in *El Pollo Loco* than here.[16] Unlike in *El Pollo Loco*, where the company missed its sales growth target by 56.7%, *id.* at *5 (reporting sales growth of 1.3% versus sales-growth projection of 3% to 5%), Merit missed its sales growth target by just 11.8%, Br. at 15:14–18.

*Fourth and finally*, plaintiffs in *El Pollo Loco* alleged that the insiders collectively sold over a $130 million in company stock a few days after attending a board presentation that contradicted their public statements. Here, in contrast, Plaintiffs allege that Lampropoulos sold only 16% of his holdings—and that he did so only *after* the first corrective disclosure that allegedly caused Merit's stock price to fall (*see infra* Section III.B), and CFO Parra did not sell at all.

**B.   Lampropoulos' stock sales do not support scienter.**

Lampropoulos' stock sales do not contribute to an inference of scienter because they were not *timed* to maximize his profits and constituted only a *small percentage* of his total holdings; nor were they accompanied by stock sales from other insiders. *See Ixia*, 2015 WL

---

reported sales growth of just 1.3%—a miss of 56% from the low end of their sales growth guidance range. *Id.* at *5

[16] Defendants in *El Pollo Loco* told investors that sales growth would be "approximately 3% to 5.0%" (despite an internal presentation that sales growth of 2.5% would be ambitious). *Id.* at *3, *8. Here, Merit reported 2018 sales of $882.8 million, and forecasted 2019 sales between $1.01 billion and $1.03 billion—an estimated sales growth between 14.4% and 16.6%. Merit reported 2019 sales of $994.9 million—achieving a sales growth of 12.7%.

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

1775221, at *35–*42 (holding that insider sales contribute to an inference of scienter *only* if they are suspicious in timing or amount); *see also* Br. at 23:6–24:13 (explaining why the stock sales were not *timed* to maximize profits); *id.* at 24:14–25:15 (explaining why the *size* of stock sales is not suspicious under Ninth Circuit precedent); *id.* at 24:22–23, 25:16–26:3 (noting that the Ninth Circuit typically requires *corroborative sales* by other defendants to allow insider trading to support scienter and that the CAC fails to allege stock sales or other indicia of scienter as to Parra).  After boldly asserting that "Lampropoulos personally took *full advantage* of his misrepresentations and the market's ignorance of the full truth to unload significant holdings of Merit stock at *artificially inflated* prices," CAC ¶ 137 (emphasis added), Plaintiffs appear to back away in their Opposition by arguing that "insider trading is not required to establish scienter"[17] and by failing to respond to Merit's arguments about why Lampropoulos' stock sales were not suspicious in timing or amount.  Opp. at 25:6–17.

As explained in Merit's brief, Lampropoulos' stock sales are not suspicious and actually negate an inference of scienter or, at a minimum, fail to contribute to one.  First, Lampropoulos' stock sales were not *timed* to maximize his profits because he sold many weeks after the alleged corrective disclosure on July 25, 2019—that allegedly caused Merit's stock price to fall 25.25% from $54.84 per share to $41 per share (CAC ¶¶ 137–38, 207)—at an average price of $31.91, which is approximately 42% below Merit's stock price on July 25, 2019.  *See* Br. at 23:10–15 n.27.  If Lampropoulos had an intent to defraud, then he would have sold his Merit stock between February 26, 2019 (start of the purported Class Period) and July 25, 2019 (the alleged corrective disclosure)—at prices ranging from $54.84 to $62.60 per share—to maximize his profits; *not* at $31.91 per share.  Plaintiffs completely ignore this argument in their Opposition.  Opp. 25:6–17.

---

[17] Plaintiffs' assertion is a red herring because the issue before the Court is *not* whether insider-trading allegations are required to plead scienter; the issue is whether the CAC's insider-trading allegations contribute to an inference of scienter (as insider sales support scienter *only if* they are suspicious in timing or amount).

