**SAXENA WHITE P.A.**
David R. Kaplan (SBN 230144)
dkaplan@saxenawhite.com
Hani Y. Farah (SBN 307622)
hfarah@saxenawhite.com
12750 High Bluff Drive, Suite 475
San Diego, CA 92130
Telephone:   (858) 997-0860
Facsimile:    (858) 369-0096

*Attorneys for Lead Plaintiffs the Atlanta Funds and Co-Lead Counsel for the Proposed Settlement Class*

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**
Jonathan D. Uslaner (SBN 256898)
jonathanu@blbglaw.com
Lauren M. Cruz (SBN 299964)
lauren.cruz@blbglaw.com
2121 Avenue of the Stars, Suite 2575
Los Angeles, CA 90067
Telephone: (310) 819-3472

*Attorneys for Lead Plaintiff Baton Rouge and Co-Lead Counsel for the Proposed Settlement Class*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| IN RE MERIT MEDICAL SYSTEMS, INC. SECURITIES LITIGATION | Case No. 8:19-cv-2326-DOC-ADS<br><br>**JOINT DECLARATION OF DAVID R. KAPLAN AND JONATHAN D. USLANER IN SUPPORT OF LEAD PLAINTIFFS' MOTION FOR FINAL APPROVAL OF PROPOSED CLASS ACTION SETTLEMENT AND PLAN OF ALLOCATION, AND LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES** |

## TABLE OF CONTENTS

I.    PRELIMINARY STATEMENT ........................................................................ 1

II.   PROSECUTION OF THE ACTION ............................................................... 5

      A.    Overview of the Allegations ............................................................. 5

      B.    The Commencement of the Action and Appointment of
            Lead Plaintiffs ................................................................................... 6

      C.    The Motion to Transfer, Lead Plaintiffs' Continuing
            Investigation, and the Filing of the Complaint ........................... 6

      D.    The Pleading Stage ............................................................................ 8

      E.    Discovery ............................................................................................. 9

III.  THE SETTLEMENT ...................................................................................... 10

      A.    The Parties' Mediation Session and Settlement
            Negotiations ...................................................................................... 11

      B.    Reasons for the Settlement ............................................................. 14

      C.    Notice to the Settlement Class ...................................................... 16

      D.    The Plan of Allocation ..................................................................... 18

IV.   LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND
      LITIGATION EXPENSES ............................................................................. 19

      A.    Lead Counsel's Motion for Attorneys' Fees ............................... 20

            1.    The Result Achieved Supports a 30% Fee Award .................. 20

            2.    The Risks of Litigation ............................................................. 21

            3.    The Skill Required and Quality of Work ................................ 22

            4.    The Contingent Nature of the Fee and Financial
                  Burden ........................................................................................ 23

            5.    Awards in Similar Actions ....................................................... 24

            6.    Lead Plaintiffs' Approval and the Reaction of the
                  Settlement Class to Date .......................................................... 24

            7.    A Lodestar Cross-Check Confirms that Lead
                  Counsel's Requested Fee is Reasonable ................................. 25

B.    Lead Counsel's Motion for Reimbursement of Litigation Expenses .......................................................................................27

C.    Lead Plaintiffs' Reimbursement Request ...............................................29

V.    CONCLUSION ..............................................................................................29

# EXHIBIT LIST

| EXHIBIT | DESCRIPTION |
| --- | --- |
| A | Declaration Of Frank Sims, Chairman of the City of Atlanta Defined Benefit Pension Plan Investment Board, In Support Of: (I) Lead Plaintiffs' Motion For Final Approval Of Proposed Class Action Settlement And Plan Of Allocation; And (II) Lead Counsel's Motion For Attorneys' Fees And Litigation Expenses |
| B | Declaration Of James A. Mack, Administrator Of The Employees' Retirement System Of The City Of Baton Rouge And Parish Of East Baton Rouge, In Support Of: (I) Lead Plaintiffs' Motion For Final Approval Of Proposed Class Action Settlement And Plan Of Allocation; And (II) Lead Counsel's Motion For Attorneys' Fees And Litigation Expenses |
| C | Declaration Of Eric Miller Regarding (A) Mailing of the Settlement Notice and Proof of Claim Form; (B) Proof of Publication of the Summary Settlement Notice; and (C) Report On Requests For Exclusion And Objections Received To Date |
| D | Declaration Of David R. Kaplan In Support Of Lead Counsel's Motion For Attorneys' Fees And Litigation Expenses On Behalf of Saxena White P.A. |
| E | Declaration Of Jonathan D. Uslaner In Support Of Lead Counsel's Motion For Attorneys' Fees And Litigation Expenses On Behalf of Bernstein Litowitz Berger & Grossmann LLP |

We, David R. Kaplan and Jonathan D. Uslaner, of the law firms Saxena White P.A. ("Saxena White") and Bernstein Litowitz Berger & Grossmann LLP ("BLB&G"), respectively submit this declaration in support of Lead Plaintiffs' motion for final approval of the proposed Settlement with Defendants and approval of the Plan of Allocation, as well as Lead Counsel's motion for approval of attorneys' fees and litigation expenses.[1]

## I.     PRELIMINARY STATEMENT

1.     We are attorneys of our respective law firms: Saxena White and BLB&G (together, "Lead Counsel").  By Court appointment, BLB&G and Saxena White are Lead Counsel for the Lead Plaintiffs in the Action: City of Atlanta Police Pension Fund and City of Atlanta Firefighters' Pension Fund (collectively, the "Atlanta Funds") and the Employees' Retirement System of the City of Baton Rouge and Parish of East Baton Rouge ("Baton Rouge" and, together with the Atlanta Funds, the "Lead Plaintiffs").  ECF No. 41. We have personal knowledge of the matters set forth herein based upon our close supervision and active participation in the investigation, prosecution and settlement of the Action.

2.     On January 3, 2022, the Court granted preliminary approval of the proposed $18.25 million cash settlement with Defendants.  ECF No. 106.  Since then, the Court-approved Claims Administrator has notified potential members of the Settlement Class of the Settlement by mail in accordance with the Preliminary Approval Order.  Summary Notice was also published through *Investor's Business Daily* and over *PR Newswire*.

3.     On or about January 14, 2022, Defendants caused the $18.25 million Settlement Amount to be deposited into an escrow account for the benefit of the Settlement Class.

---

[1] When not defined herein, capitalized terms are defined in the Stipulation and Agreement of Settlement (ECF No. 105-1, the "Stipulation").

4.     The Court, having presided over this complex securities class action for over two years, is familiar with the claims and defenses asserted.  Accordingly, this declaration does not seek to detail each and every event that has occurred so far in the litigation.  Rather, it highlights certain pertinent events leading to the Settlement, and the basis upon which Lead Plaintiffs and Lead Counsel recommend its approval.