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT

Second, the *size* of Lampropoulos' stock sales—amounting in the aggregate to 16% of his holdings—are not suspicious and thus do not support a strong inference of scienter because the Ninth Circuit "typically require larger sales amounts—and corroborative sales by other defendants—to allow insider trading to support scienter." *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008); *see also* Br. at 24:23– 25:1 n.30 (collecting cases).   Here, any inference of scienter is *defeated* because Lampropoulos' "trading percentage *belies* any intent to rid himself of a substantial portion of his holdings," *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1094 (9th Cir. 2002), and he "end[ed] up reaping the same large losses as did Plaintiff[s] when the stock price dropped," *In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1160 (C.D. Cal. 2007).   Plaintiffs completely ignore the fact that Lampropoulos' Merit holdings lost over $50 million in value during the Class Period. *Compare* Opp. at 25:6–17 *with* Br. at 25:10–15 n.31.   Plaintiffs' failure to allege corroborative sales by Parra also undercuts their insider-trading allegations.  Br. at 25:16– 26:3.

Moreover, Plaintiffs' reliance on *Stamps.com*, Opp. at 25:15–17, is misplaced.  All three of the individual defendants in *Stamps.com* "collectively sold over 302,000 of their shares, which accounted for **58%** of McBride's shares [Chairman and CEO], **83%** of Huebner's shares [President], and **47%** of Carberry's shares [CFO]." *Karinski v. Stamps.com,* 2020 WL 281716, at *15 (C.D. Cal. Jan. 17, 2020) (emphasis added).   Here, unlike *Stamps.com*'s Chairman and CEO who sold **58%** of his shares, Merit's Chairman and CEO Lampropoulos is alleged to have sold *only* 16% of his shares.  And, unlike *Stamps.com*'s CFO who sold 47% of his shares, there are no corroborating sales in this case because Merit's CFO (Parra) is *not* alleged to have sold any of his shares.

For the reasons stated above and more fully explained in the moving brief, Plaintiffs have failed to plead facts sufficient to raise a strong inference of scienter under the PSLRA.

## IV.   Plaintiffs have failed to adequately plead loss causation.

Plaintiffs fail to plead loss causation because the two alleged corrective disclosures (on July 25 and October 30) did not reveal the truth about any challenged statement. *See*

Br. at 26:10–28:13. The alleged disclosures did not cure the challenged statements about the 'transition" of Cianna to Merit being completed by April 23, Br. at 27:7–20, or the anticipated ClariVein sales, *id.* at 27:21–28:4. Nor did these alleged disclosures cure the challenged statements about retaining Cianna's sales force, *id.* at 26:17–27:2; to the contrary, the October 30 disclosure reiterated these challenged statements, *id.* at 27:3–6.

Even if Plaintiffs are not required to plead that the alleged fraud itself was revealed in the purported corrective disclosures by "confessing to specific problems with the 'integration of Cianna' and ClariVein's 'regulatory or insurance problems,'" Opp. at 27:26–28, the Court must evaluate "whether plaintiffs have pleaded or proved the facts relevant to their theory" of loss causation when Plaintiffs' theory is "based on market revelation of the fraud," *Stamps.com*, 2020 WL 281716, at \*17, which is the case here, Opp. at 28:7–8 (stating that "the corrective disclosures clearly revealed new information"). As stated above, Plaintiffs have failed to plead that the alleged corrective disclosures revealed new information "'relate[d] to' the subject of [the alleged] misstatements." Opp. 27:24–25 (citing *Stamps.com*).

Similarly, Plaintiffs' reliance on *First Solar* does not bolster their loss-causation argument. Opp. 28:3–6. In *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), the court noted that "[a] plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." But the CAC does not allege that Merit disclosed an earnings miss on July 25 or October 30 because Merit did not provide quarterly earnings guidance. Merit disclosed 2019 revenue misses for Cianna and ClariVein, after the end of the purported Class Period, on March 2, 2020. *See* Ex. 15, 2019 10-K at 70.

## V.      Plaintiffs have failed to plead control-person liability against the Individual Defendants.

The Court should dismiss Plaintiffs' control-person claim because the CAC does not adequately plead a primary violation of the securities laws. *See Howard v. Everex Sys.,*

*Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000).

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' motion to dismiss.

Dated: October 22, 2020                    Respectfully submitted,

                                           */s/ Paul R. Bessette*
                                           Paul R. Bessette
                                           Michael J. Biles
                                           Joseph N. Akrotirianakis
                                           S. Saliya Subasinghe
                                           King & Spalding LLP

                                           *Counsel for Defendants*

DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS
THE CONSOLIDATED CLASS ACTION COMPLAINT