5.     The prosecution and settlement of this litigation required extensive efforts on the part of Lead Counsel over the past two years.  Among other things, Lead Counsel: (i) conducted an extensive factual investigation, including identifying, contacting, and interviewing over four dozen former employees of Merit, Cianna, and Vascular Insights with knowledge of the facts, overseen by senior attorneys of Lead Counsel together with highly experienced private investigators with decades of law enforcement and other relevant experience in the field; (ii) defeated Defendants' motion to transfer the Action to the U.S. District Court for the District of Utah; (iii) drafted the 98-page Complaint subject to the heightened pleading standards of the PSLRA; (iv) consulted with financial experts; (v) successfully opposed Defendants' motion to dismiss before Magistrate Judge Autumn D. Spaeth and this Court; (vi) conducted meaningful fact discovery, which included obtaining and methodically reviewing over a half-million pages of documents from Defendants and five non-parties parties that were directly involved in the underlying Cianna and ClariVein acquisitions; and (vii) prepared for and participated in a full-day mediation session and six weeks of continued settlement negotiations under the oversight of an experienced mediator.

6.     The Settlement represents an excellent recovery for the Class.  The $18.25 million Settlement Amount represents approximately 12% to 55% of the Settlement Class's maximum realistic trial damages, and far exceeds the reported average class-wide recovery in securities class actions.  The recovery is even more noteworthy when weighed against the risks of continued litigation.  As set forth more

fully below, Defendants had strong arguments and Lead Plaintiffs faced risks in establishing the core claim elements of falsity, materiality, scienter, loss causation, and damages to survive a motion for summary judgment and prevail at trial.

7.    While Lead Plaintiffs believe that they had strong responses to Defendants' arguments, there is no question that Defendants' arguments could easily have been accepted by this Court at summary judgment or by a jury at trial.  The potential recovery would be reduced dramatically—possibly to zero—if the Court or jury ultimately concluded that (i) Defendants' statements regarding the alleged misrepresentations were not false, material, or otherwise actionable; (ii) Lead Plaintiffs failed to establish that Defendants made the statements with scienter; or (iii) all or a portion of the stock price declines were not attributable to the alleged fraud.  Even a favorable jury verdict would have been subject to an inevitable and lengthy appeals process, the conclusion of which would have been highly uncertain.  Accordingly, even if Lead Plaintiffs had prevailed at trial, it is highly questionable as to whether Lead Plaintiffs would have recovered more than (or as much as) the substantial Settlement Amount.

8.    Considering these arguments and the other risks inherent in continued litigation, Lead Counsel respectfully submit that the Settlement represents an outstanding recovery for the Settlement Class that is supported by each of the factors that the Ninth Circuit advises courts to consider in the settlement approval process, as set forth in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998).  This is especially true given that the Settlement was obtained before a highly uncertain summary judgment, trial, and appeals process, as well as on order approving class certification, and thereby offers a certain, immediate, and substantial cash recovery for the Settlement Class.

9.    Moreover, the Parties reached an agreement to settle only (i) after the Court denied Defendants' motion to transfer and substantially denied Defendants'

motion to dismiss; (ii) after the parties had engaged in meaningful discovery; and (iii) after the Parties participated in arms'-length settlement negotiations and an all-day mediation session before a respected, independent, and experienced mediator, Michelle Yoshida, of Phillips ADR, one of the nation's preeminent mediation firms.

10.     Lead Plaintiffs meaningfully participated in the litigation, supervised Lead Counsel, remained informed throughout the settlement negotiations, and ultimately approved the Settlement.   Representatives of Lead Plaintiffs have submitted declarations attesting to their active participation in the Action and their approval of the Settlement.  *See* Ex. A at ¶¶ 3-9; Ex. B at ¶¶ 4-7.

11.     In addition to seeking the Court's final approval of the Settlement, Lead Plaintiffs seek approval of the proposed Plan of Allocation as fair and reasonable. In preparing the Plan of Allocation, Lead Plaintiffs consulted with their damages expert, Crowninshield Financial Research, Inc. ("Crowninshield"), a well-recognized firm of financial consulting professionals with extensive experience in preparing similar plans.  Under the proposed Plan of Allocation, the Net Settlement Fund will be distributed on a *pro rata* basis to members of the Settlement Class who timely submit valid proofs of claim based on their "Recognized Loss" amount as calculated pursuant to the Plan.

12.     Lead Counsel also requests an award of attorneys' fees for their efforts, which resulted in a substantial recovery for the Settlement Class in the face of significant risks, and for reimbursement of their litigation expenses.  Lead Counsel are applying for an attorneys' fee award of 30% of the Settlement Fund, and for reimbursement of litigation expenses in the amount of $104,686.68 to be paid from the Settlement Fund.  This Court has noted that a 30% fee award is the "norm" in similar class action settlements, including securities litigation.  *See In re Allergan, Inc. Proxy Violation Derivatives Litig.*, 2018 WL 4959014, at *1 (C.D. Cal. Aug. 13, 2018) (Carter, J.).  Lead Counsel's requested fee is well within the range of fees

routinely approved by courts in this Circuit and is amply supported by each of the factors set forth by the Ninth Circuit in *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048-50 (9th Cir. 2002).  The reasonableness of Lead Counsel's requested 30% fee is also confirmed by a lodestar cross-check, which yields a multiplier of 1.4, which is on the low end of the typical lodestar multiples ranging between one and four commonly awarded in complex securities class actions.

13.     This Declaration describes (a) the efforts undertaken by Lead Counsel to prosecute the Action; (b) the events leading up to the Settlement with Defendants; (c) the Settlement and the risks that Lead Plaintiffs and Lead Counsel considered in agreeing to the Settlement; (d) the Notice to members of the Settlement Class; (e) the proposed Plan of Allocation for the Settlement; and (f) Lead Plaintiffs' and Lead Counsel's fee and expense application.

## II.     PROSECUTION OF THE ACTION

### A.     Overview of the Allegations

14.     This is a securities class action asserting claims under the Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") against defendants Merit Medical Systems, Inc. ("Merit" or the "Company"), Merit's Chief Executive Officer, Fred Lampropoulos ("Lampropoulos"), and Merit's Chief Financial Officer, Raul Parra ("Parra") (collectively, "Defendants").

15.     The Complaint alleges that Defendants made materially false and misleading statements relating to two of Merit's recent acquisitions: (i) Cianna Medical, Inc. ("Cianna"), a manufacturer of devices for the treatment of breast cancer that was the largest acquisition in the Company's history; and (ii) ClariVein, a device for varicose vein treatment.  The Complaint further alleges that the price of Merit common stock was artificially inflated as a result of Defendants' alleged misstatements and declined when the truth was allegedly revealed.

16. As explained herein, Defendants vigorously denied that they violated the federal securities laws in connection with the allegations described above, and asserted myriad challenging defenses throughout this litigation in response to Lead Plaintiffs' claims.

**B. The Commencement of the Action and Appointment of Lead Plaintiffs**

17. On December 3, 2019, a class action complaint was filed in the U.S. District Court for the Central District of California against Defendants styled *Bucks County Employees Retirement Fund vs. Merit Medical Systems, Inc., et al.*, No. 8:19-cv-02326. ECF No. 1.

18. On February 3, 2020, the Atlanta Funds and Baton Rouge filed a joint motion for appointment as Lead Plaintiffs on behalf of the proposed class. ECF Nos. 33-35.

19. On February 24, 2020, the Court issued an Order appointing the Atlanta Funds and Baton Rouge as Lead Plaintiffs, approved Lead Plaintiffs' selection of Saxena White and BLB&G as Lead Counsel for the class, and recaptioned the case as *In re Merit Medical Systems, Inc. Securities Litigation*, No. 8:19-cv-02326 (the "Action"). ECF No. 41.

**C. The Motion to Transfer, Lead Plaintiffs' Continuing Investigation, and the Filing of the Complaint**

20. On March 23, 2020, Defendants filed a motion to transfer the Action to the United States District Court for the District of Utah, where Merit is headquartered. Lead Plaintiffs filed their opposition brief on April 13, 2020. Defendants filed their reply on April 27, 2020. ECF Nos. 44-45. On May 11, 2020, the Court denied Defendants' motion to transfer. ECF No. 49. In defeating the transfer motion, Lead Counsel extensively researched the identities and locations of fact witnesses likely to possess relevant knowledge, information, and documents

concerning the Cianna and ClariVein acquisitions, as well as the Company's post-acquisition performance and operations. The investigation included, among other things, property and asset searches of the Company's executives, including the Individual Defendants, and statements by Defendants reinforcing a nexus between Lead Plaintiffs' claims and this District. These investigatory efforts were instrumental in defeating Defendants' transfer motion. *See* ECF No. 49 at 4-6 (citing the convenience of non-party witnesses located in California and Lampropoulos's Newport Beach house in denying transfer).

21. Lead Counsel's investigation continued after the Court denied Defendants' transfer motion. Lead Counsel engaged in an extensive and ongoing investigation related to claims that Defendants' public statements contained materially false and misleading statements and omissions. The investigation was multi-faceted and included, among other things: (i) review and analysis of Merit's SEC filings, including financial statements, earnings announcements, and press releases; (ii) review and analysis of other relevant public statements made by Merit or its employees, including transcripts of investor conference calls and publicly available presentations by Merit; (iii) review and analysis of research reports by securities and financial analysts, media reports, and securities pricing data; (iv) consultations with experts concerning, among other things, the effect of the alleged fraud on Merit's stock price; and (v) identifying over seven hundred potential witnesses who previously worked at Cianna, ClariVein, and Merit before and during the Class Period, and subsequently interviewing over four dozen of them, including the sixteen percipient witnesses whose accounts are included in the Complaint.

22. On June 30, 2020, Lead Plaintiffs filed the 98-page Complaint. ECF No. 53.

### D. The Pleading Stage

23. On August 14, 2020, Defendants filed their motion to dismiss the Complaint. ECF No. 56. Lead Plaintiffs filed their opposition on September 28, 2020, and Defendants filed their reply on October 22, 2020. ECF Nos. 58, 60. Prior to the Court's ruling on the motion to dismiss, discovery was stayed pursuant to the PSLRA.

24. On March 3, 2021, the Court referred the motion to dismiss to Magistrate Judge Autumn D. Spaeth. ECF No. 67.

25. On March 16, 2021, Judge Spaeth issued a Report & Recommendation (the "R&R") recommending that the Court deny the motion in substantial part. ECF No. 68. Judge Spaeth found that Lead Plaintiffs adequately alleged that Defendants made materially false and misleading statements regarding the retention of Cianna's sales force, Cianna's integration, the strength of Cianna and ClariVein sales, ClariVein's guidance, and the risks regarding insurance reimbursement for ClariVein. *Id.* Judge Spaeth also found that Lead Plaintiffs presented sufficient allegations supporting a strong inference of Defendants' scienter, including allegations concerning: (1) the importance of the acquisitions to Merit's growth strategy; (2) senior executives' receipt of real-time sales information and attendance at meetings where the sales problems were discussed; and (3) senior executives' awareness of regulatory and reimbursement issues that presented a roadblock to sales. *Id.* Finally, Judge Spaeth found that Lead Plaintiffs sufficiently pleaded the element of loss causation. *Id.*

26. Defendants objected to the R&R on March 30, 2021, and Lead Plaintiffs responded to Defendants' objection on April 13, 2021. ECF Nos. 73, 76. On May 3, 2021, the Court issued an order accepting the R&R. ECF No. 77. On May 24, 2021, Defendants served and filed their Answers and Affirmative Defenses to the Complaint. ECF No. 83.

### E.    Discovery

27.    Pursuant to the PSLRA, discovery commenced upon the Court's denial of Defendants' motion to dismiss.  On May 26, 2021, Plaintiffs served Defendants with Lead Plaintiffs' First Set of Requests for Production of Documents to all Defendants ("RFPs"). On June 15, 2021, Plaintiffs served Defendants with Lead Plaintiffs' First Set of Interrogatories to all Defendants ("Interrogatories"). Defendants submitted their responses and objections to the RFPs and Interrogatories on June 25 and July 15, 2021, respectively, and provided supplemental responses to the Interrogatories on October 27, 2021.

28.    Between June 10, 2021 and August 10, 2021, Lead Plaintiffs served document subpoenas on five non-parties, including each of the investment banks that conducted due diligence in connection with the Cianna and ClariVein acquisitions, and Jill Anderson, Cianna's former CEO and current Merit independent director. Lead Plaintiffs received responses and objections to the subpoenas between June 29, 2021 and September 13, 2021.

29.    Between June 29, 2021 and November 5, 2021, Lead Plaintiffs exchanged numerous discovery correspondence with Defendants and the above-referenced third parties and engaged in multiple meet-and-confers in an attempt to reach an agreement on the scope of the document productions.

30.    In total, Lead Plaintiffs obtained over a half-million pages of documents from Defendants and non-parties in twelve separate productions over the course of approximately three months.  Lead Plaintiffs conducted a meaningful review of the documents produced, including through frequent discussions and regular "all-hands" meetings led by senior attorneys from Lead Counsel, to discuss the progress of the review, to gain a firm understanding of the strengths and weaknesses of the case, and to prepare for mediation and, if necessary, summary judgment and/or trial.  Lead Plaintiffs' document review focused on numerous key issues underlying the class's

claims and Defendants' defenses, including (i) Cianna sales (including by region, product, and individual salesperson), sales force retention, and systems integration; (ii) ClariVein regulatory approval, reimbursement by third-party payors, marketing efforts, and sales performance; and (iii) Defendant Lampropoulos's stock sales. Conducting this extensive and focused discovery required a substantial effort in order to effectively prepare for the Parties' October 5, 2021 mediation.

31.     Lead Counsel's review included detailed analyses of Defendants' internal spreadsheets, databases, presentations and reports, and other complex compilations of data.  To analyze and process this vast amount of information and identify critical documents in order to prepare their mediation statement and for the mediation session, Lead Counsel developed and implemented an effective and efficient discovery plan.  This plan leveraged a sophisticated electronic document hosting system and a dedicated team of attorneys experienced in electronic document discovery and deposition and trial preparation, as well as extensive use of forensic analysis tools overseen by the undersigned counsel.

## III.    THE SETTLEMENT

32.     The $18.25 million cash settlement (plus interest) was the result of arm's length negotiations between experienced counsel, conducted under the auspices of Michelle Yoshida, a highly qualified and well-respected independent mediator with extensive experience mediating securities class actions.   The Settlement provides the Settlement Class with an immediate and substantial benefit before trial and eliminates the very real risk of protracted litigation against Defendants under circumstances where a favorable recovery—or any recovery at all—could not be assured.   Lead Counsel believes that the Settlement is fair, reasonable, and an excellent result for the Settlement Class considering the risk of recovering a lesser amount, or nothing at all, after years of delay.

### A.  The Parties' Mediation Session and Settlement Negotiations

33.  The Parties first began earnestly exploring the possibility of a settlement in the fall of 2021, after Lead Plaintiffs largely overcame Defendants' motion to dismiss.  The Parties agreed to engage in private mediation and retained an experienced mediator, Michelle Yoshida of Phillips ADR.

34.  Pursuant to a schedule set by Ms. Yoshida, on September 24, 2021, the Parties exchanged their comprehensive mediation statements addressing the facts and law of the case, including, among other things, Defendants' challenges on the key issues of falsity, materiality, scienter, loss causation, and damages.

35.  Throughout the litigation, Defendants asserted, among other things, that their statements to investors were not false or misleading when made. Defendants argued that Lead Plaintiffs' Complaint mischaracterized Defendants' statements to investors, taking them out of context and excluding clarifying remarks. For example, with respect to the alleged false statements that Merit retained Cianna's salesforce, Defendants argued that Merit never represented that it had retained 100% of Cianna's sales force, but rather that it had kept "essentially" all of the salesforce and indicated there had been departures.  Defendants further argued that, in any event, the departures of four salespeople in a Company with thousands of employees did not render Lampropoulos's statements misleading.

36.  As to "materiality," Defendants argued that the challenged statements concerning the Cianna and ClariVein acquisitions were not material because the acquisitions had a negligible impact on Merit's overall 2019 financial results.  Merit issued overall 2019 revenue guidance between $1.01 billion and $1.03 billion and reported 2019 revenue of $994.85 million.  Merit reported that it missed the low end of its 2019 revenue projection by $16 million (1.5%) and the high end of its 2019 revenue projection by $36 million (3.5%), and only a fraction of the revenue miss was attributable to Cianna and ClariVein.  Defendants argued that missing revenue

projections by 1.5% to 3.5% is immaterial as a matter of Ninth Circuit law, and, moreover, that Lead Plaintiffs exaggerate the impact of Cianna and ClariVein products on Merit's 2019 revenue as Merit is a global company that sells hundreds of medical devices in the United States and around the world. Defendants also argued that Merit only missed its revenue guidance for Cianna and ClariVein by approximately $3 million—less than 0.3% of the low-end of the Company's total guidance range.

37.     As to "loss causation," Defendants argued that the declines in Merit's stock price on July 26, 2019 and October 31, 2019, the trading days after the alleged corrective disclosure dates, were caused by a variety of factors unrelated to the alleged fraud. These included, among other things, higher operating expenses, unfavorable currency exchange rates, lower-than-expected sales from the Company's Aspira and DFINE acquisitions, China tariffs, and unfavorable product mix.

38.     While Lead Plaintiffs had responses to Defendants' arguments, Lead Plaintiffs and Lead Counsel recognized that the Court or a jury could have accepted Defendants' arguments on falsity, materiality, or loss causation. If the Court or a jury were to accept any of Defendants' arguments on any of these elements—each of which is necessary for Lead Plaintiffs to establish in order to recover—the class would potentially recover nothing.

39.     Damages were also heavily disputed in the Action. Lead Plaintiffs retained Crowninshield to opine on damages in this case. Based on Crowninshield's expert analysis, Lead Plaintiffs estimated that if the Settlement Class prevailed through class certification, summary judgment, trial and appeals on all arguments concerning liability, loss causation, and damages, the absolute *maximum* theoretical class-wide damages were approximately $251 million, *before* accounting for *any* issues of loss causation. After accounting for issues of loss causation, Lead Plaintiffs

and their expert estimated the maximum realistic trial damages in this case were approximately \$153.0 million.

40. Defendants had meaningful arguments concerning loss causation in this matter that, if accepted by the Court or the jury, would materially decrease the amount of recoverable damages, well beyond Lead Plaintiffs' maximum damages estimate. Specifically, Defendants argued that Merit disclosed on the alleged corrective dates a variety of factors unrelated to Cianna or Vascular Insights that contributed to Merit's financial results and its decision to lower FY 2020 revenue guidance. Defendants cited a host of factors disclosed by the Company and discussed in analyst reports as contributing to the financial results and lowered guidance—such as foreign exchange headwinds, higher operating expenditures, and other factors—and argued that the majority of these extraneous factors were unrelated to the alleged misrepresentations and omissions that specifically concerned the Cianna and ClariVein acquisitions. If the Court or jury were to accept Defendants' loss causation arguments, the maximum realistic damages were approximately \$33.4 million, according to the analysis of Lead Plaintiffs and their damages expert. Accordingly, the \$18.25 million settlement represents a recovery of approximately 12% to 55% of maximum realistic trial damages.

41. The Parties' in-person mediation session with Ms. Yoshida took place on October 5, 2021. As discussed above, the mediation was preceded by the exchange of comprehensive mediation statements and exhibits, which were also provided to Ms. Yoshida. During the full-day mediation, the Parties extensively discussed the merits of the case, including liability and damages. The October 5 mediation did not, however, result in a settlement.

42. The Parties continued to engage in settlement discussions, under Ms. Yoshida's supervision, for approximately six weeks. When negotiations reached an impasse, Ms. Yoshida made a mediator's recommendation that the Parties settle the

Action for $18,250,000. The mediator's recommendation was made on a double-blind basis, meaning that if a Party rejected the recommendation they would not learn whether the other side had accepted or rejected the proposal. The Parties accepted Ms. Yoshida's mediator's recommendation on November 16, 2021.

43. On November 24, 2021, the Parties notified the Court that they had reached an agreement in principle to settle the Action. ECF No. 101.

44. On December 21, 2021, the Parties executed the Stipulation and Agreement of Settlement (ECF No. 105-1) (the "Stipulation") setting forth the full terms and conditions of the Settlement. That same day, the Parties also entered into a confidential Supplemental Agreement, which provides that Defendants shall have the option to terminate the Settlement if the number of Settlement Class Members who request exclusion from the Settlement Class exceeds a threshold negotiated by Lead Plaintiffs and Defendants.

45. On December 22, 2021, Lead Plaintiffs filed their motion for preliminary approval of the proposed Settlement, along with the Stipulation and related documents. ECF No. 105.

46. On January 3, 2022, the Court granted preliminary approval of the Settlement and authorized Notice for the proposed Settlement to be sent to potential members of the Settlement Class. ECF No. 106.

B. **Reasons for the Settlement**

47. Lead Plaintiffs and Lead Counsel fully endorse the Settlement. *See* Exs. A and B (Lead Plaintiff Declarations) attached hereto. Lead Plaintiffs are the Court-appointed Class representatives and sophisticated institutional investors who have actively overseen the prosecution of this Action and who understood their fiduciary duty to act in the best interest of the Settlement Class.

48. Lead Counsel are law firms that specializes in complex securities class action litigation, and are highly experienced in such litigation. *See* Exs. D-4 and E-

3 (Saxena White and BLB&G firm resumes). Based on their experience and knowledge of the facts and applicable law in this Action, Lead Counsel and Lead Plaintiffs have determined that the Settlement is in the best interest of the Settlement Class.

49. Although Lead Plaintiffs and Lead Counsel believe that the claims asserted in this action are meritorious, continued litigation against Defendants posed significant risks that made any recovery from them uncertain. For example, as discussed above, Lead Plaintiffs were aware of the significant challenges Defendants could raise on each of the key issues of falsity, materiality, scienter, loss causation, and damages. Although Lead Plaintiffs were successful at the motion to dismiss stage, these risks remained at every stage of the litigation—on summary judgment, at trial, and on appeal.

50. Lead Plaintiffs and Lead Counsel also understood that Defendants disputed the amount of any damages. They recognized that Defendants would present evidence from their damages expert that maximum possible damages were far below the maximum aggregate damages Lead Plaintiffs' expert had calculated. This conflicting expert testimony would result in a "battle of the experts" at summary judgment and trial with no certainty as to which of the experts the jury would credit. Thus, there were very significant risks attendant to the continued prosecution of the Action against Defendants.

51. Had any of Defendants' arguments been accepted in whole or in part, any potential recovery would have been dramatically limited or completely eliminated. Moreover, Lead Plaintiffs would have had to prevail against Defendants on these and other issues at summary judgment and trial, and even if they prevailed at those stages, on the appeals that would most assuredly follow. Furthermore, to advance to summary judgment or trial, Lead Plaintiffs would have had to prevail in obtaining an order from the Court certifying the case as a class action pursuant to

Rule 23(c).

52.     The Settlement eliminates these substantial risks and guarantees the Settlement Class a favorable cash recovery.  Lead Counsel firmly believe that settling the Action with Defendants at this stage of the litigation is in the best interest of the Settlement Class.

### C.      Notice to the Settlement Class

53.     As required by the Court's Preliminary Approval Order, beginning on January 21, 2022, Lead Plaintiffs, through the Court-approved Claims Administrator A.B. Data, Ltd. ("A.B. Data"), notified potential members of the Settlement Class of the Settlement by mailing a copy of the Notice and Claim Form (together, the "Notice Packet") to potential members of the Settlement Class and their nominees. *See* Ex. C, (Declaration of Eric J. Miller, hereafter "A.B. Data Declaration").

54.     A.B. Data used several resources of data to reasonably identify members of the Settlement Class.  For example, under the Preliminary Approval Order, Merit was required to provide A.B. Data records reasonably available to Merit or its transfer agent concerning the identity and last known address of Settlement Class members.

55.     The Preliminary Approval Order also required brokers/nominees, to either: (a) within seven (7) calendar days of receipt of the Notice, request from the Claims Administrator sufficient copies of the Notice Packet to forward to all such beneficial owners and within seven (7) calendar days of receipt of those Notice Packets forward them to all such beneficial owners; or (b) within seven (7) calendar days of receipt of the Notice, send a list of the names, mailing addresses, and, if available, email addresses, of all such beneficial owners to the Claims Administrator in which event the Claims Administrator shall promptly mail or email the Notice Packet to such beneficial owners.  A.B. Data Declaration at ¶ 6.

56.     In connection with the proposed Settlement, A.B. Data received a list of the record shareholders of Merit common stock during the Class Period from Merit, and mailed copies of the Notice and Claim Form (the "Notice Packet") to the 100 shareholders on that list.  A.B. Data Declaration at ¶ 3.  A.B. Data also mailed the Notice Packet to a list of 4,149 nominees contained in its proprietary nominee database; mailed 9,026 copies of the Notice Packet to potential Settlement Class Members whose names and addresses were received from individuals or nominees; mailed 12,555 Notice Packets to nominees who requested Notice Packets to forward to their customers.  *Id.* at ¶¶ 4-7.  As of March 8, 2022, A.B. Data had mailed a total of 25,830 Notice Packets to potential Settlement Class Members and nominees.  *Id.* at ¶ 8.

57.     A.B. Data also published the Summary Notice in *Investor's Business Daily* and over *PR Newswire* on February 7, 2022 (*id.* at ¶ 9); maintained a website, at www.MeritMedicalSecuritiesLitigation.com, which went "live" on January 21, 2022 (*id.* at ¶¶ 10-11); and maintained call center services (*id.* at ¶ 12). Copies of the Stipulation, Notice, Claim Form, and Preliminary Approval Order were also made available on Lead Counsel's websites, www.saxenawhite.com and www.blbglaw.com.

58.     This method of giving notice, previously approved by the Court, is appropriate because it constitutes "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort," Fed. R. Civ. P. 23(c)(2)(B) and directs notice in a "reasonable manner to all class members who would be bound by the propos[ed settlement]." Fed. R. Civ. P. 23(e)(1)(B).

59.     The Notice advises members of the Settlement Class of the essential terms of the Settlement, sets forth the procedure for objecting to or opting out of the Settlement, and provides specifics on the date, time and place for the final approval

hearing.

60.     The Notice also contains information regarding Lead Counsel's fee and expense application and the proposed plan of allocating the Settlement proceeds among members of the Settlement Class.

61.     As explained in the accompanying memorandum of law in support of final approval of the Settlement, the Notice fairly apprises members of the Settlement Class of their rights with respect to the Settlement, and therefore is the best notice practicable under the circumstances, and complies with the Court's Preliminary Approval Order, Federal Rule of Civil Procedure 23, and due process.

62.     In addition, Lead Counsel were informed that Defendants caused the notice contemplated by the Class Action Fairness Act of 1995 ("CAFA") to be served by letter dated December 30, 2021.

63.     The Preliminary Approval Order established that the deadline for Settlement Class Members to file objections to the Settlement, Plan of Allocation, or Lead Counsel's motion for attorneys' fees and litigation expenses, or to request exclusion from the Settlement Class would be March 23, 2022.  As of March 8, 2022, no requests for exclusion from the Settlement Class, *see* A.B. Data Decl. at ¶ 13, and no objections to the Settlement, Plan of Allocation, or Lead Counsel's motion for fees and expenses have been received.  Lead Counsel will file reply papers on or before April 6, 2022, which will address any requests for exclusion and objections that may be received.

### D.     The Plan of Allocation

64.     Lead Plaintiffs have proposed a plan to allocate the proceeds of the Net Settlement Fund among members of the Settlement Class who submit valid proofs of claim.  The objective of the proposed Plan of Allocation (the "Plan") is to equitably distribute the Settlement proceeds, on a *pro rata* basis, to those members of the Settlement Class who suffered economic losses as a result of Defendants'

alleged misrepresentations and omissions.

65. Lead Plaintiffs utilized analyses of their damages expert, Crowninshield, to assist in formulating the Plan. Lead Plaintiffs' expert calculated the amount of estimated artificial inflation in the per share closing prices of Merit common stock that was allegedly proximately caused by Defendants' false and misleading statements. In so doing, Lead Plaintiffs' expert considered price changes in Merit common stock in reaction to the alleged corrective disclosures, adjusting for any price changes attributable to market or industry forces or that would likely have been attributed to non-fraud-related confounding information released on the same days, including the factors described above.

66. The Notice set forth and explained the proposed Plan of Allocation to members of the Settlement Class. It was prepared in consultation with Lead Plaintiffs' expert, tracks a theory of damages asserted by Lead Plaintiffs, is substantially similar to numerous other plans that have been approved in this District and around the country, and is fair, reasonable, and adequate to the Settlement Class as a whole.

67. In response to 25,830 Notices, there have been no objections to date to the proposed Plan of Allocation.

## IV.  LEAD COUNSEL'S MOTION FOR ATTORNEYS' FEES AND LITIGATION EXPENSES

68. For their efforts on behalf of the Settlement Class, Lead Counsel are applying for a fee of 30% of the Settlement Fund (*i.e.*, $5,475,000, plus interest accrued at the same rate as on the Settlement Fund), to be paid from the Settlement Fund. Lead Counsel also request reimbursement of $104,686.68 in litigation expenses, to also be paid from the Settlement Fund.

69. In determining whether a requested award of attorneys' fees is fair and reasonable, district courts are guided by the factors enumerated in *Vizcaino v.*

*Microsoft Corp.,* 290 F.3d 1048-50 (9th Cir. 2002), which include: (i) the results achieved; (ii) the risk of litigation; (iii) the skill required and the quality of work; (iv) the contingent nature of the fee and the financial burden carried; and (v) awards made in similar actions.

70.    Based on consideration of these factors, and on the additional legal authorities set forth in the accompanying memorandum of law in support of Lead Plaintiffs' motion for attorneys' fees and reimbursement of Litigation Expenses (the "Fee Memorandum"), filed contemporaneously herewith, Lead Counsel respectfully submit that their requested 30% fee should be granted.

## A.    Lead Counsel's Motion for Attorneys' Fees

### 1.    The Result Achieved Supports a 30% Fee Award

71.    For their extensive efforts on behalf of the Settlement Class, Lead Counsel are applying for compensation from the Settlement Fund on a percentage basis.  As set forth in the Fee Memorandum, the percentage method is the preferred method of fee recovery in the Ninth Circuit because, among other things, it aligns the attorneys' interest in being paid a fair fee with the interest of the Settlement Class in achieving the maximum recovery efficiently and in the shortest amount of time. Indeed, use of the percentage fee method to calculate attorneys' fees in common fund cases represents the overwhelming practice in the Ninth Circuit and in other circuits.

72.    Based on the extent and quality of work Lead Counsel performed, the highly favorable result Lead Counsel achieved for the Settlement Class before trial, and the risks of the litigation and the contingent nature of the representation, Lead Counsel respectfully submits that a 30% fee award is justified and should be approved.  As this Court has noted, a "30% award is the norm" in the Ninth Circuit, including in securities class action litigation. *Allergan*, 2018 WL 4959014 at *1; *see also Pokorny v. Quixtar Inc.,* 2013 WL 3790896, at *1 (N.D. Cal. July 18, 2013)

(Conti, J.) (same); *Schulein v. Petroleum Dev. Corp.*, 2015 WL 12762256, at *1 (C.D. Cal. Mar. 16, 2015) (same); *Burnthorne-Martinez v. Sephora USA, Inc.*, 2018 WL 5310833, at *2 (N.D. Cal. May 16, 2018) (same); *Ford v. CEC Ent. Inc.*, 2015 WL 11439033, at *5 (S.D. Cal. Dec. 14, 2015) (same); *see also Cunha v. Hansen Nat. Corp.*, 2015 WL 12697627, at *6 (C.D. Cal. Jan. 29, 2015) ("[A]bsent extraordinary circumstances that suggest reasons to lower or increase the percentage, the rate should be set at 30%.").

73.     Lead Counsel respectfully submit that the work they completed in prosecuting this case, and arriving at the successful Settlement, has been both time-consuming and challenging.  As explained above, litigation against Defendants posed substantial risks that made any recovery against them uncertain.  In the face of those risks, Lead Counsel took this case on a contingent basis, committed significant resources to the prosecution of the Action, and investigated and litigated the Action for over two years without any compensation or guarantee of success against Defendants.  Despite this, Lead Counsel successfully obtained a recovery of $18.25 million, or approximately 12% to 55% of the estimated realistic trial damages—a rate of recovery that far exceeds that of comparable securities class actions.  Class Members will enjoy the benefit of the Settlement immediately while avoiding the credible prospect of obtaining no recovery at all.

### 2.     The Risks of Litigation

74.     Lead Counsel undertook this Action on a wholly contingent basis.  Lead Counsel understood, from the outset, that they were embarking upon a complex and expensive litigation with no guarantee of compensation for the investment of time, money, and effort that a case of this size would undoubtedly require.  Lead Counsel also anticipated that Defendants would raise myriad challenges to the sufficiency of the pleadings and to Lead Plaintiffs' ability to prove liability and damages.  Further, had the litigation continued, Defendants would have continued to dispute essentially

all elements of the claims during all phases of the litigation, including on class certification, summary judgment, at trial, and on appeal.

75. In undertaking the responsibility for prosecuting the action, Lead Counsel needed to ensure that sufficient attorney resources were dedicated to the investigation of the claims, and that sufficient resources were available to advance the expenses required to pursue and complete such a complex litigation. Lead Counsel, in total, incurred $104,686.68 in expenses prosecuting this Action for the benefit of the Settlement Class.

76. Significantly, Lead Counsel bore the risk that they would obtain no recovery at all. As discussed herein, this case presented a number of significant risks and uncertainties which could have eliminated the possibility of any recovery against Defendants. Indeed, despite the vigorous and competent efforts of Lead Counsel, success in contingent-fee complex litigation such as this is never certain.

### 3. The Skill Required and Quality of Work

77. Lead Counsel completed considerable work to prepare allegations they believed would be sufficient to overcome summary judgment and be successful at trial. To accomplish this, Lead Counsel conducted an extensive investigation, including, as stated above, review and analysis of all publicly available information concerning Merit; identifying over seven hundred former employees of Merit, Cianna, and Vascular Insights and interviewing over four dozen of them, including percipient witnesses with direct knowledge of the facts alleged; consulting with experts on the specialized issues of loss causation and damages; and obtaining over a half-million pages of documents produced by Defendants and five third parties that directly bore on key issues in the case.

78. Lead Counsel also committed substantial time and resources to, among other things, conducting extensive legal and factual research necessary to defeat Defendants' motion to transfer this Action to their preferred forum; drafting and

filing the 98-page Complaint; successfully defeating Defendants' motion to dismiss (essentially briefing the motion twice, once before this Court and once before Magistrate Judge Spaeth); preparing a comprehensive mediation statement; preparing materials in response to Defendants' equally comprehensive mediation statement; engaging and conferring with experts; researching the applicable law related to Lead Plaintiffs' claims and key issues in the case, including Defendants' potential defenses; engaging in hard-fought settlement negotiations with experienced defense counsel who vigorously disputed several key issues in the case; and drafting and negotiating the Stipulation and preparing related documents.

79.    As shown by Lead Counsel's firm resumes (*see* Ex. 4 to Ex. D and Ex. 3 to Ex. E), Lead Counsel's attorneys are experienced and skilled class action securities litigators with a successful track record in securities cases across the country—including before this Court, other courts in the Central District of California, and elsewhere within the Ninth Circuit.

80.    Defendants here were represented by King & Spalding LLC, a global and highly-respected defense firm with extensive experience litigating complex securities class actions.  Defendants' counsel prepared a vigorous defense for their clients, and yet, in the face of this knowledgeable and formidable defense, Lead Counsel was able to develop a case that was sufficiently strong to persuade Defendants to settle on highly favorable terms prior to class certification, summary judgment, and trial.

### 4.    The Contingent Nature of the Fee and Financial Burden

81.    Courts have repeatedly recognized that it is in the public interest to have experienced and qualified counsel privately enforce the securities laws.  Lead Counsel took this case on a contingency basis, committing their resources, investigating, and litigating it for over two years, without any compensation or guarantee of success, a factor which supports the requested fee.

### 5.    Awards in Similar Actions

82.    As this Court has explained, "[t]he Ninth Circuit uses a 25% benchmark in common fund class actions, and 'in most common fund cases, the award exceeds that benchmark,' with a 30% award the norm 'absent extraordinary circumstances that suggest reasons to lower or increase the percentage.'"  2018 WL 4959014, at *1 (quoting *In re Omnivision Techs. Inc.*, 559 F. Supp. 2d 1036, 1047-48 (N.D. Cal. 2007); *Pokorny*, 2013 WL 3790896, at *1 (same).  Lead Counsel respectfully submit that no such "extraordinary circumstances" exist here warranting any lowering below the "norm" percentage.

83.    Consistent with the foregoing precedent by this Court, the fee amount requested by Lead Counsel here is in line with the range of fee awards approved by other courts within this District and Circuit in complex common-fund cases involving comparably sized, as well as smaller, settlements.  *See, e.g., See In re Silver Wheaton Corp. Sec. Litig.*, 2020 WL 4581642, at *4 (C.D. Cal. Aug. 6, 2020) (awarding 30% of $41.5 million settlement); *In re Banc of Cal. Sec. Litig.*, 2020 WL 1283486, at *1 (C.D. Cal. Mar. 16, 2020) (awarding 33% of $19.75 million settlement); *Turocy v. El Pollo Loco Holdings, Inc.*, No. 8:15-cv-01343-DOC-KES, slip op. at ¶ 4 (C.D. Cal. Aug. 27, 2019) (awarding 30% of $20 million settlement) (Carter, J.); *Cheng Jiangchen v. Rentech, Inc.*, 2019 WL 5173771, at *7 (C.D. Cal. Oct. 10, 2019) (awarding one-third of $2.05 million settlement); *In re CytRx Corp. Sec. Litig.*, 2018 WL 8950655, at *1 (C.D. Cal. Sept. 17, 2018); (awarding 30% of $5.75 million settlement); *Avila v. LifeLock Inc.*, 2020 WL 4362394, at *1 (D. Ariz. July 27, 2020) (30% fee award of $20 million settlement was "fair and reasonable").

### 6.    Lead Plaintiffs' Approval and the Reaction of the Settlement Class to Date

84.    Lead Plaintiffs are sophisticated institutional investors with extensive experience in successfully serving as lead plaintiffs in complex securities class

actions. They wholly endorse the Settlement and Lead Counsel's request for an attorneys' fee award of 30% of the Settlement Fund. *See* Ex. A, at ¶¶ 10-12; Ex. B. at ¶¶ 7-9. Moreover, as set forth above, 25,830 Notices have been disseminated to potential members of the Settlement Class and their nominees. In addition, the Summary Notice was published in *Investor's Business Daily* and over the *PR Newswire*. The Notice explains the Settlement and that Lead Counsel would seek fees of up to 30% of the Settlement Fund. The deadline to object to Lead Counsel's fee request is March 23, 2022. To date, no member of the Settlement Class has objected.

### 7.    A Lodestar Cross-Check Confirms that Lead Counsel's Requested Fee is Reasonable

85.    As described in the Fee Memorandum, the reasonableness of Lead Counsel's requested fee may be verified by the lodestar "cross-check." Attached hereto as Exhibits D and E are declarations from Lead Counsel in support of an award of attorneys' fees and Litigation Expenses, which include schedules detailing each Lead Counsel firm's lodestar amount (by showing each specific timekeeper, title, time, hourly rate and lodestar), as well as the expenses incurred, listed by category.

86.    As set forth in Exhibits D and E, Lead Counsel expended a total of 6,553.5 hours in the prosecution and investigation of this action up through March 4, 2022. The resulting lodestar is $3,807,351.25. In light of this, the requested fee of 30% of the Settlement Fund, or $5,475,000 (plus interest), yields a lodestar multiplier of 1.4. Such a multiplier, which is significantly lower than the multipliers usually awarded by courts in this Circuit in comparable securities class actions, is fair and reasonable based upon the significant risks in this litigation against Defendants, and by Lead Counsel's substantial efforts to obtain the highly favorable Settlement. Lead Counsel obtained this successful Settlement after defeating

Defendants' transfer motion, continued success at the motion to dismiss stage, in the midst of heavy document discovery, and before briefing class certification, sparing the Settlement Class from significant risks and years of delays caused by protracted and uncertain litigation.

87.    As stated in Exhibits D and E, the lodestar summaries were prepared from daily time records regularly prepared and maintained in the ordinary course of business.  Lead Counsel's hourly rates are the comparable to rates submitted by comparable firms for lodestar cross-checks in other securities class action fee applications that have been granted in this Circuit.  *See, e.g.*, *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *14 (N.D. Cal. Dec. 18, 2018) (in securities class action settled in 2018, finding rates ranging "from $650 to $1,250 for partners or senior counsel, from $400 to $650 for associates, and from $245 to $350 for paralegals" to be reasonable); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 1047834, at *5 (N.D. Cal. Mar. 17, 2017) (approving fee award following lodestar cross-check where hourly "rates rang[ed] from $275 to $1600 for partners, $150 to $790 for associates, and $80 to $490 for paralegals").

88.    Additionally, as shown in Exhibits D-4 and E-3 (Lead Counsel's firm biographies), many of the firms' attorneys—at all levels— have worked for Lead Counsel for years, and have extensive experience in securities class action litigation. Each attorney that prosecuted this action performed substantive work that directly benefitted the Settlement Class.  The time spent by each attorney was reasonable, non-duplicative, beneficial to effective and efficient litigation, and was important to Lead Counsel's and Lead Plaintiffs' ability to understand the strengths and weaknesses of the case in order to negotiate intelligently and evaluate the Settlement, which ultimately led to the successful and favorable resolution of the case.

**B.** **Lead Counsel's Motion for Reimbursement of Litigation Expenses**

89.    Lead Counsel also request $104,686.68 for litigation expenses reasonably and necessarily incurred in prosecuting this Action, to be paid from the Settlement Fund.

90.    As stated above, from the outset of the case, Lead Counsel were aware that they might not recover any of their expenses, and, at the very least, would not recover anything until the Action was successfully resolved (whether through trial and appeals or settlement).  Lead Counsel also understood that, even if the case were ultimately successful, an award of expenses would not compensate Lead Counsel for the lost use of the funds advanced to prosecute this Action.  Thus, Lead Counsel were motivated to, and did, take significant steps to minimize expenses whenever practicable without jeopardizing the vigorous prosecution of the Action.

91.    Lead Counsel's expenses were necessary and appropriate for the prosecution of this Action.  They include reasonable and customary charges for consulting experts, mediation costs, computer research, travel and lodging expenses to attend the in-person mediation, printing and photocopying, postal and express mail charges, filing fees, and similar case-related costs.  *See* Exhibits D and E.

92.    Because of the complex issues presented by this case and to fully prepare for an informed and productive mediation session in order to achieve a fair and reasonable settlement, Lead Counsel were required to utilize the services of experts.  Specifically, Lead Counsel coordinated and consulted with Crowninshield, a highly experienced damages expert, to prepare for the mediation.  Crowninshield's work, including its complex analyses of loss causation and damages, were also instrumental in the development of the Plan of Allocation.  In addition, Lead Counsel consulted and coordinated with Financial Markets Analysis, LLC, another highly experienced damages expert, to assist in the preparation of the Complaint and, to a limited extent, for further assistance in preparing for the mediation and evaluating

certain defenses.

93. Lead Counsel also incurred significant expenses associated with establishing and maintaining a document database to process and review the substantial amount of documents produced in this Action, and related litigation support costs. This allowed Lead Counsel to efficiently locate and categorize documents based on, among other things, relevance, issue, and significance, incorporate probative facts and information in Lead Plaintiffs' mediation statement and related submissions, and for potential use in depositions, summary judgment, and trial. In addition, these litigation support costs allowed Lead Counsel to run sophisticated forensic evaluations and analytics on ESI produced by Defendants and non-parties, and evaluate actual or potential gaps in their productions. These expenses are a necessary part of litigation of this magnitude and scale and were essential to enable Lead Counsel to achieve the results now before the Court—the $18.25 million Settlement. Furthermore, Lead Counsel conducted a review of market rates charged for the similar services performed by third-party document management vendors and found that its rate was at least 80% below the market rates charged by these vendors, resulting in savings to the Settlement Class.

94. Lead Counsel's total application for Litigation Expenses of $113,578.69 (including Lead Counsel's $104,686.68 and $8,892.01 for Lead Plaintiffs' costs and expenses, discussed below) is significantly less than the upper limit of $250,000 contained in the Notice mailed to the Settlement Class, a fact that further supports approval. As noted above, in response to the dissemination of 25,830 Notices, to date, no objections have been received to Lead Counsel's motion for Litigation Expenses.

95. Approval of the Settlement is independent from approval of Lead Counsel's Motion for Attorneys' Fees and Litigation Expenses. Accordingly, any determination with respect to Lead Counsel's fee and expense award will not affect

the Settlement, if approved.

### C.   Lead Plaintiffs' Reimbursement Request

96.   In accordance with the PSLRA, the Atlanta Funds and Baton Rouge seek reimbursement of their reasonable costs and expenses incurred directly in connection with their representation of the Settlement Class, in the total amount of $8,892.01.   The amount of time and effort devoted to this Action by the representatives of Lead Plaintiffs—who expended considerable time and effort in actively supervising the litigation over a multi-year period, including by reviewing significant pleadings and filings in the case, communicating with Lead Counsel and receiving regular status updates concerning the litigation, and participating in settlement discussions—is detailed in the accompanying Lead Plaintiff Declarations. Exs. A and B (Lead Plaintiff Declarations).

97.   Lead Plaintiffs respectfully submit that the reimbursement requested is fully consistent with congressional intent, as expressed in the PSLRA, of encouraging institutional and other highly experienced plaintiffs to take an active role in bringing and supervising actions of this type.   As set forth in the Lead Plaintiff Declarations, the Atlanta Funds and Baton Rouge have throughout the litigation of the Action been fully committed to pursuing the interests of the Settlement Class. Lead Plaintiffs have actively and effectively complied with all obligations attendant to serving as lead plaintiffs that arose during the litigation and settlement of this Action.   Lead Plaintiffs' efforts are precisely the type of activities that courts have found to support reimbursement to class representatives, and fully support Lead Plaintiffs' request for reimbursement.

### V.   CONCLUSION

98.   For all the reasons discussed above, Lead Plaintiffs and Lead Counsel respectfully submit that the Settlement and the Plan of Allocation should be approved as fair, reasonable, and adequate.   Lead Counsel further submit that the

requested fee in the amount of 30% of the Settlement Fund should be approved as fair and reasonable, and the request for reimbursement of total litigation costs and expenses, including awards to Lead Plaintiffs, in the total amount of $113,578.69 should also be approved.

We declare, under penalty of perjury, that the foregoing facts are true and correct under the laws of the United States of America.
Executed this 9th day of March, 2022.

*/s/  David R. Kaplan*          */s/  Jonathan D. Uslaner*
David R. Kaplan          Jonathan D. Uslaner